UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CRIMINAL NO. _____ |
| Plaintiff, | |
| | VIOLATION: 18 U.S.C. § 371 and 15 U.S.C. § 78dd-1 |
| v. | (Conspiracy and Foreign Corrupt Practices) |
| OUSAMA M. NAAMAN, | UNDER SEAL |
| Defendant. | |

**INDICTMENT**

The Grand Jury charges:

GENERAL ALLEGATIONS

At all times material to this Indictment, unless otherwise alleged:

1. The Foreign Corrupt Practices Act of 1977 ("FCPA"), as amended, Title 15, United States Code, Sections 78dd-1, *et seq.*, was enacted by Congress for the purpose of, among other things, making it unlawful for certain classes of persons and entities to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value to a foreign government official for the purpose of securing any improper advantage, or of obtaining or retaining business for, or directing business to, any person.

*Relevant Entities and Individuals*

2. Parent Company ("Parent"), was a Delaware company with executive offices in the United Kingdom. Parent was engaged in the manufacture and sale of gasoline additives, including tetraethyl lead ("TEL"), which is used in the refining of leaded gasoline and some types of jet fuel. Parent issued and maintained a class of publicly-traded securities registered pursuant

to Section 12(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78l), which were traded on the NASDAQ after March 22, 2006. Prior to March 22, 2006, Parent's securities were traded on the New York Stock Exchange. As such, Parent was required to file periodic reports with the United States Securities and Exchange Commission under Section 13 of the Securities Exchange Act (15 U.S.C. § 78m). Accordingly, Parent was an issuer organized under the laws of the United States, within the meaning of the FCPA, 15 U.S.C. § 78dd-1(a) and (g).

3. Subsidiary Company ("Subsidiary"), a wholly-owned subsidiary of Parent incorporated in Switzerland, also manufactured and sold TEL. Subsidiary was headquartered in Zug, Switzerland, and maintained a manufacturing plant in the Federal Republic of Germany.

4. The Iraqi Ministry of Oil ("MoO") and its component refineries and directorates were customers of Parent and Subsidiary. MoO, including all its refineries, was a department, agency, and instrumentality of the Government of the Republic of Iraq within the meaning of the FCPA, 15 U.S.C. § 78dd-1(f)(1)(A).

5. The defendant, OUSAMA M. NAAMAN, a Lebanese/Canadian dual national, acted as the agent for Parent and Subsidiary in Iraq and elsewhere beginning in at least 1995 and maintained his principal offices in Abu Dhabi, United Arab Emirates. On behalf of Parent and Subsidiary, NAAMAN negotiated contracts with the MoO to provide TEL to the oil refineries operating in Iraq. Interact S.A.R.L. and Tawam Commercial Est. ("defendant's companies") were companies controlled by NAAMAN, which were used to facilitate the payment of bribes to and for the benefit of officials of the MoO.

6. "Executive," a British citizen, was a senior executive of Parent until in or around April 2005.

7. "Employee A," a German citizen, was the General Manager of Subsidiary.

8. "Employee B," a British citizen, was a division managing director for Parent.

*The United Nations Oil-for-Food Program*

9. On or around August 6, 1990, days after Iraq's invasion of Kuwait, the U.N. adopted Security Council Resolution 661, which prohibited U.N. member states from transacting business with Iraq, except for the purchase and sale of humanitarian supplies. Resolution 661 prohibited virtually all direct financial transactions with the government of Iraq.

10. On or around April 15, 1995, the U.N. adopted Security Council Resolution 986, which provided a limited exception to the Iraq sanctions regime in that it allowed Iraq to sell its oil. However, Resolution 986 required that the proceeds of oil sales be used by the Iraqi government to purchase humanitarian supplies for the Iraqi people, including food and equipment to maintain and service Iraq's oil sector. Hence, this program became known as the Oil for Food Program. Payments made to the Iraqi government which were not approved by the U.N. and which were outside the strict contours of the OFFP were prohibited.

11. The rules of the OFFP required that the proceeds from all sales of Iraqi oil be deposited into a U.N.-controlled escrow account at the New York branch of Banque Nationale de Paris ("BNP-Paribas"). That escrow account funded the purchase of humanitarian goods by the Iraqi government.

12. Under the provisions of the OFFP, a supplier of humanitarian goods contracted with a ministry or other department of the Iraqi government to sell goods to the Iraqi government. Once that contract was finalized, the contract was submitted to a U.N. Committee ("the 661 Committee") which reviewed the contracts to ensure that their terms complied with all OFFP

and Iraqi sanction regulations. The 661 Committee accepted the contracts, rejected them, or asked the supplier to provide additional information upon which the committee could make a decision.

13. If a contract was approved by the 661 Committee, a letter of credit was issued by the New York branch of BNP-Paribas to the supplier's bank stating that the supplier would be paid by the OFFP for the relevant goods once certain conditions were met, including delivery of the goods to Iraq and inspection of the goods by a U.N. contractor. Once those conditions were deemed by the U.N. to have been met, the U.N. would direct BNP-Paribas to release payment to the supplier.

14. On or around December 10, 1996, the first Iraqi oil exports under the OFFP began. The OFFP continued from in or around December 1996 until the United States invasion of Iraq on or around March 19, 2003. From in or around December 1996 through March 2003, the United States government prohibited United States companies and individuals from engaging in transactions with the government of Iraq, unless such transactions were authorized by the U.N. pursuant to the OFFP. 31 C.F.R. § 575.201, *et seq.*

15. Beginning in approximately August 2000, the Iraqi government demanded that suppliers of humanitarian goods pay a kickback, usually valued at 10% of the contract price, to the Iraqi government in order to be awarded a contract by the government. These kickbacks violated U.N. OFFP regulations and U.N. sanctions which prohibited payments to the Iraqi government which were not expressly approved by the U.N. and which were not contemplated by OFFP guidelines.

16. Often, these kickbacks were termed "after sales service fees" ("ASSFs"). They did not, however, involve the performance of any actual service by the supplier. Typically, these ASSFs were included in the contract price submitted by the supplier to the U.N. without disclosing to the U.N. the fact that the contract contained an extra 10% which would be kicked back to the Iraqi government. Including the 10% in the submitted contract price allowed the supplier to avoid paying the 10% out of its profits; instead, the suppliers caused the U.N., unknowingly, to fund the kickbacks to the Iraqi government.

17. In many cases, during or after contract negotiations, the Iraqi government asked the supplier to sign an auxiliary contract, usually called a "side letter," memorializing the supplier's commitment to pay the ASSFs. These side letters usually stated explicitly that the supplier agreed to pay a set amount, approximately 10% of the contract price, to the Iraqi government in advance of the arrival of the goods in Iraq.

18. Some suppliers described the ASSFs as such in the contracts submitted to the U.N. for approval, thereby leading the U.N. to believe that actual after-sales services were being provided by the supplier. Other suppliers disguised the ASSFs by inserting fictitious line items into the contracts for goods or services that were not being provided. Still other suppliers simply inflated their contract prices by 10% to account for the payments they would make, or cause to be made, to the Iraqi government.

## COUNT ONE
## (Conspiracy, 18 U.S.C. § 371)

### THE CONSPIRACY AND ITS OBJECTS

19. Paragraphs 1 through 18 of this Indictment are realleged and incorporated by reference as if set out in full.

20. From in or around March 2001, through in or around June 2008, in the District of Columbia and outside the jurisdiction of any particular state or district, NAAMAN and others, known and unknown to the Grand Jury, did unlawfully and knowingly combine, conspire, confederate, and agree to commit the following offenses against the United States:

   a. to knowingly devise, and intend to devise a scheme and artifice to defraud the United Nations and the Oil-for-Food Program, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, through the use of interstate and foreign wire communications, in violation of Title 18, United States Code, Section 1343;

   b. to knowingly falsify and cause to be falsified books, records, and accounts required to, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of Parent, an issuer within the meaning of the FCPA, in violation of Title 15, United States Code, Sections 78m and 78ff; and

   c. to offer, pay, promise to pay, and authorize the payment of money and other things of value to foreign officials for purposes of: (i) influencing acts and decisions of such foreign officials in their official capacities; (ii) inducing such foreign officials to do and omit to do acts in violation of the lawful duties of such officials; (iii) securing an improper advantage;

and (iv) inducing such foreign officials to use their influence with a foreign government and instrumentalities thereof to affect and influence acts and decisions of such government and instrumentalities, in order to assist NAAMAN, Parent, Subsidiary, Employee A, Employee B, and others, in obtaining and retaining business for and with, and directing business to, Parent and Subsidiary, in violation of Title 15, United States Code, Section 78dd-1.

## PURPOSE OF THE CONSPIRACY

21. The primary purpose of the conspiracy was to obtain and retain lucrative business with the government of Iraq through the payment and promise of payment of kickbacks and bribes to the Iraqi government and its officials.

## MANNER AND MEANS OF THE CONSPIRACY

22. To achieve the goal of the conspiracy, NAAMAN and others used the following manner and means, among others:

    a. It was part of the conspiracy that NAAMAN agreed to pay kickbacks and caused kickbacks to be paid to the Government of Iraq in exchange for contracts awarded to Subsidiary by the Government of Iraq pursuant to the OFFP.

    b. It was a further part of the conspiracy that Parent, through Subsidiary, submitted contracts to the U.N. which failed to disclose and concealed the fact that the prices of the contracts had been inflated by 10% in order to generate the money that was used to pay kickbacks to the government of Iraq.

    c. It was a further part of the conspiracy that NAAMAN and Parent caused the transmission of international wire communications to and from the United States to give notice to the U.N. that goods had been shipped to, and inspected in, Iraq and to give notice to

Subsidiary's bank in Switzerland that the U.N. was authorizing payments pursuant to the contracts.

   d. It was a further part of the conspiracy that NAAMAN falsified invoices for reimbursement of the kickbacks, thereby causing Subsidiary to falsify its corporate books and records, in order to conceal the true nature of the payments in the consolidated books and records of Parent.

   e. It was a further part of the conspiracy that NAAMAN, on behalf of Parent, paid $150,000 in bribes to officials of the MoO to ensure that methylcyclopentadienyl manganese tricarbonyl ("MMT"), a chemical which could be used as an alternative to TEL that is not manufactured by Parent or Subsidiary but is manufactured by a competitor, failed a field trial test and therefore would not be used by the MoO as a replacement for TEL.

## OVERT ACTS

23. In furtherance of the conspiracy and to accomplish its unlawful objects, the following overt acts, among others, were committed by the defendant within the territory of the United States and elsewhere:

*Contract 830584*

24. On or around March 19, 2001, NAAMAN submitted a bid in response to a tender issued by the MoO for the purchase of TEL for use at Basrah Refinery. The bid was in the name of Employee A on behalf of Subsidiary. The bid listed a price of €7,800 per metric ton.

25. On or around March 19, 2001, the MoO issued a purchase order for the sale of TEL on the same tender. The purchase order specified a price of €8,580 per metric ton, a 10% increase over the bid.

26. On or around April 16, 2001, NAAMAN signed a side letter on behalf of Subsidiary promising to pay a kickback of €381,888 to the Iraqi government in exchange for being awarded Contract 830584.

27. On or around April 25, 2001, NAAMAN, acting on behalf of Subsidiary, signed a contract with the MoO for the provision of TEL to Basrah refinery, subsequently referenced by the U.N. as Contract 830584, with a total contract price of €4,200,768. This total included the extra 10% fee promised in the side letter. This fee was concealed in contracts and correspondence with the U.N. and was intended to be used to pay a kickback to the Iraqi government through NAAMAN and his companies.

28. On or around August 30, 2001, Subsidiary's actions caused the New York branch of BNP-Paribas to send, via an international electronic wire communication, a notice to the Union Bank of Switzerland in Zurich, Switzerland, notifying it of the issuance of a letter of credit in favor of Subsidiary, authorizing the eventual payment of €4,200,768 from the OFFP escrow fund maintained at BNP-Paribas to Subsidiary, which represented payment for Contract 830584.

29. On December 14, 2001, Employee A sent a letter to NAAMAN increasing his "commission" by 12% for U.N. OFFP Contracts 830584, 930208, and 930299. This increase was comprised of the 10% kickback to the Iraqi government and an additional 2% commission for NAAMAN for delivering the kickback, all above and beyond NAAMAN's usual 2% commission.

30. On or around March 4, 2002 and April 2, 2002, the landing of Subsidiary's TEL in Iraq caused a company based in Geneva, Switzerland, that provided commercial inspection services on behalf of the U.N. in Iraq ("the inspection company"), to send from Iraq to the U.N.

in New York, via international wire communication, notification that the TEL purchased pursuant to Contract 830584 had been received and inspected by the inspection company in Iraq, thereby triggering payment by the U.N. to Subsidiary for Contract 830584.

31. On or around December 20, 2001, Subsidiary paid NAAMAN €39,312 in agent's fees and €196,560 to reimburse him for kickbacks paid on Contract 830584.

32. On or around January 17, 2002, Subsidiary paid NAAMAN €37,065.60 in agent's fees and €185,328.00 to reimburse him for kickbacks paid on Contract 830584.

33. On or around May 7, 2002, Subsidiary paid NAAMAN €76,377.60 in agent's fees on Contract 830584.

*Contract 930208*

34. On or around March 29, 2001, NAAMAN submitted a bid in response to a tender issued by the MoO for the purchase of TEL for use at Daura Refinery. The bid was in the name of Employee A on behalf of Subsidiary. The bid listed a price of €7,850 per metric ton.

35. On or around March 29, 2001, NAAMAN submitted another bid for the sale of TEL on the same tender. The bid was in the name of Employee A on behalf of Subsidiary. The bid listed a price of €8,700 per metric ton, an 11% increase over the original bid.

36. On or around May 31, 2001, NAAMAN sent a fax to Employee A, requesting that he sign the contract for the Daura tender. NAAMAN stated in the letter that the contract price includes a "2% + 2%" commission for his company and an additional 10% described as "Additional Money for Third Party Reimbursement."

37. On or around June 2, 2001, Employee A signed a side letter on behalf of Subsidiary promising to pay a kickback of €255,000 to the Iraqi government in exchange for being awarded Contract 930208.

38. On or around June 3, 2001, Employee A signed a contract with the MoO for the provision of TEL to Daura refinery, subsequently referenced by the U.N. as Contract 930208, with a total contract price of €2,610,000, which included the extra 10% fee promised in the side letter. This fee was concealed in contracts and correspondence with the U.N. and was intended to be used to pay a kickback to the Iraqi government through NAAMAN and his companies.

39. On or around September 7, 2001, Subsidiary's actions caused the New York branch of BNP-Paribas to send, via an international electronic wire communication, a notice to the Union Bank of Switzerland in Zurich, Switzerland, notifying it of the issuance of a letter of credit in favor of Subsidiary, authorizing the eventual payment of €2,610,000 from the OFFP escrow fund maintained at BNP-Paribas to Subsidiary, which represented payment for Contract 930208.

40. On or around May 31, 2002, the landing of Subsidiary's TEL in Iraq caused the inspection company to send from Iraq to the U.N. in New York, via international wire communication, notification that the Subsidiary products purchased pursuant to Contract 230208 had been received and inspected by the inspection company in Iraq, thereby triggering payment by the U.N. to Subsidiary for Contract 930208.

*Contract 930299*

41. On or around May 11, 2001, NAAMAN submitted a bid in response to a tender issued by the MoO for the purchase of TEL for use at Baiji Refinery. The bid was in the name of Employee A on behalf of Subsidiary. The bid listed a price of €8,330 per metric ton.

42. On or around May 11, 2001, NAAMAN submitted another bid for the sale of TEL on the same tender. The bid was in the name of Employee A on behalf of Subsidiary. The bid listed a price of €9,164 per metric ton, a 10% increase over the original bid.

43. In or around mid-2001, NAAMAN signed a side letter on behalf of Subsidiary promising to pay a kickback of €663,652 to the Iraqi government in exchange for being awarded Contract 930299.

44. On or around July 8, 2001, Employee A signed a contract with the MoO for the provision of TEL to Baiji refinery, subsequently referenced by the U.N. as Contract 930299, with a total contract price of €7,291,000, which included the extra 10% fee promised in the side letter. This fee was concealed in contracts and correspondence with the U.N. and was intended to be used to pay a kickback to the Iraqi government through NAAMAN and his company.

45. On or around October 17, 2001, Subsidiary sent a fax, via an international electronic wire communication, from its offices in Switzerland to the Office of the Iraq Program of the United Nations in New York, amending the contract to increase its total value to €16,495,200.

46. On or around December 5, 2001, Subsidiary's actions caused the New York branch of BNP-Paribas to send, via an international electronic wire communication, a notice to the Central Bank of Iraq in Baghdad, Iraq, notifying it of the issuance of a letter of credit in favor of Subsidiary, authorizing the eventual payment of €16,495,200 from the OFFP escrow fund maintained at BNP-Paribas to Subsidiary, which represented payment for Contract 930299.

47. On or around April 9, 2002; April 14, 2002; April 22, 2002; May 8, 2002; May 24, 2002; and June 18, 2002, the landing of Subsidiary's TEL in Iraq caused the inspection company

to send from Iraq to the U.N. in New York, via international wire communication, notification that the Subsidiary products purchased pursuant to Contract 930299 had been received and inspected by the inspection company in Iraq, thereby triggering payment by the U.N. to Subsidiary for Contract 930299.

48. In or around 2002, NAAMAN was paid a total of approximately €1,501,200 to reimburse him for kickbacks paid under Contract 930299.

*Contract 1230520*

49. On or around July 31, 2002, NAAMAN submitted a bid in response to a tender issued by the MoO for the purchase of TEL for use at Daura Refinery. The bid was in the name of Employee A on behalf of Subsidiary. The bid listed a price of €10,437 per metric ton, which included the extra 10% kickback to the Iraqi government. This fee was concealed in contracts and correspondence with the U.N. and was intended to be used to pay a kickback to the Iraqi government through NAAMAN and his company.

50. On or around December 4, 2002, Employee A signed a contract with the MoO for the provision of TEL to Daura refinery, subsequently referenced by the U.N. as Contract 1230520, with a total contract price of €3,131,100, which included the extra 10% fee.

51. On or around February 5, 2003, Subsidiary's actions caused the New York branch of BNP-Paribas to send, via an international electronic wire communication, a notice to the Central Bank of Iraq in Baghdad, Iraq, notifying it of the issuance of a letter of credit in favor of Subsidiary, authorizing the eventual payment of €3,131,000 from the OFFP escrow fund maintained at BNP-Paribas to Subsidiary, which represented payment for Contract 1230520.

52. On or around July 11, 2003, the landing of Subsidiary's TEL in Iraq caused the inspection company to send from Iraq to the U.N. in New York, via international wire communication, notification that the Subsidiary products purchased pursuant to Contract 1230520 had been received and inspected by the inspection company in Iraq, thereby triggering payment by the U.N. to Subsidiary for Contract 1230520.

53. On or around July 22, 2003, €3,131,000 was transferred from BNP-Paribas to Subsidiary in payment for Contract 1230520. Parent did not pay the promised kickbacks, but instead kept the additional 10% and incorporated it into its books as profit.

54. In or around mid-2003, NAAMAN was paid €100,199.77 in commissions on Contract 1230520.

*Contract 1230533*

55. On or around September 1, 2002, NAAMAN submitted a bid in response to a tender issued by the MoO for the purchase of TEL for use at Baiji Refinery at a price of €10,437.90 per metric ton, which included the extra 10% kickback to the Iraqi government. This fee was concealed in contracts and correspondence with the U.N. and was intended to be used to pay a kickback to the Iraqi government through NAAMAN and his company.

56. On or around November 25, 2002, Employee A signed a contract with the MoO for the provision of TEL to Baiji refinery, subsequently referenced by the U.N. as Contract 1230533, with a total contract price of €18,788,220, which included the extra 10% fee.

57. On or around February 11, 2003, Subsidiary's actions caused the New York branch of BNP-Paribas to send, via an international electronic wire communication, a notice to the Central Bank of Iraq in Baghdad, Iraq, notifying it of the issuance of a letter of credit in favor of

Subsidiary, authorizing the eventual payment of €18,788,220 from the OFFP escrow fund maintained at BNP-Paribas to Subsidiary, which represented payment for Contract 1230533.

58. On or around July 15, 2003; August 19, 2003; August 22, 2003; October 10, 2003; and November 7, 2003, the landing of Subsidiary's TEL in Iraq caused the inspection company to send from Iraq to the U.N. in New York, via international wire communication, notification that the Subsidiary products purchased pursuant to Contract 1230533 had been received and inspected by the inspection company in Iraq, thereby triggering payment by the U.N. to Subsidiary for Contract 1230533.

59. On or around August 4, 2003 through November 20, 2003, €18,734,849 was transferred to Subsidiary in payment for Contract 1230533. Parent did not pay the promised kickbacks, but instead kept the additional 10% and incorporated it into its books as profit.

60. On or around late 2003 through early 2004, NAAMAN was paid €601,218.13 in commissions on Contract 1230533.

*Books and Records*

61. In order to conceal the kickback payments to the Iraqi officials on the books and records of Subsidiary, on or around December 19, 2001; January 19, 2002; and February 11, 2002; NAAMAN sent Subsidiary invoices misrepresenting the kickbacks on Contracts 803584, 930208, and 930299 as "remuneration for after sales services."

62. Based on NAAMAN's false invoices, Subsidiary improperly characterized the kickback reimbursement payments to NAAMAN as "agent's commissions" on its books and records.

63. At the end of Parent's fiscal year, the books and records of Subsidiary, including those containing false characterizations of the payments given to the Iraqi government, were incorporated into the books and records of Parent for purposes of preparing Parent's year-end financial statements, which were filed with the Securities and Exchange Commission in Washington, D.C.

*MMT Test*

64. On or around September 13, 2006, NAAMAN emailed Employee B, advising him that the MoO was testing MMT and, if it passed the test, the MoO would purchase 350 metric tons of MMT, reducing the amount of TEL the MoO would purchase from Parent.

65. On or around September 16, 2006, NAAMAN faxed Employee B a letter, attaching a falsified invoice for $105,000, to cover "payment for additional technical support and security operations required to nurture and protect the ongoing TEL business in Iraq."

66. On or around September 18, 2006, Employee B approved the falsified invoice for payment through Subsidiary, with the note, "Best to allocate to agents commissions."

67. On or around February 26, 2007, NAAMAN sent a letter to Employee B enclosing an English translation of the MoO field trial test for MMT, and noting that MMT had failed the test. NAAMAN wrote that in order to ensure that MMT failed the test, he "had to pay an additional fee to make sure that the report will come to our advantage." NAAMAN requested an "additional $50,000/- cost incurred.... Accordingly, enclosed is Interact's invoice for the additional amount...." and attached a falsified invoice from NAAMAN's company, Interact S.A.R.L., requesting payment of $50,000 for "training of Daura Refinery blending unit team in Jordan..."

68. On or around March 21, 2007, NAAMAN sent an email to Employee B noting that the payment of the additional $50,000 was still outstanding.

69. In or around late September 2006 and April 3, 2007, Parent paid NAAMAN a total of $155,000 to reimburse him for the payments to the Iraqi officials.

(All in violation of Title 18, United States Code, Section 371.)

## COUNTS TWO AND THREE
### (Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-1, 18 U.S.C. § 2)

70. The allegations of paragraphs 1 through 18 and 23 through 69 of this Indictment are realleged and incorporated by reference as though set in forth in full.

71. On or about the dates set forth below, in Iraq and elsewhere outside of the jurisdiction of any particular state or district of the United States, but within the extraterritorial jurisdiction of the United States pursuant to Title 15, United States Code, Section 78dd-1(g), and, therefore, pursuant to Title 18, United States Code, Section 3238, within the venue of the United States District Court for the District of Columbia, defendant OUSAMA M. NAAMAN, while acting as the agent of Parent, an issuer organized under the laws of the United States, willfully and corruptly did an act outside the United States in furtherance of an offer, payment, promise to pay, or authorization of the payment of money to officials of the Iraqi government for purposes of (i) influencing acts and decisions of such foreign officials in their official capacity; (ii) inducing such foreign officials to do and omit to do acts in violation of the lawful duty of such officials; (iii) securing an improper advantage; and (iv) inducing such foreign officials to use their influence with a foreign government and instrumentalities thereof to affect and influence acts and decisions of such governments and instrumentalities, in order to assist Parent,

Subsidiary, Employee A, Employee B, and others, known and unknown to the Grand Jury, in obtaining and retaining business for and with, and directing business to, Parent and Subsidiary, by paying Iraqi officials within the MoO to cause MMT to fail a field test thereby ensuring that MMT would not be purchased by the MoO instead of TEL.

| Count | Date | Amount of Payment |
|---|---|---|
| TWO | In or around mid- to late 2006 | $100,000 |
| THREE | In or around Spring 2007 | $50,000 |

(All in violation of Title 15, United States Code, Section 78dd-1 and Title 18, United States Code, Section 2)

A TRUE BILL

_____
Foreperson

STEVEN A. TYRRELL
Chief, Fraud Section

KATHLEEN M HAMANN
Trial Attorney, Fraud Section

Criminal Division
United States Department of Justice
1400 New York Avenue, NW
Washington, D.C. 20530
(202) 305-7413