# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

v.

OUSAMA M. NAAMAN,

Defendant.

08-CR-246 (ESH)

## OUSAMA NAAMAN'S MEMORANDUM IN AID OF SENTENCING

Abbe David Lowell, Esq.
Christopher D. Man, Esq.
James M. Commons, Esq.
McDermott Will & Emery LLP
600 Thirteenth Street, N.W.
Washington, D.C.  20005-3096
202-756-8000

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................1

I.     STATEMENT OF FACTS ..............................................................4

II.    PERSONAL HISTORY ...........................................................15

    A.    Childhood ................................................................15

    B.    College Years ...........................................................17

    C.    Early Career .............................................................18

    D.    Career Success .........................................................25

    E.    Health Decline and Retirement Planning ......................26

    F.    Civic and Charitable Contributions .............................28

III.    THE EFFECTS OF INCARCERATION ...................................31

    A.    Wife and Children.....................................................31

    B.    Mr. Naaman .............................................................37

    C.    Extended Family .......................................................41

    D.    Employees ...............................................................43

IV.    THE PRESENTENCE INVESTIGATION REPORT OVERSTATES MR. NAAMAN'S SENTENCING GUIDELINE CALCULATION ....................................46

    A.    The PSR Inappropriately Fails to Group Offenses .............46

    B.    The PSR Miscalculates the Fraud Guideline ...................48

        1.    The PSR Miscalculates Loss................................48

        2.    The PSR Inappropriately Adds a Sophisticated Means Enhancement ........................................52

        3.    The PSR Inappropriately Adds a Manager/Supervisor Enhancement ..............................54

    C.    The PSR Miscalculates the Bribery Guideline ................54

        1.    The PSR Overstates the Amount of the Bribes...........54

        2.    The PSR Inappropriately Adds an Organizer Enhancement..................57

        3.    The PSR was Correct in Determining that a "Public Official" Enhancement is Not Warranted .........................58

V.    A SENTENCE OF TIME-SERVED AND OTHER PENALTIES ARE WARRANTED ...........................................................60

# TABLE OF CONTENTS
(continued)

**Page**

A.    Minimal Sentence is Justified Based on Family Circumstances, Prior Good Works, and Substantial Cooperation ...................................................... 63

    1.    Family Ties ............................................................................. 63

    2.    Civic and Charitable Service ................................................... 64

    3.    Substantial Cooperation .......................................................... 66

B.    Mr. Naaman Poses No Risk of Recidivism .................................... 70

C.    Lengthy Incarceration Does Not Strengthen Deterrence ................... 73

D.    A Lengthy Sentence would Produce a Sentencing Disparity .............. 75

    1.    Comparison to Other Similarly-Situated Defendants .............. 75

    2.    Sentencing Disparity in this Case ........................................... 82

CONCLUSION .............................................................................................. 85

# TABLE OF AUTHORITIES

**Page**

**Cases**

Asociacion de Relamantes v. The United Mexican States, 735 F.2d 1517 (D.C. Cir. 1984) ...................................................................................50

Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398 (1964) ....................................50

Bernstein v. Van Heyghen Freres Societe Anonyme, 163 F.2d 246 (2d Cir. 1947)........................................................................................51

Global Crossing Telecomm., Inc. v. Metrophoes Telecomm., Inc., 550 U.S. 45 (2007)................................................................................59

Jarecki v. G.D. Searle & Co., 367 U.S. 303 (1961)....................................................59

Morrison v. Nat'l Australia Bank LTD., 130 S. Ct. 2869 (2010)...............................60

Oetjen v. Central Leather Co., 246 U.S. 297 (1918)...................................................50

Samantar v. Yousef, 130 S. Ct. 2278 (2010)...............................................................59

Skilling v. United States, 130 S. Ct. 2896 (2010).......................................................60

The Schooner Exchange v. McFaddon, 11 U.S. (7 Cranch) 116 (1812) ....................50

Underhill v. Hernandez, 168 U.S. 250 (1897).............................................................50

United States v. Beamon, 373 F. Supp. 2d 878 (E.D. Wisc. 2005)............................64

United States v. Belmont, 301 U.S. 324 (1937) ..........................................................50

United States v. Bisanti, 414 F.3d 168 (1st Cir. 2005) ...............................................63

United States v. Booker, 125 S. Ct. 738 (2005) ..........................................................60

United States v. Bortnick, 2006 U.S. Dist. Lexis 11744 (E.D. Pa. Mar. 15, 2006)........................................................................................65

United States v. Bustillos-Pena, 612 F3. 863 (5th Cir. 2010) ...................................60

# TABLE OF AUTHORITIES

**Page**

United States v. Canova, 485 F.3d 674 (2d Cir. 2007) ............................................................65

United States v. Cooper, 394 F.3d 172 (3d Cir. 2005)............................................................65

United States v. DeLuca, 17 F.3d 6 (1st Cir. 1994)................................................................60

United States v. Garcia, 414 F.3d 201, 228 (2d Cir. 2005)......................................................63

United States v. Jemal, No. 05-0359-01 (D.D.C. Apr. 17, 2007)........................................65, 66

United States v. Kuhn, 351 F. Supp. 2d 696 (E.D. Mich. 2005) ...............................................65

United States v. Nellum, No. 2:04-CR-30-PS, 2005 WL 300073 (N.D. Ind.
   Feb. 3, 2005) ............................................................................................................63

United States v. Nichols, 376 F.3d 440 (5th Cir. 2004)............................................................64

United States v. Olis, 429 F.3d 540 (5th Cir. 2005) ................................................................52

United States v. Pink, 315 U.S. 203 (1942)............................................................................51

United States v. Rice, 17 U.S. 246 (1819) .............................................................................51

United States v. Rioux, 97 F.3d 648 (2d Cir. 1996) ............................................................64, 65

United States v. Smith, 359 F. Supp. 2d 77 (E.D. Wisc. 2005)................................................64

United States v. Woods, 159 F.3d 1132 (8th Cir. 1998)..........................................................64

## TABLE OF AUTHORITIES

**Page**

**Statutes**

15 U.S.C. § 78dd-1..................................................................................................46, 47

18 U.S.C. § 371.........................................................................................................46

18 U.S.C. § 1343...................................................................................................46, 47

18 U.S.C. § 3553(a) ...........................................................................................60, 61, 63

# INTRODUCTION

All cases are unique and require a review of their individual factors. This one is especially so. Before the Court stands a non-American who, already having served almost a year in jail in a country foreign to him, has been transported away from his home and his part of the world, to answer for conduct that was illegal in the United States but all too tolerated in the place he did business. Once held accountable in our system, Ousama Naaman has done everything he could to make amends and cooperate. This memorandum, the numerous letters of support (Ex. A.), and the attached exhibits are submitted on behalf of Mr. Naaman to assist the Court in making a sentencing determination and to support Mr. Naaman's request for a sentence that involves no further incarceration beyond that which he already has served.

The Superseding Information and Statement of the Offense provide only a narrow glimpse into a lifetime of Mr. Naaman's work and may give the misimpression that he devoted the vast majority of his time between March 2001 and June 2008 to the illegal promotion of tetraethyl lead ("TEL") in Iraq. That is far from the case. The reality is that Mr. Naaman was involved in a variety of perfectly legitimate and successful business ventures, most of which were outside of Iraq. In fact, Mr. Naaman traveled to Iraq on only a handful of occasions in connection with the TEL business. While Mr. Naaman has fully accepted responsibility for his actions, and freely admits his guilt, he hopes this memorandum will provide the Court with a more complete view of his life's work and how the TEL business fit into that work.

As importantly, this memorandum hopes to convey to the Court how dedicated and important Mr. Naaman is to his family, and others for whom he provides support. Mr. Naaman

1

has shown steadfast devotion to his wife of 33 years, Laurice, and their two children, Marwan, age 32, and Mira, age 30.  Mr. Naaman cherishes his family and he always has tried to act in its best interests.[1]  Mr. Naaman has never shied away from his responsibilities as a husband, parent and sibling, and he has shown an unwavering commitment to supporting his siblings and extended family in their times of need.  Mr. Naaman fully comprehends how his arrest, incarceration and conviction have adversely impacted his family.  Seeing his family suffer the consequences of his actions has been particularly painful.

Mr. Naaman's errors in judgment should be considered against a lifetime of selfless charity and good deeds.  While it is unfortunate that Mr. Naaman's good deeds come to light in this context, those deeds define Mr. Naaman as much as, if not more than, his activities in the business world.  This memorandum – relying on more than 40 letters of support – provides first-hand accounts of how others have been touched by Mr. Naaman's generosity and goodwill.  A

---

[1]     This sentiment is reflected in numerous letters submitted to the Court by people who know the Naaman family well.  (Riad B. Kamal, Chairman, Arabtec Construction LLC, Ltr. at 1 ("[O]ur families have been very close and I have known Ousama to be a decent and respectable husband and a loving father to two lovely children."); Jihad Shibaru, Friend, Ltr. at 1 ("[Ousama] worked very hard over the years to take care of his family and provide a safe environment and quality education for his children . . . ."); Abdul Aziz Said, Professor, Ltr. at 1 ("In addition to the high regard in which I hold Mr. Naaman on a personal level, I have also witnessed the immense value he places on his family."); Jack Jossaume, Friend, Ltr. at 1 ("[Mr. Naaman's] children, who have been able to receive an American education, are the pride of their parents."); Helmut Huber, Former CEO of ThyssenKrupp Mannex Co., Ltr. at 1 ("[Ousama] was the backbone of his family and his attitude towards family, the parents and siblings was always exemplary."); Edouard Touma, Friend, Ltr. at 1 ("I have seen and admired the respect and devotion Ousama had for his family."); Dr. Muhammad A. Bulbul, Professor, Ltr. at 1 ("As I got to know [Ousama] . . . I was taken by his fierce commitment to his family.  He would spend hours with his son and daughter enjoying every minute of it.").)

number of these individuals have written Your Honor urging the Court to consider Mr. Naaman's outstanding character and long history of contributing positively to society as support for a sentence that does not require his further incarceration. As the letters demonstrate, Mr. Naaman is widely regarded as a man of goodwill and strong character, who routinely places the needs of others before his own.[2]

There is no doubt that Mr. Naaman's generosity has touched the lives of countless others who have not written to Your Honor. In fact, it is a tribute to Mr. Naaman's charity that so many of the people he has helped have no personal connection to him and are not even aware of these proceedings. (Said Kiwan, Friend, Ltr. at 1 ("[Ousama] is known as a silently charitable person who puts family, friends, and those in need ahead of his own interests." ); Dr. Shawki D. Saad,

---

[2]     Indeed, this is a common theme of the letters submitted to the Court. (Elena Turner, Friend, Ltr. at 1 ("I know Ousama to be a man of solid character. He is dedicated to his family, and has raised two outstanding children."); Dr. Shawki D. Saad, Surgeon, Ltr. at 1 ("I have personally known Mr. Naaman for the past 35 years. He always impressed me with his honest character and love of family and friends as well as the community at large."); Dr. Juan Grau Argilaga, Chairman of Folcra Group, Ltr. at 1 ("Since the very first moment of our acquaintance I realized that Ousama was a great person because of his uprightness qualities and integrity."); Tammam Salam, Member of Lebanese Parliament, Ltr. at 1 ("I would vouch for [Ousama's] integrity and decency anytime, anywhere."); Sami K. Boulos, Friend, Ltr. at 1 ("Ousama is a decent calm educated peace loving person, a wonderful family man, a leader and provider to his community . . . ."); Helmut Huber, Former CEO of ThyssenKrupp Mannex Co., Ltr. at 1 (Without exception [Ousama] also treated his friends with the same caring attitude and respect. Always willing to help, in a modest and thoughtful way. I am very proud to know such a valuable person and to have him as a friend."); Lutz Radtke, Former Board Member, Pirelli Tyre Co., Ltr. at 1 ("I got to know [Ousama] as a modest shy gentleman with great friendliness and human warmness . . . ."); Maher Nasser, Friend, Ltr. at 1 (explaining how he was struck by Mr. Naaman's "tolerance, his kindness and his compassion" and describing Mr. Naaman as an "eternal optimist who saw the good in people and always showed empathy towards his friends and family."); Dr. Muhammad A. Bulbul, Professor, Ltr. at 1 (explaining how Mr. Naaman "has been very generous in sharing his good fortune with others; family, friends and people in need" because "[t]hat is his character.").)

Surgeon, Ltr. at 1 ("I can easily say [that Mr. Naaman] is a philanthropist who spared nothing to help someone in need."); <u>see also</u> Abdul Khaliq, Employee, Ltr. at 1 (explaining how Mr. Naaman made donations to the hospital, schools, and orphanages in Rajasthan, India and took responsibility for the education of 300 impoverished children).) Given the opportunity, there is no doubt that these people would be first in line to ask that the Court take Mr. Naaman's goodwill into consideration in fashioning an appropriate sentence.

Although Mr. Naaman cannot turn back the clock and choose a different path, he has learned from his mistakes and truly appreciates the wrongfulness of his conduct. Mr. Naaman has done everything in his power to make amends for his misconduct and he looks forward to being integrated back into society so that he can continue to support his family, friends and employees, and continue to make a positive contribution through his charitable work. Mr. Naaman humbly comes before this Court with great remorse, fully accepting responsibility for his actions, and he respectfully submits this memorandum in aid of sentencing in this matter.

## I.   **STATEMENT OF FACTS**

Unlike many prosecutions arising under the Foreign Corrupt Practices Act ("FCPA"), this is not a case in which an American citizen, acting on behalf of an American corporation, paid bribes to foreign officials to curry favor with those officials and secure lucrative contracts that inured to the benefit of the American company. Rather, Mr. Naaman is a Lebanese and Canadian dual-national who for all relevant periods maintained his business and residence in the United Arab Emirates. In addition to a number of other business ventures, Mr. Naaman worked as an agent in Iraq on behalf of Alcor Chemie Vertriebs GmbII ("Alcor"), a Swiss company

4

headquartered in Zug, Switzerland.  During the agency relationship, Alcor became a wholly-owned subsidiary of Innospec Inc. ("Innospec"), which was formerly known as Octel Corporation.[3]  Innospec is a Delaware company, but it maintains its headquarters and executive offices in the United Kingdom.  Beyond Alcor's corporate relationship with Innospec, Mr. Naaman had virtually no connection to the United States during the relevant period and none of his misconduct took place on American soil.  In fact, he only traveled to the United States to visit his children, who attended college in Washington, D.C. and Boston, Massachusetts.  While these facts certainly do not change the criminality of Mr. Naaman's conduct, they distinguish his case from some of the more common prosecutions of white-collar crimes, especially those arising under the FCPA.

The idea of paying kickbacks to the Iraqi government to secure contracts under the Oil-for-Food Program did not originate with Mr. Naaman.  In August of 1990, the United Nations ("U.N.") Security Council adopted Resolution 661, which imposed comprehensive sanctions on Iraq in response to the Iraqis invasion of Kuwait.  Specifically, Resolution 661 prohibited U.N. member states from importing goods from Iraq and exporting goods to Iraq, except for humanitarian supplies.  When the Gulf War ended in 1991, the U.N. sent a delegation to Iraq to assess the country's humanitarian needs and determine whether the U.N.'s economic sanctions

---

[3]     For the sake of clarity, this memorandum uses "Innospec" to refer to both "Octel" and "Innospec."

were harming the Iraqi people.  The delegates drafted a report of their observations and, in that report, they offered a grim assessment of the state of affairs in Iraq and advised the U.N. of the need for significant aid.  Based in part on the report, the U.N. Security Council proposed measures that would allow Iraq to sell limited quantities of oil to meet the humanitarian needs of its people.  After initially declining the U.N.'s proposal, Iraq eventually acquiesced and, in April 1995, the parties reached an agreement that established the Iraq "Oil-for-Food Program."  Under the agreement, which was implemented in December 1996, Iraq was allowed to sell oil to finance its purchases of humanitarian goods.  During the initial stages of the program, Iraq was permitted to export $2 billion worth of oil every six months, with two-thirds of that amount to be used to meet Iraq's humanitarian needs.  The U.N.-imposed ceiling on oil sales was raised in mid-1998 and subsequently removed in December 1998.  The program continued until March 2003, when the Iraq war intervened and oil exports under the program were discontinued.

From the outset, Saddam Hussein and his regime took every opportunity to abuse the Oil-for-Food Program and circumvent its restrictions.  For example, the regime instituted an informal system of kickbacks, whereby suppliers of humanitarian goods and other approved items were required to provide the regime with a 10 percent kickback on contracts with Iraq.[4]  The regime also collected illegal surcharges from companies that wanted to purchase Iraqi oil and sold oil

---

[4]     In October 2000, the Iraqi Command Council instructed the Iraqi ministries to impose an "after-sales-service fee" of *at least* 10 percent on all commercial contracts under the Oil-for-Food Program.

6

illegally to companies outside the parameters of the Oil-for-Food Program, all in contravention of its agreement with the U.N.  The General Accounting Office ("GAO") has estimated that the Hussein regime diverted $10.1 billion in illegal revenue from the program – $5.7 billion in oil smuggled out of Iraq and $4.4 billion in illicit surcharges on oil sales and after-sales charges on suppliers.  Observations on the Oil For Food Program, April 7, 2004 (Statement of Joseph A. Christoff, Director International Affairs and Trade, U.S. General Accounting Office), http://www.gao.gov/new.items/d04651t.pdf.

The massive scheme implicated thousands of companies, foreign officials, and individuals around the world.  Following the 2004 release of the GAO report, the U.N. commissioned an Independent Inquiry Committee, headed by former Federal Reserve Chairman Paul Volcker, to investigate the Oil-for-Food Program.  After an 18-month investigation, Volcker and the Committee released a final report accusing nearly half of the 4,500 companies that participated in the Oil-for-Food Program of paying kickbacks and illegal surcharges to win lucrative contracts.  See Independent Inquiry Committee into the United Nations Oil-for-Food Programme, Manipulation of the Oil-for-Food Programme by the Iraqi Regime (October 27, 2005), http://www.iic-offp.org/story27oct05.htm.  In the report, the U.N. committee states, "Iraq simply required humanitarian contractors to make [kickback] payments directly to Iraqi-controlled bank accounts or to front companies outside Iraq that in turn forwarded the payments to the Government of Iraq." Id. at 249.

Mr. Naaman did not enter into an agency relationship with Alcor expecting to become a willing participant in the massive fraud being perpetrated by the Hussein regime under the Oil-

for-Food Program.   In fact, when Gunter Zobel[5] first approached Mr. Naaman (through a common business acquaintance) with the prospect of becoming an agent of Alcor in 1995, he indicated that Alcor wanted Mr. Naaman to help the company gain entry into the TEL market in Saudi Arabia.   To that end, Mr. Zobel agreed to provide Mr. Naaman with a two percent commission in exchange for Mr. Naaman's assistance in procuring Saudi contracts.   After accepting Alcor's offer, Mr. Naaman engaged a business partner in Saudi Arabia, as required by Saudi law, and they reached an agreement to split the two percent commission on a "50-50" basis.   Under the partnership agreement, Mr. Naaman's partner was responsible for making the necessary arrangements to import the TEL into Saudi Arabia.

It was not until the year 2000 that Alcor asked Mr. Naaman to help promote TEL within the framework of the Iraqi Oil-for-Food Program.[6]   In late 2000, Mr. Naaman entered into a new agency agreement with Alcor, which provided that he would serve as Alcor's sole agent under the Oil-for-Food Program, and would receive a two percent commission on sales of TEL above $7,000 per metric ton.   Mr. Naaman appointed Sarmad Hassan as his manager of the Iraqi operation because of Mr. Hassan's familiarity with the Iraqi market generally, and Oil-for-Food Program specifically.   Mr. Hassan informed Mr. Naaman that the Iraqi government required its suppliers to submit dual invoices and provide a 10 percent kickback on Oil-for-Food contracts.

---

[5]      At the time, Mr. Zobel was the owner and manager of Alcor.

[6]      Innospec acquired Alcor in the fall of 1999.

Mr. Naaman, in turn, conveyed this information to Alcor's general manager, Gerry Schack,[7] who was Mr. Naaman's primary point of contact within Alcor at the time.  Mr. Schack told Mr. Naaman that Alcor wanted to participate in the program and approved both the dual invoices and the kickback payments.  Mr. Schack advised Mr. Naaman that he would not receive his commissions for the Oil-for-Food contracts until after Alcor was paid for its TEL shipments. Accordingly, the process would commence when Mr. Naaman invoiced Alcor for the 10 percent kickback.  When Alcor supplied the funds, Mr. Naaman had the payment directed to a numbered account at various banks in Jordan, Beirut and Syria, or another financial institution specified by the Iraqi Ministry of Finance.   Within 24 hours, the funds were transferred to an account controlled by the Central Bank of Iraq.[8]  Mr. Naaman explained the process in detail not only to his initial point of contact, Gerry Schack, but also to David Turner,[9] who was the director of

_____

[7]     Mr. Naaman's understanding is that Mr. Schack has not been charged in any jurisdiction and currently resides in Italy.

[8]     The process by which the kickback payments were transferred to the Iraqi government is discussed in greater detail in the "Report on Programme Manipulation." See Independent Inquiry Committee into the United Nations Oil-for-Food Programme, Manipulation of the Oil-for-Food Programme by the Iraqi Regime (October 27, 2005), http://www.iic-offp.org/story27oct05.htm.   For example, the report states, "At the outset of the after-sales-service scheme, Rafidain Bank and the Ministry of Finance were tasked with establishing accounts at banks in Amman and Beirut that would facilitate the collection of fees levied by Iraqi ministries and state companies.  Initially, all fees were paid to the Ministry of Finance's account at Rafidain Bank." Id. at 286.

[9]     Mr. Naaman's understanding is that Mr. Turner has not been charged in any jurisdiction and currently resides in the United Kingdom.

Innospec's TEL Group.  Messrs. Schack and Turner not only authorized Mr. Naaman to facilitate the illicit payments in the manner described, but also directed him to do so.

Although Mr. Naaman administered five contracts under the Oil-for-Food program on behalf of Alcor, each of the five contracts was authorized by Alcor and signed by Gerry Schack. Mr. Schack also signed one of the side letters memorializing Alcor's agreement to pay the 10 percent kickback, referred to as an after-sales service fee.  Although each of the five contracts was accompanied by a side agreement requiring payment of the kickback, Alcor did not make a kickback payment to the Iraqi government for the final two contracts due to the chaos inside Iraq following the U.S.-led invasion.

Innospec and Alcor forced Mr. Naaman to share his commissions on the final two contracts with Innospec's agent in Iraq, Talib Khan.  (See Ex. B.)  In or around March 2002, Innospec informed Mr. Naaman that he would be required to share his commissions with Mr. Khan as part of Innospec's settlement of its legal dispute with Mr. Khan.[10]  (Id.)  On June 18, 2002, Mr. Naaman's company, Interact, executed a collaborative marketing agreement with Mr. Khan's company, Al Habaishi Agencies Co.-Metco LLC ("Metco"), as directed by Innospec. (Id.)  Under the terms of the agreement, Metco and Interact were to split all commissions

---

[10]     At the time of the agreement, Mr. Khan was Octel's commercial agent for the sale of lead alkyl antiknock compound in Iraq.

10

received from Innospec or Alcor in connection with the sale of TEL in Iraq on a 60-40 basis, in favor of Metco.  (Id.)

When the Oil-for-Food Program ended in 2003, Mr. Naaman proposed that Alcor and the Iraqi Ministry of Oil enter into a long-term agreement for the provision of TEL, pursuant to which Alcor would supply a fixed quantity of TEL to the Ministry of Oil at a fixed price.  With Alcor's approval, Mr. Naaman presented the proposal to the Ministry of Oil and explained that a long-term contract would benefit the Iraqi government by ensuring price stability.  The Iraqi Ministry of Oil subsequently approved the proposal and signed a memorandum of understanding. In October 2004, Alcor and the Iraqi Ministry of Oil executed a long-term purchase agreement ("LTPA I") for Alcor's provision of TEL to Iraq.  To facilitate the actual orders under LTPA I, on behalf of Alcor, Mr. Naaman paid approximately $167,000 in bribes to various employees within the Ministry of Oil.  On occasion, Mr. Naaman also provided Iraqi officials with small gifts, such as a watch, and paid for some of their travel expenses (e.g., airfare and hotel bill). These payments were authorized by Innospec and Alcor and encouraged by officials within both companies as business expenses.  To disguise the true nature of the payments, Alcor and Innospec, through Messrs. Schack and Turner, instructed Mr. Naaman to submit false invoices for fabricated expenses, which he did.

From 2001 to 2007, Mr. Naaman traveled to Iraq infrequently (a total of approximately seven times) and relied on his staff to manage the day-to-day operations of the TEL business. Because Iraq was a dangerous place, where kidnappings were one of the primary tactics of terrorists, Mr. Naaman was concerned for the safety of his staff and provided them with

11

additional security.  Mr. Naaman believed Alcor should reimburse him for these security costs because the costs were associated with facilitating the TEL shipments into Iraq.  Mr. Naaman also believed Alcor should reimburse his costs associated with the installation of special units used to blend the TEL with gasoline.  Because the Iraqi refineries could not process the TEL without the blending units, Alcor agreed to supply the units to the refineries free of charge and Mr. Naaman paid to have them installed.

When Alcor refused to reimburse Mr. Naaman for his out-of-pocket expenses, he was upset and believed the company had violated their mutual understanding.  He then improperly took matters into his own hands, rather than seeking legal redress for his claim.  When the Iraqi government announced it would conduct field tests of methycyclopentadienyl manganese tricarbonyl ("MMT"), another gasoline additive and a TEL competitor, Mr. Naaman saw the testing as an opportunity to recoup his unreimbursed expenses.  He informed Alcor of the Iraqi testing and proposed that the company bribe the Iraqi engineers to ensure that MMT failed the test.  Alcor readily agreed with Mr. Naaman's proposal and paid him approximately $150,000, expecting that the funds would be used to bribe a Ministry of Oil engineer.  Instead, Mr. Naaman kept the funds to offset his denied expenses and did nothing to interfere in the test, believing that TEL was superior to MMT and MMT would fail the test anyway.  Nevertheless, MMT passed the Iraqi tests and the Ministry of Oil placed an order for 300 tons of MMT.  (See Ex. C.)

When LTPA I ended in or around 2007, Alcor began negotiating a second long-term agreement with the Iraqi Ministry of Oil.  To facilitate the agreement, again with the direction and approval of Alcor and Innospec, Mr. Naaman promised to pay future bribes to certain

12

officials within the Iraqi Ministry of Oil, but this never occurred.  The amount of the illicit payments was conditioned on the amount of TEL purchased under the long-term agreement.  On January 28, 2008, Mr. Naaman, Mr. Turner, and an Iraqi official initialed the second long-term agreement ("LTPA II"), pending approval from the Iraqi Minister of Oil.  Although Messrs. Naaman and Turner initialed the agreement, neither had the authority to actually bind Alcor to the terms of LTPA II.[11]  Messrs. Naaman and Turner initialed the document to show the parties had reached an agreement in principle with the understanding that the document was not yet a valid and executed contract.

On February 8, 2008, only two weeks after the parties initialed the agreement, Innospec sent a letter to Mr. Naaman informing him that Innospec and Alcor were suspending their agency relationship with him.  The letter instructed Mr. Naaman and his associated companies to immediately suspend all activities on behalf of Innospec and Alcor.  Because of the suspension, Mr. Naaman does not have firsthand knowledge as to whether Innospec or Alcor ever shipped any TEL to the Ministry of Oil pursuant to LTPA II.[12]  What is clear, however, is that Mr. Naaman did not receive any payment whatsoever in connection with orders that may have resulted from LTPA II, a separate tender for the TEL, or any subsequent agreement between

---

[11]    At the time, Mr. Turner was an Innospec employee and, therefore, could not bind Alcor to the agreement.  Mr. Naaman simply lacked the authority to bind Alcor to the agreement.

[12]    The government advises Mr. Naaman that the Iraqi government placed an order for TEL pursuant to LTPA II.

13

Alcor and the Iraqi government for the provision of TEL.   As of February 8, 2008, Mr. Naaman was no longer involved in the TEL contracts.

Although he certainly understood that his participation in the kickback scheme and his payment of bribes was improper and unethical, Mr. Naaman believed that there were two possible scenarios if he declined to facilitate the kickback scheme:  (1) Alcor simply would find another agent in Iraq to facilitate the scheme and that agent would administer the TEL contracts or (2) Alcor would be unable to find another agent in Iraq and another supplier would agree to pay kickbacks to the Iraqi government.  Mr. Naaman sincerely believed that everyone who did business in Iraq was paying the same bribes and kickbacks to the Iraqi government that he was. Mr. Naaman made a clear error in judgment, rationalizing his misconduct by assuming that if he failed to act, someone else would, especially since Alcor had encouraged him to pay the bribes. At the time, Mr. Naaman failed to truly appreciate the gravity of his conduct and he compromised his principles because he thought his actions were consistent with the way business was done in Iraq.  In essence, Mr. Naaman fell into the age-old trap of thinking two wrongs made a right.

On July 30, 2009, Mr. Naaman was transiting Frankfurt, Germany on his way to the Arnault Tzanck facility in St. Laurent du Var, France to seek medical treatment for a serious heart condition, when he was arrested pursuant to an Interpol notice (based on a sealed indictment and arrest warrant the U.S. obtained in or around August 2008).  On April 30, 2010, he was extradited to the United States, having already been detained in Germany for nine months.  When Mr. Naaman arrived in the United States, he was transported to the Central

Detention Facility in Washington, D.C, where he was kept in solitary confinement (the same place inmates who are sent for punishment when they misbehave) for 10 days for his safety.[13] He was arraigned on May 3, 2010 and then transferred to the Northern Neck Regional Jail in Warsaw, Virginia, where he was incarcerated for an additional two months.   Mr. Naaman subsequently entered a plea of guilty on June 25, 2010.   He is currently scheduled to be sentenced on January 26, 2011.

## II.   PERSONAL HISTORY

### A.   Childhood

Born on June 6, 1949, in Beirut, Lebanon, Ousama Naaman is the fourth child of Mahmoud and Turkieh Naaman.   The Naamans were a middle-class family who were well-respected in the local community.   Mahmoud Naaman served as a judge and was later appointed to the highest judicial council in Lebanon.   Turkieh Naaman was the center of the Naaman family and devoted her time and attention to raising her children.   Although he was raised in a financially constrained family, Mr. Naaman nevertheless had a happy childhood.   Like most children, his upbringing and his family had a profound effect on him.   It is in part because of his upbringing that Mr. Naaman feels such great remorse for his misconduct.

---

[13]      Shortly after arriving at the Central Detention Facility, one of the other inmates called Mr. Naaman a snitch and threatened violence against him.   After raising the issue with the prison, prison officials determined that the only way to ensure Mr. Naaman's safety was to place him in solitary confinement for the duration of his incarceration at the facility.

Mr. Naaman fully understands his conduct has tarnished his proud family name. Growing up, Mr. Naaman was well-aware of his father's reputation in the community as a man of integrity, who was committed to fairness and equity.  (Atif Kubursi, Professor, Ltr. at 1 ("Judge Mahmoud Naaman was one of the most notable and respected judges in Lebanon.  His reputation for fairness and his renowned integrity are still common knowledge in the corridors of the Justice Palace in Beirut."); Tammam Salam, Member of Lebanese Parliament, Ltr. at 1 ("I have also known [Ousama's] late father who was a prominent and highly respectable judge and a trustee in one of the most important and reputable charitable organizations in Lebanon.").)  In his work as a judge, Mr. Naaman's father stressed that the purpose of the judicial system is not simply to punish someone for a crime, but to promote the interests of justice.  Mr. Naaman admired his father's integrity, honesty and steadfast convictions, and Mr. Naaman felt great pride when his father was awarded the Lebanese Medal of Honor posthumously.  Mr. Naaman knows he has failed to live up to his father's expectations and understands his misdeeds have sullied the Naaman family name, which was held in high regard before this ordeal.  The knowledge he has ruined his family's reputation has been stiff punishment for Mr. Naaman.

Mr. Naaman also feels that he has let down his grandfathers, who worked hard to build honest businesses servicing the Lebanese community.  Mr. Naaman's maternal grandfather, Ali Hout, was a businessman and entrepreneur who opened the first ice factory in Lebanon.  Mr. Naaman's paternal grandfather, Ahmad Naaman, owned and operated a button shop.  Mr. Naaman observed his grandfathers' hard work in building successful businesses.  More than anything, Mr. Naaman's grandfathers stressed that a businessman is only as good as his name

16

and that he should do whatever he can to ensure his good name is never tarnished. Mr. Naaman knows his grandfathers built strong reputations in the community through legitimate and fair dealings, and he knows his misdeeds have erased some of the goodwill that his grandfathers worked so hard to achieve. Moreover, Mr. Naaman understands he failed to follow his grandfathers' teachings and now, not only has he paid the price, his entire family also has been punished. As a child, Mr. Naaman knew he wanted to follow in his grandfathers' footsteps and one day own his own business but, as an adult, he lost sight of their fundamental teachings.

**B.**   **College Years**

Mr. Naaman attended American International College for high school, and later enrolled at the American University of Beirut ("AUB") to study business administration. AUB was one of the most prestigious universities in the Middle East and afforded its graduates a myriad of opportunities. Mr. Naaman believed his studies would further his understanding of business and bring him one step closer to his dream of owning and operating a successful business.

When Mr. Naaman enrolled at AUB, his father was retired but still supported a family of six children. By Mr. Naaman's fourth year in college, his tuition had become a substantial burden for his parents and they told him they could no longer afford to pay it. Because Mr. Naaman was committed to earning his degree, he secured a part-time job with Coca-Cola (K-Cola in Lebanon) and worked as a sales associate throughout his final year of schooling. To earn extra money, he also worked for AUB assisting the university's yearbook department in securing advertisement revenue and sold sand buggies to supplement his salaries. (Former Gen. Ghassan Naaman, Cousin, Ltr. at 1 (recounting how Mr. Naaman sold the sand buggies to avoid having to

drop out of college.).)  Mr. Naaman did whatever was necessary to remain enrolled in school. He understood the career opportunities afforded to AUB graduates and was willing to put in the extra work to avoid dropping out.  He worked hard to balance his work commitments with his academic pursuits and extracurricular activities, such as student council and varsity sports.  And, when the political situation in Lebanon deteriorated, and other students were aligning themselves with one political faction or another, Mr. Naaman did his best to remain focused on school. Through hard work and perseverance, he earned enough money to complete his studies and help his parents with the tuition for his two younger sisters.  In February 1975, Mr. Naaman proudly graduated from AUB with a bachelor's degree in business administration.

### C.   Early Career

Upon graduating from AUB, Mr. Naaman accepted a position with the 3M company in the Middle East as a sales and marketing representative.  3M was expanding its operations in the Middle East and Mr. Naaman joined the company's sales and marketing team in Lebanon.  3M's principal office in the Middle East was in Beirut, and the Lebanese team was responsible for facilitating the growth of 3M products throughout the Middle East.  When civil war broke out in Lebanon in 1975, 3M relocated its Lebanese offices to the United Arab Emirates.  (See, e.g., Sami Boulos, Friend, Ltr. at 1 ("[T]he ugly Lebanese civil war started in 1975 and our young lives were quickly shattered as we had to scatter around the globe to survive the next 15 years."); Nabil Safieddine, Friend, Ltr. at 1 ("Then the Lebanese war broke up, bombings were all over the place, Beirut was worse than a nightmare that stretched over 17 years.").)  Mr. Naaman moved to Dubai and helped 3M open its new office there.  The move was difficult because Dubai

18

in 1975 was not the Dubai of today.  Despite its shortcomings, Dubai provided Mr. Naaman with refuge from the violence in Lebanon.  (Id.)  In 1976, 3M again transferred Mr. Naaman, this time to its office in Tehran, Iran (during the reign of the Shah).  In 1977, Mr. Naaman was promoted to 3M area manger in Kuwait and he relocated there.  The Kuwait office serviced the Kuwaiti and Iraqi markets, and Mr. Naaman was responsible for managing 3M's relationships with local distributors.  In the course of his work, Mr. Naaman learned about 3M's products, which included materials and chemicals used for firefighting.  Mr. Naaman also learned about channels of distribution and the way supplier agreements worked.  Most importantly, Mr. Naaman developed extensive knowledge of the internal workings of markets in the Middle East.

In May 1977, Mr. Naaman married his college sweetheart, Laurice Gebran Khalil.  Mr. Naaman met Laurice at AUB and was immediately struck by her drive and intellect.  From the beginning, Mr. Naaman knew that Laurice would make a tremendous partner, and following a six-year courtship, they married.  Shortly thereafter, Mr. Naaman resigned from 3M, forfeiting what had been a reliable stream of income.  Mr. Naaman consulted his wife on his planned resignation and told her that he wanted to pursue his dream of owning a business.  Mrs. Naaman, who had a Masters of Business Administration degree from AUB, appreciated the financial risks, but recognized how important owning a business was to her husband.  She made a personal sacrifice, setting aside her own career aspirations to help her husband achieve his.  Mr. Naaman resigned from 3M and he and his wife returned to Lebanon.

Once in Lebanon, Mr. Naaman began working on the logistics of establishing his own company.  Although he had limited financial resources, he had an abundance of ambition and

19

considerable experience.  Drawing on the knowledge he acquired through his work with 3M, he decided to gear his business towards the Iraqi market.  Mr. Naaman was quite familiar with the market and sensed it had immense potential for growth.  He focused on supplying firefighting materials and equipment; products he worked with extensively during his time at 3M.  After developing a business model, Mr. Naaman formed a limited liability company called, "Interact," which was registered in Lebanon.  Mr. Naaman retained majority control of the company and managed its day-to-day operations.  He hired a full-time engineer and secretary to assist him with the company's operations. Consistent with Mr. Naaman's business plan, Interact's primary business involved supplying firefighting equipment and chemicals in Iraq and Lebanon. Interact matched the right supplier to the appropriate tender, did the logistical work for the purchase and then facilitated the shipment to Iraq and Lebanon.[14]

As Mr. Naaman was growing his business, his family also expanded with the birth of his son, Marwan.  At the same time, the political situation in Lebanon was rapidly deteriorating. The Naamans were concerned for the safety of their young family, particularly because Mr. Naaman's work frequently took him abroad.  But he took some comfort in the fact that his home was on the coastal side of Beirut, and by Lebanese standards, somewhat safe.  Following the birth of his daughter, Mira, who Mr. Naaman considered his lucky charm, Mr. Naaman gave more serious consideration to leaving Lebanon for a safer environment.  When the Israelis

---

[14]     Interact's main suppliers were in France and Italy.

invaded Lebanon in 1982, it fortified Mr. Naaman's belief that remaining in Lebanon posed too great a risk to his family's safety.   Despite their apprehension about leaving their extended family and their home, the Naamans moved their family to France.[15]   They packed a few of their belongings and traveled from Lebanon to Cyprus by ship (the Beirut International Airport was closed), and then on to France.

The Naamans relocated to Nice, France, but Mr. Naaman maintained Interact's business registration in Lebanon.   He traveled to the Middle East frequently, selling firefighting equipment and chemicals in Lebanon and Iraq.   Mr. Naaman was concerned for the safety of his staff in Beirut, so he moved the Interact office to Iraq.[16]   Mr. Naaman would routinely travel to Iraq, work there for a short period and then return to his family in France.   It was difficult to be away from his family for even brief periods, but Iraq was not safe enough to establish permanent residence there.   He had no real alternative but to continue traveling back and forth between France and Iraq.   As Mr. Naaman's son, Marwan, explains in his letter to Your Honor:

> [A]s a child, my father was away from us quite often. And not out of selfishness nor absenteeism, but out of the necessity to provide for us wherever his travels had to take him.  As a boy, I remember crying in my mother's arms asking why dad had to leave and travel so much.  And she would tell me, "toughen up, your dad has to go to work in some of the worst places in the world to provide you with the life that you live, and for every tear you shed, he sheds ten, because your sister

---

[15]    France seemed like a reasonable place to seek refuge because the Naamans already had a visa to travel there and France was similar to Lebanon in many ways.

[16]    Although Iraq presented its own safety issues, Mr. Naaman considered the country to be far safer than Lebanon at that time.

and us are here together and have each other, and he is alone somewhere wishing
he could be with us."

(Marwan Naaman Ltr. at 1.)  Mr. Naaman's perseverance paid off and his business expanded

from 1982 to 1987.

From 1982 to 1987, the Iraq-Iran war occurred and operating a business in Iraq was

extremely dangerous.  Mr. Naaman was aware of the risks, but felt he had no choice but to

continue his work there, as the Iraqi market was where he had invested his time and resources

(and the business in Lebanon had deteriorated substantially).  On several occasions while in Iraq,

Mr. Naaman was confronted with life-threatening situations.  Once, while in Basra delivering a

fire truck to a refinery, Iranian fighters bombarded the refinery and Mr. Naaman took shelter

with the refinery employees for several hours.  He faced a similar situation in Khanakeen, except

that time, when the refinery was bombarded, he took refuge in a sewage tunnel.  Iraq was quickly

deteriorating into a worse environment than the one the Naamans fled in Lebanon.  And yet, Mr.

Naaman felt his only option was to move forward with his work because his family's well-being

depended on the success of his business in Iraq.

After living in France for three years, it was clear to the Naamans that returning home to

Lebanon was not an option because of the ongoing civil war.   Unfortunately, the most

convenient option – simply staying in France – was complicated because it would have been

very difficult for the Naamans to obtain immigration status in France at that time.   While

exploring their options, the Naamans discovered that Canada was welcoming immigrants,

especially those from Lebanon.  The Naamans liked the idea of moving to Canada because they

22

had friends and relatives living there.   After weighing their options, the Naamans moved to Canada and, in the fall of 1986, they purchased a home in Toronto and established themselves as landed immigrants.   In early 1987, the family took full residence in Canada and Marwan and Mira enrolled in Canadian schools.   Within three years of their arrival, the Naamans became Canadian citizens, and the Naaman family had successfully adjusted to the Canadian way of life.

Mr. Naaman wanted to make the most of his situation by establishing roots in Canada and setting up a business.   Lacking a firm understanding of the Canadian market, Mr. Naaman asked the Royal Bank of Canada for an investment recommendation.   The bank recommended that he consider acquiring a one-third ownership interest in a retirement home in Peterborough, Ontario, with the prospect of investing in additional retirement homes in the future.   Mr. Naaman followed the bank's recommendation and entered into a partnership with two Canadians who had an established reputation in the retirement home sector.   After working in the business for a year, Mr. Naaman developed concerns about the way the business was being run, particularly the lack of transparency.   When his concerns reached a crescendo, Mr. Naaman withdrew from the partnership and sold his interest back to his partners.   Mr. Naaman was happy to have extricated himself from the business, especially once he learned his two former partners had embezzled and then absconded with funds from the retirement homes.[17]

---

[17]        Mr. Naaman does not know if his former partners were ever prosecuted.

Mr. Naaman's exit from the retirement home business left him looking for other business opportunities. That opportunity presented itself when Mr. Naaman was approached by one of his cousins, who proposed opening a chain of fast food restaurants called, "Chicken N' Choices." After reviewing his cousin's proposal, Mr. Naaman and his cousin entered into a partnership to open the Chicken N' Choices chain of restaurants. Unfortunately, the fast food business was not successful and the chain incurred heavy losses. Even though he suffered personal losses, Mr. Naaman made sure their employees received all the benefits they were entitled. Mr. Naaman's accountant advised him to file for bankruptcy to protect himself from creditors and the Canadian government, but Mr. Naaman refused because he wanted to build a good name for himself in his new country. Mr. Naaman paid every dollar he owed in relation to the failed restaurant business and he closed the business with his good name intact.

Although Mr. Naaman's initial forays into the Canadian market were not successful, those setbacks did not squelch his entrepreneurial spirit or determination to own and operate a business in Canada. Mr. Naaman and two of his Lebanese friends started a real-estate and construction company, MERAL, to capitalize on Canada's real estate boom in the late 1980s. The company initiated five residential housing projects. In the beginning, the company was profitable. Before MERAL could complete all of the projects, however, the Canadian real estate market collapsed and the company was forced to sell its properties at a loss. Between the failed restaurant and the real estate ventures, Mr. Naaman lost approximately Canadian $1.3 million.

Throughout his struggle to establish a sustainable business in Canada, Mr. Naaman never lost sight of his Interact business in Iraq. Mr. Naaman traveled to Iraq periodically to promote

24

the business and to maintain a presence in the country.  In the course of his travels, Mr. Naaman observed business conditions improving in the Middle East and he once again saw an opportunity to tap into the expanding market.

**D.**     **Career Success**

By 1993, Mr. Naaman moved his family back to the Middle East to start a new business in Abu Dhabi.  He formed a partnership with an Emirati businessman to establish two companies in the United Arab Emirates:  Tawam Building Material and Tawam Oil and Gas company. Although U.A.E. law allowed Mr. Naaman to retain only a 49 percent ownership interest in the companies, he devoted his full time and energy to building the businesses.  Through the Tawam companies, Mr. Naaman marketed kitchens, bathrooms and sanitary wares, as well as industrial consumables such as welding electrodes, cutting discs, grinding discs and safety equipment.  The companies also sold and installed marine loading arms for local refineries' offshore jetties.  Both companies were successful.

Once back in the Middle East full-time, Mr. Naaman also revived Interact's business supplying Iraq with firefighting equipment and chemicals.  Because Mr. Naaman had extensive knowledge and experience supplying goods in the Middle East, he was approached by Mr. Zobel, then the sole owner of Alcor, to be Alcor's agent in the Middle East.  When Innospec later acquired Alcor, Alcor retained Mr. Naaman as its agent in Iraq.  Mr. Naaman relied on the employees in his Baghdad office to manage the day-to-day operations of Alcor's TEL business. But because running a business in Iraq was dangerous, and the market was sporadic, Mr. Naaman focused his efforts on his businesses in the U.A.E.

25

Observing the construction boom in the U.A.E., Mr. Naaman anticipated there would be a need for local fabrication of aluminum windows, doors and curtain walling.  Responding to that need, Mr. Naaman acquired an ownership interest in a small aluminum factory.  Realizing he lacked the technical expertise to operate and manage the factory on his own, Mr. Naaman reached out to a Spanish company, Folcra, for assistance.  Folcra was a reputable company with vast experience in the aluminum construction business.  The partnership proved successful by combining Folcra's technical expertise with Mr. Naaman's business acumen and work ethic.  Through their collective efforts, the aluminum business prospered and a company that started with 40 employees grew to employ almost 1,000 workers.

### E.      Health Decline and Retirement Planning

As Mr. Naaman's dreams of owning and operating a successful business came to fruition, his health started to fail him.  He began suffering chest pains, fatigue and dizziness.  Worried about his declining health, Mr. Naaman returned to Lebanon for a thorough medical evaluation.  Mr. Naaman's cardiologist suspected there was a problem with Mr. Naaman's heart and recommended that Mr. Naaman undergo a cardiac catheterization, which involves inserting a catheter into a chamber of the heart to determine the degree of coronary artery disease.  Upon performing the catheterization, the cardiologist determined that Mr. Naaman had a 60 percent closure of his LAD and circumference arteries.  He informed Mr. Naaman that his condition was life-threatening and advised Mr. Naaman to consider an immediate bypass surgery.

Given the gravity of the diagnosis, Mr. Naaman wanted a second opinion and he and his wife traveled to the Cleveland Clinic in the United States.  The Cleveland Clinic conducted a

battery of tests, each of which confirmed the arterial closure.  Although the diagnosis was the same, the Cleveland doctors recommended that Mr. Naaman try to control the problem through medication and a change in lifestyle.  Under their treatment plan, Mr. Naaman was to take an array of medication, control his diet, exercise regularly, forgo stressful activities and receive a semi-annual check-up to monitor his heart condition.

With two conflicting treatment recommendations, Mr. Naaman sought a third opinion. He went to the Tzanck Heart Institute in Nice, France, where he consulted Dr. Jean-Pierre Elbeze.  Dr. Elbeze insisted on conducting his own medical tests and a new catheterization.  The testing once again confirmed the arterial closure and Dr. Elbeze recommended that Mr. Naaman control his heart decease through medication and a change in lifestyle.  Dr. Elbeze made clear to Mr. Naaman that he was in the "hot seat" and that he should not take his condition lightly.  Dr. Elbeze emphasized the importance of Mr. Naaman avoiding stressful situations and even suggested that Mr. Naaman consider an early retirement.  Dr. Elbeze also agreed with the Cleveland physicians that Mr. Naaman should have semi-annual check-ups.

Mr. Naaman and his family discussed the doctors' diagnoses and treatment recommendations, and they decided the risks associated with a bypass operation were too great when another less risky option was available.  The Naamans agreed that Mr. Naaman would take a less active role in his businesses to reduce his stress levels, eat a more balanced and healthy diet, and exercise more frequently.  Mr. Naaman made adjustments to his businesses so that they could continue their successful operations without his full-time involvement.  Mr. Naaman made his first adjustment in 2006, by selling the majority of his ownership stake in the aluminum

factory.[18]   He was in the process of making other adjustments when he was arrested in Frankfurt, Germany, while en route to France for medical treatment.

### F.    Civic and Charitable Contributions

One of the pervasive themes in the letters submitted in support of Mr. Naaman is how generous he has been with his time and money.  Mr. Naaman always recognized how fortunate he is to have a loving and supportive family and has remained humble and grounded throughout his many successes in the business world.  (Suha El Natour Hout, Wife of Mr. Naaman's cousin, Ltr. at 1 (explaining that Mr. Naaman's generosity stems in part from the fact that "[he] never forgot when he was a young ambitious man and wished somebody could help him to improve his life").)   Recognizing that others have not been as fortunate, Mr. Naaman provided charitable contributions to dozens of poor and underprivileged families in developing nations.   His charitable support includes donations to established charitable organizations such as Red Cross, Red Crescent, Al Makassed Charity Organization, St. Jude Hospital, as well as unofficial donations made directly to small schools and medical clinics in extremely impoverished towns in India and Lebanon.  When someone comes to Mr. Naaman in need, he makes an effort to help to the extent he can, whether through a monetary contribution or other support.

Mr. Naaman's employee, Abdul Khaliq, recounts how he mentioned various problems in his village in India to Mr. Naaman and Mr. Naaman "immediately agreed to help" and "started to

---

[18]     Mr. Naaman retained a small percentage of his ownership stake and transferred it to his son, who had an eagerness to manage the factory operations.

give money to [the] hospital, school, orphanage, and age people." (Abdul Khaliq, Employee, Ltr. at 1.)  Moreover, "Mr. Naaman took the responsibility of education of 300 children who stopped their education because of money issue.  He arranged their books, uniforms, full year food, and promised to continue every year." (Id.)  Mr. Naaman appreciates the value of education and has contributed his time and money promoting education for the underprivileged. As Mr. Naaman's friend, Maher Nasser, explains, "Ousama was well known for his generosity, and no one can attest to that more than my wife Gisele Nassar, who for the past 4 years has been the President of the AUB (American University of Beirut) Alumni Association in Abu Dhabi and who always received the support of [Ousama] in raising donations to assist the education of needy students." (Maher Nasser, Friend, Ltr. at 1).  Dr. Mukbil Hourani, a professor of clinical radiology at AUB, writes: "We are graduates of the same high school, and he always participated in our fund raisers and donated generously when called upon.  His generosity was not limited to his high school, but extended to those in need around him, when he volunteered to help whenever help (financial or otherwise) was needed." (Dr. Mukbil Hourani, Professor, Ltr. at 1.)

Mr. Naaman's charitable work is motivated purely by a desire to help others who are less fortunate.[19]  In fact, Mr. Naaman often makes his charitable contributions anonymously. (Walid Ramadan, Friend, Ltr. at 1 ("Mr. Naaman has also contributed to numerous charities helping

---

[19]    Unlike the United States, Lebanon and the U.A.E. do not offer tax deductions or other concessions for charitable donations.

needy people, because of his upbringing, and always kept it anonymous.").)  Mr. Naaman is
unable to turn a blind eye when someone is in need.  The letter from Mr. Naaman's friend,
Michael Issa, provides but one example of Mr. Naaman's unwillingness to sit idly by when a
friend is in need.  (See Michael Issa, Friend, Ltr. at 1.)  Mr. Issa was diagnosed with morbid
obesity and placed on a five-year waiting list to undergo gastric bypass surgery in Canada.  (Id.)
Seeing his friend in need, Mr. Naaman took action.  Mr. Issa recounts, "One day I received a call
from Professor Noon of Hotel-Dieu de France Hospital in Lebanon telling me that I have been
booked an all expense paid for operation to undergo the life saving procedure."  (Id.)

Others attest to similar experiences with Mr. Naaman, including members of the United
States military.  When the commander of Security Forces stationed at the Al Dhafra Air Base in
the U.A.E. was scheduled for ten days of leave to celebrate his 20th wedding anniversary.  (Haig
Melkessetian Ltr. at 1.)  Unfortunately, the Saudi Arabian government had suspended military
passenger flights when the commander was scheduled to take his leave.  (Id.)  The commander's
only option was to leave from the Abu Dhabi civilian airport, but that required the commander to
obtain a visa from his host country.  (Id.)  The U.S. embassy in Abu Dhabi refused to assist in
obtaining a U.A.E. visa for "bureaucratic reasons."  (Id.)  There was a law in the U.A.E. that
allowed companies to issue visitor visas within 24 hours, but the commander did not have a local
company to sponsor his visa.  (Id.)  When Mr. Naaman's friend, Haig Melkessetian, a U.S.
military intelligence contractor at the time, approached him and requested that he help the
commander, Mr. Naaman agreed without hesitation.  (Id.)  Twenty-four hours later, "Major
Adkison was on a flight to a joyful reunion with his wife and family."  (Id.)

30

The letters attached to this memorandum recount a number of other acts demonstrating Mr. Naaman's unflinching commitment to helping those in need.  Mr. Naaman's friend, Said Kiwan, writes:

> As a young entrepreneur in my direst time of need both financially and operationally, I approached Ousama and asked him for both guidance and a push in the right direction, to help at that time, my fledgling and heavily indebted company.  He unblinkingly lent me a helping hand.  His contribution of simply a few good words put in on my behalf to people in the business world meant the difference between my success and failure.

(Said Kiwan, Friend, Ltr. at 1.)  Similarly, Sami Boulos writes:

> I needed Ousama the most when I had to leave Lebanon hastily at the onset of the civil war and he stayed.  Since then he continuously checked on my parents and younger siblings and took care of their basic needs and managed to connect me with them during the difficult and brutal days that they all experienced while my family struggled to survive as a Christian family living in West Beirut.

(Sami Boulos, Friend, Ltr. at 1.)

These are but a few of the examples of Mr. Naaman's generosity and charity.  The list of people who have been touched by Mr. Naaman's goodwill, both knowingly and unknowingly, would go on and on and many of these people have written to the Court.

## III.   THE EFFECTS OF INCARCERATION

### A.   Wife and Children

These proceedings have taken an undeniable toll on the Naaman family.  Mr. Naaman's arrest and incarceration in Germany came as a complete shock to the Naamans and they were left scrambling to figure out how to respond.  During the nine months that Mr. Naaman spent in a German prison, Mrs. Naaman and her children traveled from Abu Dhabi to Frankfurt on at least

31

18 occasions.  The long intercontinental flights and hotel stays were particularly difficult for the Naamans because, once they arrived in Frankfurt, they were only allowed to visit with Mr. Naaman for one hour every two weeks.  Although Mr. Naaman could receive mail from his family while he was incarcerated, it took more than a month for the mail to be delivered because it had to be scanned and approved prior to delivery.  Mr. Naaman contacted the German prosecutor in Frankfurt and requested that he be allowed to contact his family, German and American attorneys by phone, but that request was denied.  As a result, Mr. Naaman could not contact anyone by phone during the nine months that he was incarcerated in Germany.  Instead, he had to wait for his family to visit before he could speak with them.  The Naaman family's restricted access to Mr. Naaman stood in stark contrast to the frequent family time they had grown accustomed to sharing.  Because the Naamans are a close-knit family in which each family member relies on the others for support, Mr. Naaman's absence placed a tremendous emotional and physical strain on the entire family.

Following Mr. Naaman's arrest, Mrs. Naaman was consumed with fear for her husband's well-being and deeply concerned for his future and their family's future.  When Mr. Naaman was extradited to the United States, Mrs. Naaman uprooted her life, leased an apartment in Washington, D.C., and stood by her husband's side as he faced the most difficult time in his life. (Laurice Naaman, Wife, Ltr. at 2 ("The lowest point in my life was visiting [my husband] in this

Washington D.C. jail, seeing him with his hands and feet cuffed and chained, like a dangerous criminal.  He had not slept for a week, looked exhausted and weak.")  Mrs. Naaman left her elderly, widowed mother and a sister, who is blind.[20]  Having to leave her mother and sister weighed heavily on Mrs. Naaman, as has leaving her other family and friends to support her husband in a foreign country to which she has no real ties.   This ordeal has been extremely stressful for Mrs. Naaman, and for more than nine months, she felt like she had lost her best friend, closest confidant and life partner.  (Laurice Naaman, Wife, Ltr. at 1 ("I am saddened, angry, frustrated and shocked at what has happened to my husband; fearful at what might still happen; anguished, hurt and profoundly sad at what has befallen our family").)  There is no way to quantify the feeling of being deprived access to the one person who has been by your side for more than 33 years.

Mr. Naaman's arrest and incarceration also had a devastating impact on his two children, Marwan and Mira.  In her letter to Your Honor, Mira explains:

> I struggle to put into words how inexplicably difficult the past year has been.  My father being incarcerated has put a heavy toll on him as a person and us as a family.  My father is a strong and proud man, a man with a good heart, a man who believes in the goodness of people.  This past year has been extremely taxing on all of us as we endured a rollercoaster of emotions.  When we were weak, he kept us strong with his strength.  He kept us positive, humble and united.  We became stronger as a family unit because of him.  We are a close knit family with him at our core.  Not having my father around has been almost impossible to bear.

---

[20]    Mrs. Naaman's mother and sister have relied on Mrs. Naaman for care since Mrs. Naaman's younger brother passed away a little under two years ago.

(Mira Naaman, Daughter, Ltr. at 1.)  Like many children, Marwan and Mira admire their father as a caring and compassionate man, who worked hard to provide for them.  As adults, Marwan and Mira still look to their father for his counsel and support.  Before his arrest, both Marwan and Mira spoke with him frequently and often sought his advice.  Marwan explains the impact of his father's arrest and incarceration when he writes:

> I honestly cannot express the anguish of that moment nor the 18 months that followed. Your Honor, here was my father, a mountain of strength for me, seemingly impervious to everything, now humbled so terribly that I was nearly paralyzed on how to move forward at first. This is the man I would turn to in my hour of most dire need seeking advice, and I couldn't consult with him on anything. Even worse still, my questions would be about how to help him, and he couldn't answer any of them. Communication with him while in prison in Germany was so minimal (one hour visit every two weeks!) that our traditional roles as father and son had almost reversed. He was almost totally helpless and reliant on us to help him in this foreign country where none of us even spoke the language.

(Marwan Naaman Ltr. at 3.)  Unlike others who have a family member who is incarcerated, Marwan and Mira were not able to visit their father several times a week, or even weekly.  As a result, they were deprived of the access to their father's love and support to which they had grown accustomed.  Mr. Naaman was no longer there to provide encouragement to his children as they moved forward in their lives.  (Jack Jossaume, Friend, Ltr. at 1 ("There is no doubt that [Mira's and Marwan's] recent separation from their father has been extremely difficult for them and will have an impact on them for the rest of their lives.")  Instead, Marwan and Mira read articles from local Emirati newspapers and the internet about this case, many of which portrayed their father in a negative light.  Knowing that their father's name was being tarnished was very

difficult for Marwan and Mira.  The burden was particularly heavy for Marwan who stepped into his father's shoes for the sake of his family:

> So here I was, 32 years old, newly married and expecting a baby, managing a business, and having to coordinate all of his legal issues almost alone.  I had to console and comfort my mother and sister, keep my pregnant wife as insulated from the stress as possible, try to manage what I could of his business and deal with the social fallout of his entire story within our community.

(Marwan Naaman Ltr. at 3.)

Unfortunately, both Marwan and Mira are at a stage of adulthood in which important changes in their lives are taking place.  When Mr. Naaman's first grandchild was born, Mr. Naaman's incarceration prevented him from being there to congratulate his son and welcome his new granddaughter to this world.  Mr. Naaman was not able to kiss his granddaughter until five months after she was born.  Marwan was terribly upset that his father could not be there when his daughter was born:

> For me, not having my father by my side to welcome our daughter into this world, and for him to be so far away in prison and isolated from that joyous moment is beyond what words can express.  He had to learn of Serena's birth from his lawyer in prison in Germany, and could not even congratulate me until our next visit several weeks later. I have tried to further encapsulate these particular feelings into words but with no luck so I trust that your heart can fill in the blanks of what I cannot articulate on this subject.  I believe it was truly one of the greatest punishments of his life.  A punishment no person should ever have to endure.

(Marwan Naaman Ltr. at 3.)  Although Marwan will remember the birth of his daughter as one of the greatest moments of his life, he also will have the painful memory of his father's absence and the reason for that absence.  Marwan will never have another chance to have his father by his side during the birth of his first child and that fact is not loss on him.  Although Mr. Naaman's

35

absence at the birth of his granddaughter was especially painful for the Naaman family, it is but one of the many family moments that Mr. Naaman has missed because of this ordeal.

In some instances, members of the Naaman family have put their lives on hold while praying for an end of this process. Although Mira and her fiancé have been engaged and ready to have their wedding for quite some time, Mira simply cannot fathom getting married without her father there. (Mira Naaman, Daughter, Ltr. at 1 ("I can only hope that this nightmare ends and that my father can stand by my side when I get married in the coming year. I can only hope that he will be with me to whisper a few words of wisdom before I embark on my next adventure and to give me the encouraging support he always has.").) She was forced to have a difficult conversation with her fiancé and his family in which she explained the circumstances preventing them from marrying. Although she has been dreaming of her wedding day since she was a young girl, that dream has been deferred because of her father's circumstances.

Most importantly, Laurice, Marwan and Mira are worried about Mr. Naaman and the toll this case has had on his health. Laurice, Marwan and Mira are well aware of Mr. Naaman's health problems and they have witnessed first-hand the emotional and physical strain these proceedings have caused him. They worry this entire experience has further jeopardized Mr. Naaman's health and they cannot help but fear the worst. Although Mr. Naaman was the one who was arrested, incarcerated and convicted, he has not faced any of these challenges alone. Through them all, his family has been there to offer their enduring love and support. It is not only Mr. Naaman who has suffered, so has his family.

B.   **Mr. Naaman**

Because Mr. Naaman is a family man, he will always put his family's needs before his own.  He would be the last person to make light of how his arrest, incarceration and conviction have affected him, knowing how much his family has suffered.  But the fact remains that this experience has nearly broken him.  As Mrs. Naaman explains:

> No words can convey the trauma of being imprisoned, and the suffering my husband endured.  Now the specter of possible reincarceration is exhausting and draining him and us, his family; even further.  He does not sleep well, is always despondent and worried at what might be the outcome of his sentencing.  His mental, psychological and physical state is worrying us.  He has a heart condition, where stress is detrimental.  His faith and our support are his refuge, yet the whole ordeal has worn us down.

(Laurice Naaman, Wife, Ltr. at 1.)

More than anything, Mr. Naaman is overwhelmed with shame and sorrow for his misconduct, and regret for the pain he has caused his family.  (Shahin Shirian, Employee, Ltr. at 1 ("I met [Ousama] in Washington in August 2010 and talked to him at length . . . .  I sincerely felt from his words that he has understood that somehow wrong was done and he expressed how much he regretted what had happened to him and his family whom have equally with Ousama, endured so much pain during the past 14 months."); <u>see also</u> Laurice Naaman, Wife, Ltr. at 2 (describing how Mr. Naaman cried when he saw his wife and son at the D.C. jail and "said he was sorry [they] had to see him in such a state and was sorry to have caused [them] such anguish."); Jihad Shibaru, Friend, Ltr. at 1 ("I have recently talked to Ousama, he sounded depressed an [sic] regretted the hurt he had caused his family and friends, especially his wife Laurice.").)  Although Mr. Naaman felt great pride to learn of the birth of his first grandchild, he

37

was deeply saddened that he was not able to be there to support his son and welcome his granddaughter to the world.  (Suha El Natour Hout Ltr. at 2 ("The experience has been traumatic to all of us and especially to Ousama, whose first grandchild was born while he was in prison in a different continent.").)  Mr. Naaman always made it a priority to be with his children and he felt that he had let his family down.  Mr. Naaman also becomes teary-eyed at the thought that his daughter has not been able to have her wedding because of him.  Mr. Naaman is fully aware of how much the wedding means to Mira and it has been emotionally devastating to know that he is now an impediment to his daughter's happiness.  And, Mr. Naaman feels awful that he left his wife without her husband for almost a year.  Mr. Naaman knows how much this ordeal has upset her and he knows that he cannot make up for the loneliness, fear and despair that she felt while he was incarcerated.  Mr. Naaman considers the pain that his situation has caused his family to be the most severe punishment he has ever endured.  (Laurice Naaman, Wife, Ltr. at 3 ("Further incarceration of my husband will not benefit anyone; will not strengthen his resolve to learn his lesson.  It will serve only to break him, prolong his and our family's suffering.")

Even without these criminal proceedings, Mr. Naaman was experiencing significant health issues that caused him to take pause and re-evaluate the course of his life.  When Mr. Naaman was diagnosed with heart problems in 2006, he immediately understood the seriousness of the diagnosis and its potential ramifications.  Since 2006, Mr. Naaman has taken measures to reduce the risks created by his heart condition.  He has reduced his exposure to stressful situations, modified his diet and exercised more.  Unfortunately, Mr. Naaman's efforts to stay

38

healthy have been seriously undermined by the harmful effects of these proceedings, which have aggravated Mr. Naaman's existing conditions while giving rise to new ones.

During the first two weeks of his incarceration at Northern Neck Regional Jail, Mr. Naaman was deprived of his heart medication because the facility did not have the medication in stock. Mr. Naaman's physicians previously had instructed him that he should not miss taking the heart medication for more than two days, and he should only miss two days of the medication for good reason. In addition, the Northern Neck facility refused to provide Mr. Naaman with the medication he takes to treat his stomach ulcers. Mr. Naaman's understanding of the reason for the facility's refusal was that the medication was too expensive and the facility's insurance would not cover it. Despite Mr. Naaman's requests, the facility also refused to provide him with an additional blanket to keep him warm at night. And Northern Neck denied Mr. Naaman's request for additional food so that his medication would work properly. As a result, Mr. Naaman was cold and hungry throughout his incarceration at the Northern Neck facility. As Mrs. Naaman explains in her letter to Your Honor:

> But all this pales in front of the conditions [my husband] faced in the Virginia jail. Over there my husband was constantly cold and hungry. A man with a serious heart condition who had to worry about his medication and health. My husband is a strong man, but what he had to endure would break most men. I nursed him back to health after posting bail; he had lost 50 pounds during his incarceration and had various ailments as a result, for which he is still being treated.

(Laurice Naaman, Wife, Ltr. at 3 (emphasis added).)

Upon his conditional release, Mr. Naaman received a full medical evaluation. Blood tests revealed that he was suffering from severe anemia, which the doctors attributed to Mr. Naaman's

poor diet while incarcerated.  Mr. Naaman's physicians also informed him there was a problem with his white blood cells, red blood cells and platelets counts, which were very low.  Despite taking the medication prescribed to treat his condition, Mr. Naaman's platelet counts have continued to decline.  The physicians are still uncertain as to the cause.  Mr. Naaman's physicians also informed him that there is a problem with his liver function.  Lastly, and perhaps most important, Mr. Naaman continues to suffer from substantial closure of his heart arteries and his elevated stress levels threaten to aggravate his condition.

If Mr. Naaman were sentenced to additional incarceration, there is a serious risk that imprisonment would further aggravate his health problems.  In his letter to the Court, Mr. Naaman's physician, Dr. Omar Hamoui[21] confirms that Mr. Naaman "has known coronary disease demonstrated by two catheterization procedures" which "showed significant two vessel coronary artery disease."  (Dr. Omar Hamoui Ltr. at 1.)  In addition, Mr. Naaman has been "diagnosed with small, silent strokes with brain magnetic resonance imaging (MRI) showing microischemic supratentorial white matter lesions" and he suffers from "hypertension, significant prostrate disease, and hypercholesterolemia."  (Id.)  Most importantly, Dr. Hamoui advises that Mr. Naaman "needs to remain strictly adherent to his medical therapy and avoid stressful situations" and states, "[i]n my medical opinion I think any further incarceration would

---

[21]    Dr. Hamoui is a physician at the Clemenceau Medical Center, which is affiliated with Johns Hopkins Medicine International.

adversely affect his cardiac condition, as any stress is detrimental to his tenuous cardiovascular status . . . ." (Id.)

Lastly, Mr. Naaman fully understands that his arrest and conviction have tarnished his reputation. Mr. Naaman always has strived to preserve his good name and reputation in both his social and business circles. He has worked hard to build a reputation as a hard-working businessman who conducts his business in a fair and straightforward manner. (Jihad Khazen, Journalist, Ltr. at 1 ("I am not trying to justify Mr. Naaman's conduct in Iraq, which I am sure he regrets and will never repeat, but he has conducted a lot of other business with honesty and integrity, and Iraq was but a small mistake among a lot of honest hard work."); Ghassan Naaman, Cousin, Ltr. at 1 ("Ousama did wrong, but business practices in the Middle East are different from the United States, and I also truly believe that he regrets his actions.").) Mr. Naaman knows that it will be almost impossible to restore his reputation to what it was prior to his arrest and that, at this stage of his life, in some people's eyes, his arrest and prosecution will define him more than his lifetime of honest achievements.

## C.   Extended Family

Mr. Naaman's incarceration also inhibited his ability to pursue the activities that he does in support of others. Mr. Naaman's family means more to him than anything else and he does whatever he can to help relatives who are in need. (Hassana Arayssi, Sister, Ltr. at 1 (recounting how "Ousama took on [his siblings'] troubles and helped each of his siblings when their father passed away); Suha El Natour Hout Ltr. at 1 ("[Ousama] has always embraced all his family members and helped the needy of them by steady salaries, educating their children or even

41

paying for their accommodation and many other ways."); Walid Ramadan, Friend, Ltr. at 1 ("When Mr. Naaman's brother-in-law died of cancer in 1989, Ousama was the Guardian Angel who took care of his children by putting them through school and university.").) He provides substantial financial support to numerous members of his family and he considers it his moral duty to help members of his family who suffer financial hardship. Mr. Naaman pays each of these family members a monthly sum, which they use to support themselves and their respective families. Mr. Naaman provides support to two of his sisters, his mother-in-law, his sisters-in-law, several of his cousins, and their respective families. (Michael Issa, Friend, Ltr. at 1 ("[Ousama] completely supports the families and children of his two deceased brother in-laws, his sister in-law and her mother to name a few.").) All told, Mr. Naaman provides financial support to roughly 11 members of his family, each of whom receives between $1,000 and $1,500 each month. Mr. Naaman provides this assistance because these relatives are unable to work and do not receive unemployment benefits, social security or pensions. For these individuals, Mr. Naaman is their sole source of income and they rely on him for their basic needs. They especially rely on Mr. Naaman to help them pay their medical bills because they lack any form of medical insurance. Mr. Naaman's friend, David K. Saad, explains how Mr. Naaman provided for his sister-in-law and her family when her husband, Ghassan Khalil, died of liver cirrhosis:

> Ousama continues to provide for the wife of the late Ghassan. He even provides, on a monthly basis, for the daughter of Ghassan and her 2 children. The daughter underwent a bitter divorce. Her ex-husband does not provide anything in either child support of alimony. [Ousama] filled in the gap. He is the bread winner for no less than 4 families.

(David Saad Ltr. at 1.)

In addition to the monthly support payments, Mr. Naaman also provides financial assistance to his family through lump sum payments to cover tuition, medical expenses, rent and other large expenses and emergencies.  (Hassana Arayssi, Sister, Ltr. at 1 (explaining  how Mr. Naaman wired her money when she and her family found themselves stranded in England because of the ongoing war in Lebanon).)  Mr. Naaman's nephew, Sami Arayssi, writes,

> Uncle Ousama, as I always like to call him, was the first person that believed in me and encouraged me to pursue my graduate studies in Electrical Engineering at Stanford University.  My joy of being accepted in this prestigious program did not last too long when my father decided not to assist me in covering the program's tuition and other expenses.  Highly committed to his family and a strong advocate for education, uncle Ousama took it upon himself to cover my expenses.

(Sami Arayssi, Nephew, Ltr. at 1.)

Mr. Naaman's arrest and incarceration have inhibited his ability to support his extended family because they have placed his businesses in jeopardy, caused him to incur substantial fees, and made him susceptible to large fines and penalties.   While Mr. Naaman understands that certain financial penalties are a consequence of his illegal acts, he is deeply concerned about the financial well-being of his family and those who depend upon him.

### D.   Employees

Mr. Naaman's incarceration has not only impacted his family, it also had a severe impact on the many women and men who work for his companies.   Through his companies, Mr. Naaman employs approximately 50 workers.   These workers rely on the successful functioning of the companies that employ them for income to sustain their lives.  In a joint letter to the Court,

Mr. Naaman's employees explain how vital Mr. Naaman has been to the company's success and

the detrimental impact of his absence:

> Many of us have been working for Mr. Naaman since the very beginning and our
> company feels more like a family than anything else.  And this family has spent
> the last year as if without its father.  Since Mr. Naaman's legal problems started
> over 15 months ago, we have all been in a state of disbelief, confusion and worry.
> You see your Honor, Mr. Naaman is more than just the manager and shareholder
> in this company; he is the beating heart of it.  It is through his hard work and
> determinations that he built this company, and every day during that building
> process, he would make each one of us feel like we are all the reasons for its real
> success.  His motivating way makes us feel like we are the best in what we do,
> and pushes us to be even better.

(Tawam Employee Ltr. at 1.)

In addition to the joint letter from Mr. Naaman's employees, a number of employees have

written the Court individually to explain how Mr. Naaman has not only enriched their lives as

employees, but also shown compassion towards them personally.  Mr. Khaliq, who is an Indian

National, writes:

> I am a chartered accountant and started working with [Mr. Naaman] since
> [January 2003].  I was in desperate need of a job to support my family in UAE
> and my parents and brothers in India.  Without knowing me or my accounting
> qualifications, he personally hired me as an accountant for his company.  I started
> as a very junior employee and he helped me to raise myself up to eventually head
> the accounts department . . . .  Today I support my entire family and extended
> family back home in India.

(Abdul Khaliq, Employee, Ltr. at 1.)  Like many of the women and men who work in Mr.

Naaman's companies, Mr. Khaliq depends on the successful operation of his employer for his

livelihood.  As importantly, these employees look to Mr. Naaman for his support, guidance and

mentorship.  (Ahmed Sen, Employee, Ltr. at 1. ("To me Mr. Osama was the father, teacher and

44

friend, he ran the company with love and passion caring about every single individual in the company.  He was always involved in our personal and professional problems, his door was always opened when you need him."); Shahan Shirian, Employee, Ltr. at 1 ("I have spent the past ten years working for [Ousama].  During this time, we have developed such a close relationship that I consider myself not only as an employee or a friend but rather as a member of his family.").)

Because of his incarceration, a number of Mr. Naaman's creditors have withdrawn their credit facilities for Mr. Naaman's businesses, which threatens the operations of those businesses. Since being released, he has been able to restore some of his business contacts and operations.  If Mr. Naaman is sentenced to additional incarceration, it is very likely he will be unable to secure credit to maintain his business operations in the Middle East.  The unfortunate consequence will be that many of the workers who currently rely on Mr. Naaman and his businesses will lose their jobs.  As Mr. Naaman's employees explain in their letter to the Court:

> [I]n all honesty your honor, it is Mr. Naaman who is our Sheppard and our guide. It is he that brings new business and life to our company, that allows it to grow and most importantly, to allow us to provide for our families.  This past year without him, we have really suffered.  In this already poor market conditions, business has become very slow.  We need to have him back with us again so we can all continue to work and earn a living.  We fear that the company will not be able to survive without him, even though on the rare chance that some of us were able to speak with him since he was on bail, he would always state otherwise and try to comfort us.  But reality is, we cannot survive very much longer without him and too much is at stake for all of us and our families if [Mr. Naaman] does not return to us soon.

(Tawam Employees Ltr. at 2.)

45

As the letters from Mr. Naaman's employees make clear, a sentence of further incarceration is not only a sentence on Mr. Naaman, it is a sentence upon his family and many employees as well.

## V.   THE PRESENTENCE INVESTIGATION REPORT OVERSTATES MR. NAAMAN'S SENTENCING GUIDELINE CALCULATION

Although Mr. Naaman does not seek a sentence that is based on the Sentencing Guidelines, in the event that the Guidelines are considered, he objects to several facets of the Presentence Investigation Report ("PSR") that he believes result in a Sentencing Guideline range that is excessive.  The PSR drives Mr. Naaman's Sentencing Guideline range up dramatically by failing to group all offenses under one Guideline and then misapplying the Bribery Guideline of Section 2C1.1.

### A.   The PSR Inappropriately Fails to Group Offenses

Mr. Naaman pled guilty to two offenses that should be grouped, but the PSR inappropriately concluded that they could not be grouped.  Count 1 alleges a conspiracy in violation of 18 U.S.C. § 371, 15 U.S.C. § 78dd-1, and 18 U.S.C. § 1343.  The PSR correctly notes that the appropriate Guideline for the Section 371, Section 78dd-1 and Section 2 offenses is the Bribery Guideline of Section 2C1.1.  (PSR ¶ 83.)  Nevertheless, the PSR erroneously concludes "[t]he guideline applicable to violation of 18 USC § 1343 is USSG §2B1.1," the Fraud Guideline.  (Id.)  In truth, Appendix A to the Guidelines lists both Sections 2C1.1 and 2B1.1 as potentially applicable.

46

Where a statutory offense like Section 1343 references two or more potentially applicable Guidelines, it falls to the Court to decide which Guideline is more appropriate.  U.S.S.G. §§ 1B1.2, app. note 1; App. A, intro.  There should be no question that Count 1 is more about bribery than it is about fraud.  All of the statutes referenced in Count 1 can be sentenced under the Bribery Guideline, and the conspiracy that is charged involves conduct that can only be charged under the Bribery Guideline (15 U.S.C. § 78dd-1).  The fraud at issue in this case was not the deprivation of money, but the impairment of the U.N.'s governmental functioning.  This is not a typical financial fraud, like the one contemplated by the Fraud Guideline, where a person is tricked into giving up their money.  Indeed, the U.N. was not deprived of money – the money belonged to the Government of Iraq and the Government of Iraq initiated the scheme to get its own money back.  The U.N. was merely regulating the Government of Iraq's access to its money, and that governmental function is what was impaired.  Accordingly, there is no reason why Count 1 should not be sentenced under Section 2C1.1 and why it cannot be grouped with Count 2, which the PSR acknowledges is subject to Section 2C1.1.

In responding to this objection, Probation does not dispute any of what is said above, but claims that the Bribery Guideline fails to account for the falsification of books and records.  But the same companies that are subject to bribery charges under the FCPA are subject to books and records requirements, such that bribery almost invariably results in a books and records violation because people who pay bribes are not going to document that for auditors to discover.  Efforts to conceal the bribery through such means as books and records violations are subsumed within the Bribery Guidelines.

47

B.      **The PSR Miscalculates The Fraud Guideline**

1.      **The PSR Miscalculates Loss**

To be sure, the PSR does a better job at calculating loss than is suggested by the government.   Even assuming the Fraud Guideline is applicable, the government's efforts to inflate the loss calculation are not appropriate.   The government claims that Innospec's full profit of $23 million from the sales of TEL to Iraq under the Oil for Food Program is the measure of loss, but that simply is not true.   The PSR was justified in rejecting this inflated figure.   Even had Innospec been a perfectly honest company, it still would have been in the business of selling its products at a profit.   It is not reasonable to suggest – as the government's calculation assumes – that absent any fraud, Innospec would have sold TEL to Iraq without making any profit whatsoever.   There is no basis for assuming that all profits are derived from fraud.

The government's argument also ignores that fact that Alcor's sale of TEL to Iraq under the Oil-for-Food Program was the result of competitive bids.   When Alcor did not offer the best price, they did not receive the contract.   Consequently, there is no reason to believe that Iraq could have received a better price for the quantities of TEL contemplated.

To make this case look like a fraud case, the government skews the facts by looking at "the loss suffered by the Iraqi people as a result of the fraud on the United Nations Oil for Food Program." (DOJ Obj. at 1.)   That is not what this case is about.   The real issue in this case is that U.N. sanctions were in place against the Government of Iraq and Mr. Naaman helped the Government of Iraq evade those sanctions so that the Government of Iraq could get access to its

48

own money, which was being held by the U.N.  That is an injury to the U.N. in its sovereign or regulatory capacity.  It is not a fraud against the people of Iraq.

There is no doubt that the government is right when it suggests that Saddam Hussein's government did not represent its people well, but that does not change the fact that Saddam Hussein's government was the Government of Iraq and its actions were binding on the people of Iraq.  The Government of Iraq was determined to violate the Oil-for-Food Program to get access to its money, no matter who they contracted with.  Accordingly, it is reasonable to assume that, had Alcor not won the contracts at issue, the Government of Iraq would have given the contract to the next highest bidder who was able to meet Iraq's quantity requirements and would have required that bidder to provide the same 10 percent kickback payment.  Thus, the people of Iraq were better off having their government accept the lower bid.

Moreover, while the United States certainly can invoke the U.S. judicial system to complain about a foreign sovereign violating U.N. sanctions or to go after U.S. companies and their agents for bribery abroad, U.S. courts cannot adjudicate claims that a foreign government did not spend its people's money well.  It should not use that concern to enhance the penalty in an individual's criminal case.  The U.S. government's claim that the Government of Iraq misspent the people of Iraq's money through its efforts to circumvent the U.N.'s restrictions on the Government of Iraq's money is not cognizable because the Government of Iraq alone represents the Iraqi people.  Here, the Government of Iraq deemed its actions in national interest and, while we may disagree with that policy, it was nevertheless a decision by the Government of Iraq that was binding on its people.

As Chief Justice Marshall noted, the world is "composed of distinct sovereignties, possessing equal rights and equal independence," such that each maintains "absolute and complete jurisdiction within their respective territories which sovereignty confers." The Schooner Exchange v. McFaddon, 11 U.S. (7 Cranch) 116, 136 (1812). "The jurisdiction of the nation within its own territory is necessarily exclusive and absolute. It is susceptible of no limitation not imposed by itself." Id. "[E]very sovereign state must recognize the independence of every other sovereign state; and the courts of one state will not sit in judgment upon the acts of the government of another, done within its own territory." United States v. Belmont, 301 U.S. 324, 327 (1937). The "conduct of one independent government cannot be successfully questioned in the courts of another." Oetjen v. Central Leather Co., 246 U.S. 297, 303 (1918); see Underhill v. Hernandez, 168 U.S. 250, 254 (1897) ("acts of the government of Venezuala . . . are not properly the subject of courts of another government"). This "doctrine is applicable even if international law has been violated," Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 431 (1964), and no matter how "offensive to the public policy of the country" that conduct may be. Id. at 436-37.

Moreover, because a government represents its people, the sovereign has the authority to decide what is in the public interest of its people and its decisions are binding upon the people. See, e.g., Asociacion de Relamantes v. The United Mexican States, 735 F.2d 1517, 1523 (D.C. Cir. 1984) (Scalia, J.) (explaining that a sovereign represents the private claims of its citizens, and can do with those claims as it sees fit). Following the Soviet Union's nationalization of industry within its country, United States courts refused to hear judicial challenges to the Soviet

government's property confiscation orders.   The Supreme Court explained: "What another country has done in the way of taking over property of its nationals and especially of its corporations, is not a matter for judicial consideration here.   Such nationals must look to their own government for any redress to which they may be entitled." United States v. Pink, 315 U.S. 203, 226 (1942) (quoting United States v. Belmont, 301 U.S. 324, 332 (1937)).   Indeed, courts have refused to even hear challenges to Nazi era laws that discriminated against Jews, even though the United States has asserted that such conduct constituted crimes under international law and violated German law.   See Bernstein v. Van Heyghen Freres Societe Anonyme, 163 F.2d 246, 251-52 (2d Cir. 1947) (L. Hand, J.).   The United States even has applied the same principle to its own citizens, when conquered by a foreign power.   In United States v. Rice, 17 U.S. 246 (1819), when the British captured Castine, Maine in the War of 1812 and sought to impose its laws on the citizens there, the Supreme Court acknowledged Britain's authority to do so.   By taking over those U.S. lands, Britain obtained "the fullest rights of sovereignty over that place" and the people "were bound by such laws, and such only, as it chose to recognize and impose . . . .   [N]o other laws could be obligatory upon them . . . ." Id. at 253 (Story, J.).

Thus, while the United States and the U.N. can complain about the Government of Iraq violating U.N. sanctions (and Mr. Naaman's minor role in assisting Iraq in doing so), the United States cannot complain that the Government of Iraq defrauded the Iraqi people through its conduct.   The actions taken by the Government of Iraq – whether legal or illegal, or good policy or bad policy – is binding action taken on behalf of the Iraqi people.   U.S. courts have no

51

jurisdiction to sit in judgment of whether such actions by foreign government worked a fraud against their own people.

The PSR was justified in not looking to the total profits to Innospec or the phantom losses to Iraq or its people (which the Iraqi government, acting as the representative of its people, wanted), and by instead looking to the gain to Mr. Naaman.  But the PSR confuses the gross receipts that Mr. Naaman was paid with his net gain.  See United States v. Olis, 429 F.3d 540, 547-48 (5th Cir. 2005) (reversing sentence for calculating loss based on gross, rather than net loss).  Although Mr. Naaman was paid roughly the $540,000 in commissions, Innospec required him to split those commissions 60/40 in favor of Talib Khan and he incurred numerous additional expenses, including paying the salaries of his staff and maintaining an office in Iraq. (See Ex. B.)  Factoring in the split commissions paid to Talib Khan reduces Mr. Naaman's commission to roughly $216,000.  There should be no question that his remaining expenses would at the very least pull this below the $200,000 threshold, which would lower the loss enhancement calculated as 14 in the PSR to 10, resulting in a 4-level decrease.

## 2.    The PSR Inappropriately Adds a Sophisticated Means Enhancement

The PSR imposes a 2-level enhancement for sophisticated means because Mr. Naaman was asked by the Innospec employees who directed him in his role as agent for the company to submit false invoices, and those Innospec employees caused Innospec to falsely report the payments in its books and records.  But there is not anything particularly sophisticated about a false invoice, and the false invoice did not cause the fraud, it just made it more difficult to uncover following a subsequent audit.  It does not take much sophistication to realize that, if

your books are being audited, you are going to get caught if you write "bribe" in a ledger. You need an invoice that says something else. What Mr. Naaman did at the request of the Innospec officials was a crime and that is accounted for in the base guideline calculation, but it was not a sophisticated crime.

The commentary to U.S.S.G. § 2B1.1 establishes that "'sophisticated means'" means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1, cmt. n. 8(b). The commentary offers further guidance when it states, "Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means." Id. There was nothing "especially complex" or "especially intricate" about Mr. Naaman's conduct. Nothing about Mr. Naaman's conduct was notably more intricate than the garden variety kickback scheme. The typical bribery and kickback scheme involves the submission of false invoices to conceal the true nature of the illicit payments. Moreover, the fact that thousands of other companies used the exact same methods, which were based on the instructions provided by the Iraqi government, suggests that there was nothing particularly unique about the execution or concealment of the offense.

The PSR also errs in its suggestion that, even if the "sophisticated means" enhancement did not apply, a 2-level enhancement would otherwise be warranted because "a substantial part of the fraudulent scheme was committed from outside the United States." No such enhancement is warranted because the circumstances of this case will be true of every FCPA case. The government has made much of the fact that Mr. Naaman's conduct took place abroad, but that

will be true of every <u>Foreign</u> Corrupt Practices Act case, where the crime is paying a <u>foreign</u> official a bribe.

These factors are built into the base offense score and there is no reason to apply this added enhancement in every case.  Doing so would effectively make these enhancements a part of the base offense, and that plainly is not what the Sentencing Commission intended.

<b>3.       The PSR Inappropriately Adds a Manager/Supervisor Enhancement</b>

The PSR also erroneously makes a 3-level enhancement, claiming Mr. Naaman was the manager or supervisor because he "organized the fraud, including arranging for all the bids and instructing Innospec employees as to how the kick backs should be paid."  This is not a fair reading of the record.  Mr. Naaman was the "agent," not the manager or supervisor.  At all times, Innospec was in charge of what took place.  The Iraqi government "organized the fraud" and it made sure that men like Mr. Naaman knew that bribes had to be paid to get business under the Oil-for–Food Program.  Mr. Naaman told Innospec what the Iraqi government was telling him about how the bribes worked, and Innospec chose to go forward with paying the bribes.  To be sure, Mr. Naaman crossed a line when he agreed to help pay bribes on Innospec's behalf.  But he was the agent, and it was Innospec employees who directed his conduct as managers and supervisors.

**C.       The PSR Miscalculates the Bribery Guideline**

**1.       The PSR Overstates the Amount of the Bribes**

The PSR appropriately rejects the government's claim that the loss should be calculated on the basis of Innospec's $30,000,000 in profits because Innospec would have profited even

54

without the bribes and it would be disproportionate to hold Mr. Naaman accountable for all of Innospec's profits. (PSR at 27.)   The PSR follows the better approach of looking to Mr. Naaman's anticipated gain from the bribery, but the PSR stumbles in calculating what those gains would be.  The PSR calculates the value of the payment to be made as $2,679,600, which has the effect of driving up the Guideline score a staggering 18 levels and it is a bit of a misreading of the facts.  At the very least, it is not required and really skews any Guidelines calculations.

The Superseding Information notes that Mr. Naaman paid $167,000 in bribes and agreed to pay bribes equaling an additional 2.5 percent of future sales under LTPA II.   (Super. Information, Count 1 ¶ 102, Count 2 ¶ 2.)  The LTPA II did require the Ministry of Oil to buy a certain quantity of TEL at a certain price and, if honored, 2.5% of that would have yielded the $2,679,000 in bribes used by the PSR.  But it is not that simple.  These sales did not occur, and it was never certain that they would.   Indeed, the LTPA I had certain minimum purchase requirements as well, but the Ministry of Oil did not honor its commitments.  As a practical matter, there is very little a company like Innospec can do to hold a foreign sovereign like Iraq accountable for its contractual obligations and, given the instability in Iraq, there was no certainty it could honor its obligations even if it wanted to.  Despite being the language of the contract, both sides knew these were not hard numbers.

To be sure, Mr. Naaman hoped that LTPA II would yield sales that would be profitable to both Alcor and himself, and which also would require additional bribes be paid.  But he had no way of knowing whether the Government of Iraq would purchase a substantial quantity of TEL,

as the officials he dealt with boasted they would, or whether the reality would be more modest. Moreover, Mr. Naaman had no way of knowing if the Government of Iraq would continue to use TEL or if it would begin using a more environmentally friendly product such as methyl tertiary butyl ether (MTBE), as most of the world did.  In fact, in a letter to the Iraqi Ministry of Oil dated February 18, 2007, the Daura Refinery refers to TEL as an "environment polluter" and expresses a desire to phase out the product.  (See Ex. D.)  Consequently, it is purely speculative to use this $2.67 million figure and, at the very least, the use of that figure could substantially overstate the harm.

Mr. Naaman readily acknowledges that it could also understate the harm, but that is precisely the problem.  There is simply no way to know how accurate the $2.67 million figure is because the contract minimums were largely illusory, as evidenced by the Iraqi government's erratic purchases under LTPA I.  As the United States government acknowledges, sales under LTPA II did not occur as expected.  As discussed, there was no assurance that the LTPA II would go forward, even after it was initialed by Messrs. Turner and Naaman.  Since the initials of Messrs. Turner and Naaman were non-binding, there was always a possibility that the agreement would be rejected by the Minister of Oil or that intervening circumstances would prevent execution and fulfillment of the contract.  In fact, it was not until May 30, 2008 (after Innospec has suspended Mr. Naaman) that Phil Boon of Alcor sent a letter to D.Y. Al-Khashab, the General Manager of the Daura Refinery, in which he wrote, "We are pleased to inform you that we will be forwarding a copy of the New LTPA signed on behalf of Alcor next week.  We acknowledge receipt of the New LTPA signed on behalf of the Midland Refineries Company."

56

(See Ex. E.)  Moreover, despite executing LTPA II in 2008, it appears that the Ministry of Oil issued a tender for TEL in or around March 2009.  (See Ex. F.)  Given the uncertainty as to how much TEL actually would be purchased, and given the fact that the government's estimate of loss drastically raises the offense level to a point that Mr. Naaman believes would be overly punitive, he believes that the fairer and better course is to assume the bribes under LTPA II would be in line with those paid under LTPA I.

If the Court were to assume that the amount of bribes to be paid would be the same as they had been previously, $167,000, then there would be a 10-level enhancement, rather than an 18-level enhancement.  Bringing the total offense level down from Level 33 (135-168 months) to Level 25 (63-78 months) would cut the recommended Guideline range in half.  It simply is not fair to effectively double Mr. Naaman's sentence based on this sort of speculation as to what the Government of Iraq would buy when, we now know, it bought nothing (at least while Mr. Naaman was serving as Alcor's agent).

The disagreement here and the application of Guidelines to this type of overseas conduct is one very good reason that the Guidelines are no longer mandatory and often are not the best means to evaluate a fair sentence.

**2.**     **The PSR Inappropriately Adds an Organizer Enhancement**

The PSR inappropriately adds a 4-level enhancement, claiming that Mr. Naaman was an organizer because he "directed employees of Innospec in regard to paying bribes; routed bribes; wrote falsified invoices to justify bribes that were incorporated into the books and records of a publicly-traded company; and he secured contracts that were the benefit of the bribes."  (PSR ¶

100.)  Mr. Naaman does not deny any of this conduct, but none of it makes him the organizer of the crime.  Mr. Naaman was the "agent" here, he did not make the rules and he did not decide what would take place.  He exchanged messages between Alcor and corrupt Iraqi officials.  Mr. Naaman did not propose paying bribes to Iraqi officials, they told him to tell Alcor that bribes would have to be paid if Alcor wanted Iraqi business and they told him how the bribes would be paid.  Mr. Naaman delivered that message to Alcor and Innospec and the companies told him they would pay the bribes.  Mr. Naaman then made the payments on the terms dictated by the corrupt Iraqi officials, and helped Alcor cover its tracks by submitting the false invoices they requested of him.  Again, all of what Mr. Naaman did was a crime, but he should not be made the patsy to take the blame for all of the misconduct caused by those who were really in control here – the Iraqi officials who demanded bribes and the Innospec officials who agreed to pay them.  They were the organizers of this crime, Mr. Naaman did their bidding.

**3.      The PSR was Correct in Determining that a "Public Official" Enhancement is Not Warranted**

The PSR was correct in determining that the 4-level enhancement for bribes to certain public officials does not apply in this case.  U.S.S.G. § 2C1.1(b)(3).  The term "public official" is specifically defined to include: (A) those persons defined as such by U.S.C. § 201(a)(1) (Federal officials); (B) "A member of a state or local legislature.  'State' means a State of the United States, and any commonwealth, territory, or possession of the United States"; (C) persons acting on "behalf of a state or local government"; (D) persons selected to be a person described in categories (A)-(C) before or after such persons have qualified; and (E) persons not otherwise

58

covered but who are responsible for carrying out government programs, act under color of official right, or have de factor authority to make government decisions. Id. cmt. n. 1.

By their terms, categories (A)-(D) apply only to federal, state, or local public officials of the United States.  Category (E) makes reference to "government," but fails to specify which "government."  Nevertheless, "[a] word 'is known by the company it keeps,' and one should not 'ascrib[e] to one word a meaning so broad that it is inconsistent with its accompanying words.'" Global Crossing Telecomm., Inc. v. Metrophoes Telecomm., Inc., 550 U.S. 45, 76 (2007) (quoting Gustafson v. Alloyd Co., 513 U.S. 561, 575 (1995)); see, e.g., Samantar v. Yousef, 130 S. Ct. 2278, 2287 (2010) (quoting Russell Motor Car Co. v. United States, 261 U.S. 514, 519 (1923)); Jarecki v. G.D. Searle & Co., 367 U.S. 303, 307 (1961)).  This tenet of construction is particularly applicable when another interpretation could have such a devastating impact on a person's liberty.  Here, as the only "government" personnel referenced in the first four categories are public officials of the U.S. government, it would be inappropriate to construe the term to include public officials of foreign governments.  Indeed, the only example the Guideline offers for someone in this category is "a leader of a state or local political party."  U.S.S.G. § 2C1.1(b)(3), cmt.1 (emphasis added).

In addition, where the term "government" is used elsewhere in this Guideline, the commentary makes clear it means the United States government.  There is a separate enhancement, not applicable here, where the bribery is to obtain "a government identification document," U.S.S.G. § 2C1.1(b)(4), and that phrase is defined in pertinent part as "a document made or issues by or under the authority of the United States Government, a State, or a political

subdivision of a State…." Id. at cmt 1.  Thus, even where the Guideline uses the word "government" in isolation, its drafters understood it to mean a government within the United States.

The Court should not give the Guideline's definition of "public official" extraterritorial effect absent a clearer statement by the Sentencing Commission.  Morrison v. Nat'l Australia Bank LTD., 130 S. Ct. 2869, 2878 (2010) ("When a statute gives no clear indication of an extraterritorial application, it has none.").   Not only does the presumption against extraterritoriality get us to this conclusion, but the rule of lenity does as well.  See, e.g., Skilling v. United States, 130 S. Ct. 2896, 2932 (2010) (noting "the familiar principle that 'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.'") (quoting Rewis v. United States, 401 U.S. 808, 812 (1971)); See also United States v. Bustillos-Pena, 612 F3. 863, 869 (5th Cir. 2010) ("Although the provisions of the Sentencing Guidelines are not statutes, we apply the rule of lenity to them when we find that they are ambiguous."); United States v. DeLuca, 17 F.3d 6, 10 (1st Cir. 1994) ("[A]lthough [the Sentencing Guidelines] are not statutes, [they] are to be construed in much the same fashion.").

## VI.   A SENTENCE OF TIME-SERVED AND OTHER PENALTIES ARE WARRANTED

The United States Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), requires sentencing courts to impose their sentences in accordance with the statutory requirements of 18 U.S.C. § 3553(a).  Ultimately, the sentence imposed should be "sufficient, but not greater than necessary" to satisfy the objectives of providing "just punishment for the

60

offense," adequately deterring criminal conduct, protecting "the public from further crimes of the defendant," and providing the defendant with rehabilitation.  Id.  The sentence should reflect a careful consideration of pertinent factors that bear on whether the sentence is "sufficient."  As Your Honor advised Mr. Naaman during the hearing on Friday, June 25, 2010:

> Here it is, Mr. Naaman, and what I say goes.  Put aside whatever is said here, because I'm interpreting it, and you and I better understand that, one, I can depart and you can ask me to depart based on substantial assistance if the government files a 5K motion.  If they find that you have not cooperated or stiffed them in some fashion, they don't have to file that, and I cannot depart on that basis.  You are free at the time of sentencing to tell me and your counsel everything that is favorable to you, and I will consider them in terms of fashioning a sentence.

(Hearing Tr. at 24.)

Now that Mr. Naaman has spent just shy of a year in prison, and another seven months under strict conditions of release, a sentence of time-served will satisfy the goals set forth in § 3553(a).

Mr. Naaman's conviction serves as a powerful example to other foreign agents that if they violate the laws of the United States, they too will be arrested, extradited and find themselves subject to prosecution and a substantial financial penalty.  Surely no one believes Mr. Naaman would repeat the alleged offenses or is otherwise a menace to society.  Nor would anyone need to see further punishment inflicted upon Mr. Naaman before they would be deterred from engaging in unlawful behavior. (Maher Nasser, Friend, Ltr. at 1 ("The charges levied against [Mr. Naaman] and his long detention have sent shockwaves to the local business communities.  Companies are for the first time auditing their business procedures and some are publishing new guidelines for their clients and customers.  In a strange twist of fate the change that Ousama Naaman was advocating is now coming through his misfortune.").)

61

There also is no doubt that Mr. Naaman would be exiting the criminal justice system a better man than he was when he went in.  (Sami K. Boulos, Friend, Ltr. at 1 ("[Ousama] is now of feeble health who does not need to be incarcerated in dangerous jails to repent as I feel that he has and was humbled enough already.").)  Mr. Naaman has acknowledged his responsibility for his criminal conduct and shown sincere remorse for that conduct.  He has tried to make amends for his offenses by providing the U.S. Department of Justice (DOJ), the Securities and Exchange Commission (SEC), and the U.K.'s Serious Fraud Office with complete and full cooperation. Mr. Naaman even paid the <u>largest fine</u> any individual ever paid the SEC for FCPA violations. Mr. Naaman willingly cooperated despite the fact that doing so placed his life and the lives of his family members in danger.  (<u>See</u> Supplement to Memorandum in Aid of Sentencing (filed under seal).)

Moreover, because Mr. Naaman is 61 years old, the period in which he was incarcerated had a more profound impact on him than it might have had on someone younger.  (Elena Turner, Friend, Ltr. at 1 ("I believe that the prison time that Ousama has served, coupled with significant financial penalties, and profound humiliation before his family and community has significantly affect him. . . . I know from personal discussions with him that Ousama is deeply pained and shaken to the core. . . . he is clearly at this point a broken man.").)  Mr. Naaman had never before been deprived of his freedom and this experience has truly humbled him and made him evaluate the manner in which he conducted his business.  Where a younger person may be more reluctant to take a lesson away from this experience, this truly has been a learning experience for Mr. Naaman.  (Shahin Shirian, Employee, Ltr. ("[Ousama] talked about the fact that he had been

taught a lesson in life on how to evaluate business dealings more carefully in the future and how to proceed more conscientiously with matters from now on in his life."); id. ("[U]nfortunately in our part of the world, sometimes business is done with an approach which is not in line with the values of the Western countries. There are so many cultural, moral and ethical differences in the Middle East that sometimes wrong is done without really grasping its real moral standing and human implications. This is the lesson that Ousama has learned, there is no doubt in it, and as a consequence, he is today an even better and more complete human being that he was before.").)

His family also needs him, and while that is true in most cases, it is particularly so here. Mr. Naaman provides financial support to two of his sisters and his sister-in-law, and their respective families. We ask the Court to appreciate that further incarceration will impose the heaviest toll on Mr. Naaman's family. Justice does not require that they suffer any more.

**A.**    **Minimal Sentence is Justified Based on Family Circumstances, Prior Good Works, and Substantial Cooperation**

**1.**    **Family Ties**

Factors contained in Section 3553(a) are useful in determining how to sentence Mr. Naaman. Indeed, it is widely recognized that "under § 3553(a), the history and characteristics of the defendant, including his family ties, are pertinent to crafting an appropriate sentence." United States v. Nellum, No. 2:04-CR-30-PS, 2005 WL 300073, at *4 (N.D. Ind. Feb. 3, 2005); see, e.g., United States v. Garcia, 414 F.3d 201, 228 n. 19 (2d Cir. 2005); United States v. Bisanti, 414 F.3d 168, 173 (1st Cir. 2005). Many courts have reduced sentences for defendants who were devoted to and supported their families, even under circumstances that are far less

63

compelling than Mr. Naaman's.  <u>See, e.g.</u>, <u>United States v. Smith</u>, 359 F. Supp. 2d 771, 776, 782 (E.D. Wisc. 2005) (reducing defendant's sentence by half, even after a 15-level downward departure on other grounds – because he had been married several years, supports his children, cares for his mother and obtained letters as to his good character from his pastor and others); <u>United States v. Beamon</u>, 373 F. Supp. 2d 878, 887 (E.D. Wisc. 2005) (considering "Defendant's admirable service as a mentor to young men, his assistance to his ill father, and his positive influence on younger family members merited some consideration.").  As John Martin, former U.S. Attorney and later District Judge for the Southern District of New York, observed in retiring from the bench:

> Every sentence imposed affects a human life and, in most cases, the lives of several innocent family members who suffer as a result of a defendant's incarceration.  For a judge to be deprived of the ability to consider all of the factors that go into formulating a just sentence is completely at odds with the sentencing philosophy that has been a hallmark of the American system of justice.

John S. Martin, Jr., <u>Let Judges Do Their Job</u>, N.Y. Times, at A31 (June 24, 2003) (2003 WLNR 5657759).

## 2.   Civic and Charitable Service

Even under the rigors of the mandatory Guidelines, Mr. Naaman would be entitled to a downward departure for his civic and charitable service.  <u>See, e.g.</u>, <u>United States v. Nichols</u>, 376 F.3d 440, 442 (5th Cir. 2004) (noting that a downward departure for exceptional charitable service is available); <u>United States v. Woods</u>, 159 F.3d 1132, 1137 (8th Cir. 1998) (affirming a downward departure for a defendant who assisted troubled youth); <u>United States v. Rioux</u>, 97

F.3d 648, 663 (2d Cir. 1996) (affirming a downward departure for a defendant heavily engaged in charitable fundraising).

Since <u>Booker</u>, the freedom of a sentencing judge to factor charitable work into sentencing has expanded even further and numerous courts have factored such charitable service into their sentencing decisions.  <u>See, e.g.</u>, <u>United States v. Canova</u>, 485 F.3d 674, 679 n.5 (2d Cir. 2007) (initially affirming a 4-level downward departure, but authorizing the sentencing court to expand this downward departure further upon resentencing post-<u>Booker</u>); <u>United States v. Cooper</u>, 394 F.3d 172, 175 (3d Cir. 2005) (affirming 4-level downward departure for charitable activity); <u>United States v. Bortnick</u>, 2006 U.S. Dist. Lexis 11744, at *21 (E.D. Pa. Mar. 15, 2006) (departing based on charitable activity to impose a sentence of 7 days in custody and five years supervised release); <u>United States v. Kuhn</u>, 351 F. Supp. 2d 696, 699 (E.D. Mich. 2005) (departing from a guideline range of 21-27 months to a sentence of 7 days in a community correction facility followed by 6 months of supervised release based upon charitable service). Indeed, Mr. Naaman's situation closely resembles that of Douglas Jemal, a wealthy 64-year-old businessman in Washington, D.C. who was able to provide the sentencing court with numerous letters from supporters attesting to how his great kindness and generosity helped them in times of need.  Mr. Jemal was accused of bribery and fraud and faced 33-41 months in prison, but Judge Urbina appropriately considered Mr. Jemal's history of charitable service and sentenced him to probation and imposed a fine.  <u>See</u> <u>United States v. Jemal</u>, No. 05-0359-01 (D.D.C. Apr. 17, 2007); Carol D. Leonnig, <u>Jemal Avoids Prison For Fraud</u>, Wash. Post at B1 (Apr. 18, 2007). And, Mr. Jemal did not have some of the other factors that Mr. Naaman possesses which should

warrant this Court's mercy, including nearly a year in jail pre-sentencing and offenses outside the U.S. and his not being a U.S. citizen and not doing business according to U.S. standards.

Mr. Naaman's history of community service and charity is outstanding, certainly as impressive as any other defendant who has received a substantial downward departure or below-Guideline sentence. When viewed in conjunction with the needs of his family, the justification for a below-Guideline sentence is more than compelling. And the fact that Mr. Naaman already has been severely punished, having spent almost a year in jail and another seven months under strict conditions of release, means no further punishment is warranted.

### 3.      Substantial Cooperation

A sentence of time-served is further warranted because of the substantial cooperation that Mr. Naaman provided the government in connection with this matter. Not only did Mr. Naaman cooperate with the Department of Justice in its investigation, he cooperated with the Securities and Exchange Commission and the United Kingdom's Serious Fraud Office. Even before he arrived in the United States, Mr. Naaman expressed his willingness to assist the government in its investigation. Upon arriving in the United States, however, he had serious concerns about fully disclosing the nature of his business operations in Iraq because doing so would place him and his family's safety at risk. Mr. Naaman expressed his concerns to the government and sought a way to provide full cooperation, while containing the serious risks associated with that cooperation. (See Supplement to Memorandum in Aid of Sentencing.) Mr. Naaman understood that there was no way to guarantee that the substance of his cooperation would remain confidential, but he knew he needed to accept responsibility for his mistakes and try to atone for

66

them.  In addition, Mr. Naaman wanted to assist the government with its investigation by setting the record straight on a number of issues.  With those objectives in mind, Mr. Naaman provided the government with full and complete disclosure of his knowledge, despite the fact that such disclosure placed him and his family in jeopardy.  Moreover, Mr. Naaman agreed to cooperate with the government, and did so, without a proffer agreement and with little or no protection offered in return.

Since arriving in the United States, Mr. Naaman contacted officials with the Department of Justice, through his attorneys, and requested opportunities to meet with the prosecutors and agents to share his knowledge of pertinent facts and further the government's investigation.  Mr. Naaman asked his family and his staff in the Middle East to gather any documents or materials that might assist the government in their investigation (documents and materials that the government might otherwise not being able to receive or would take tremendous efforts to obtain).  Through his attorneys, Mr. Naaman produced more than 1,000 pages of documents to the government, including critical documents the government could not have obtained otherwise, and he expressed a willingness to answer any questions the government might have with respect to the documents.

Upon his release, Mr. Naaman continued to search through his business and personal records for pertinent information and immediately produced any additional items of interest to the government.  Although Mr. Naaman's supplemental production consisted of a small number of additional documents, Mr. Naaman believed that the documents contained information that would be valuable to the government and, as a result, he felt it was important to produce the

67

documents.  It is important to note that, in searching through his records, Mr. Naaman took a broader focus than simply gathering materials relating to the TEL business in Iraq.  Instead, Mr. Naaman made a concerted effort to provide the government with a complete picture of Innospec and Alcor's TEL operations worldwide and his involvement in those operations.  In this respect, Mr. Naaman tried to provide the government with detailed information on topics with which it already had some familiarity, while also alerting the government to information about additional topics that may have been previously unknown.  Some of the additional information pertained to topics outside of the Iraq, including the fact that Innospec bought back old stock from the Iranian Government and transferred the funds for the purchase through Barclays Bank in the United Kingdom.

In addition to his production of documents, Mr. Naaman made himself available to the government for meetings – and even requested meetings through his attorneys – and he spent countless hours preparing for those meetings.  Because many of the events at issue took place more than a decade ago, Mr. Naaman spent a substantial amount of time carefully reviewing his records to refresh his recollection of the relevant events.   While he was incarcerated in the United States, Mr. Naaman spent much of his time reflecting on his work on behalf of Alcor, his conversations with employees of both companies, the meetings he attended, and his discussions with various Iraqi officials, all in preparation for his meetings with the government.  Following his release, Mr. Naaman continued his extensive preparation for meetings so that he could continue to provide the government with full and complete disclosure, and also satisfy the obligations of his plea agreement.

68

Mr. Naaman met with the Department of Justice on four occasions, voluntarily participated in an interview with Securities and Exchange Commission, and also met with the United Kingdom's Serious Fraud Office on four occasions. For some of these meetings, Mr. Naaman's desire to cooperate meant he would do the travelling, even though he was incarcerated more than two hours away in Virginia. For one meeting with the SFO, Mr. Naaman was awakened very early in the morning, transported without any food, brought to the holding cell in the federal courthouse here, and kept in handcuffs and shackles throughout the meeting. When the meeting broke for lunch, and the SFO and their American counterparts headed to the cafeteria, Mr. Naaman remained in the meeting room in his physical restraints and was not allowed to get any lunch because food was deemed a security concern. Mr. Naaman did not complain, he simply sat in the room patiently and waited for the meeting to resume. He carried out that and subsequent meetings in an effort to make amends for his conduct.

Mr. Naaman has spent well over a hundred hours preparing for and participating in interviews with the government. Mr. Naaman provided the government with detailed information on a variety of issues and sought to assist the government with its investigation at every turn. Mr. Naaman began his cooperation well before there were any agreements with the government about how, if at all, his cooperation might affect his plea or sentence. After entering a plea of guilty, Mr. Naaman continued to provide full and complete cooperation, not only because it was a term of his plea agreement, but also because he feels genuine remorse and feels that it is his duty to make amends in any way that he can. Mr. Naaman also settled with the U.S. Securities and Exchange Commission and agreed to disgorge $877,106. To put the fine into

proper perspective, on the same day the SEC announced that it had settled its enforcement action against Mr. Naaman, it announced that David Turner had also settled with the Commission and agreed to disgorge $40,000.  Although Government counsel will be better able to describe how Mr. Naaman's cooperation has assisted their efforts, it is clear from the time he has spent preparing to cooperate and cooperating with the government that Mr. Naaman did everything in his power to provide the government with substantial and genuine assistance and to further the government's investigation.

**B.      Mr. Naaman Poses No Risk of Recidivism**

In addition, the Court should take added comfort in knowing the statistical evidence shows there is little chance of recidivism for someone with Mr. Naaman's background.  The fact that Mr. Naaman is a first-time offender strongly suggests that he does not pose a major threat of recidivism.  According to recent U.S. Sentencing Commission analysis, defendants who are in Criminal History Category ("CHC") I, like Mr. Naaman, have the lowest rate of recidivism of all offenders – 13.8 percent within two-years of release.  See U.S.S.C., Measuring Recidivism:  The Criminal History Computation of the Federal Sentencing Guidelines, at 6 (2004) ("Measuring Recidivism").  Persons like Mr. Naaman, who have zero criminal history points, have a substantially lower two-year recidivism rate than persons with one criminal history point – 11.7 percent vs. 22.6 percent.  See U.S.S.C., Recidivism and the "First Offender" at 13 (2004) ("First Offender").  Moreover, persons with zero criminal history points and, who like Mr. Naaman have not previously been convicted of a serious offense, the re-conviction recidivism rate (as opposed to recidivism defined by re-arrest, violation of supervised release, etc.) was a mere 5.3

70

percent.  Id. at 26.  Looking at its data, the Sentencing Commission suggested that "[p]ossible sentence reductions for 'first offenders' are supported by the recidivism data and would recognize their lower re-offending rates."  Measuring Recidivism at 15.  The Commission's finding coupled with this Court's discretion is yet another factor supporting leniency.

Other factors also suggest that Mr. Naaman is not likely to recidivate, including Mr. Naaman's age, stable home life, steady history of employment and his education level.  The Sentencing Commission explains that "[r]ecidivism rates decline consistently as age increases," and notes that offenders over age 50 have a recidivism rate of only 9.5 percent.  Id. at 12.  For persons over 50 years old who are also in CHC I, like Mr. Naaman, the rate of recidivism is more than one-third lower – 6.2 percent.  Id. at 28.  (Again, the Commission's First Offender report subdivided CHC I further and scored people in Mr. Naaman's position with a 5.3 percent recidivism – and that was without further reducing the odds by accounting for age.)  The Commission has suggested that if age were incorporated into the criminal history score, it would strengthen the predictive power of the Guidelines in identifying a risk of recidivism.  Id. at 16.  Mr. Naaman is 61 years old, which means that he is more than a decade past the age where the Sentencing Commission stops to even break down the decline in recidivism rates by age.

Other factors identified by the Sentencing Commission suggest that Mr. Naaman is even less likely to recidivate.  As a married man in CHC I, Mr. Naaman's likelihood of recidivism also is substantially lower than it would be for most defendants (9.8 percent vs. 22.7 percent for never married in the same category), id. at 12, 29, and is likely to be particularly lower in his case, as Mr. Naaman and his wife, Laurice, have been married for 33 years.

71

The Sentencing Commission also found lower recidivism rates by defendants with a history of stable employment (19.6 percent vs. 32.4 percent) and  who are well-educated (8.8 percent among college graduates).  Id. at 29.  For defendants in CHC I, there are even lower rates of recidivism for defendants with stable employment (12.7 percent) and with a college degree (7.1 percent).  Mr. Naaman has a college degree, and he has been steadily employed his whole life.

When taken together, these factors suggest that the statistical risk of Mr. Naaman's recidivism is negligible.  The Sentencing Commission aggravated many individual factors such as age, education, marital status and age with criminal history, but did not aggregate data in cases like Mr. Naaman's where each of these factors suggesting a reduced risk of recidivism are present.  Nevertheless, the data trends suggest that Mr. Naaman's risk of recidivism can be estimated as a mere fraction of a percent.  On each of the factors identified above, Mr. Naaman scores off the chart.  The Commission looked at whether the defendant was employed the year prior to trial, and Mr. Naaman was continuously employed for well over thirty years before he was arrested in Germany.  The Commission identified a steady drop in recidivism as people age but lumped everyone over fifty-years-old together. Mr. Naaman would be even further down that trajectory at age sixty-one.  And the Commission scores married people better risks than the unmarried, but did not further break-down those who have the added stability of having been married nearly 33 years.

Because the Commission would consider his risk of recidivism a mere 6.2 percent based on his being in CHC I and being over age fifty or 5.3 percent based solely on his criminal history

72

within CHC I, it is fair to assume that his statistical risk of recidivism would be substantially lower still if the calculation were to also factor in that he is sixty-one-years-old, has been married for more than two decades, and has a steady work history spanning more than three decades.  In light of the aforementioned considerations, the likelihood of Mr. Naaman repeating the crimes to which he has pled guilty is virtually zero from a statistical standpoint.

Beyond the statistics, Mr. Naaman is looking to ease into retirement for health reasons and plans to make up for lost time by spending it with his family, and he will not be living in the United States.[22]  Consequently, it is difficult to imagine a retiree living abroad, as Mr. Naaman intends to do, posing much risk of violating U.S. laws.  Moreover, given Mr. Naaman's full and forthright acceptance of responsibility in this matter, it is clear that his offenses in this case were aberrational and unlikely to be repeated in the future.

### C.   Lengthy Incarceration Does Not Strengthen Deterrence

Lengthy incarceration does not enhance deterrence for white collar offenders.  Studies of white collar offenders from before the enactment of the sentencing guidelines have shown no difference in recidivism patterns between offenders who received jail time and those sentenced to probation.  See David Weisburd et al., Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes, 33 Criminology 587 (1995).  These studies show "no

---

[22]   Mr. Naaman wants to return home to Lebanon, but as a foreigner convicted of a felony he could not stay in the United States even if he wanted to.

73

significant difference in recidivism between white-collar offenders sentenced to prison and similar offenders who did not receive a prison sentence" and are consistent with the findings of earlier criminological studies dating back to the 1970s.  See Elizabeth Szockyj, Imprisoning White Collar Criminals?, 23 S. Ill. Univ. L. J. 485, 495 (1999).  Rather than longer sentences, it appears to be "the criminal process itself – charge, trial, conviction, and sentencing – [that] has the greatest impact on the offender, and the period of imprisonment adds little by way of deterrence."  Id.  See, e.g., John Braithwaite, Crime, Shame and Reintegration 69 (1989) ("It would seem that sanctions imposed by relatives, friends or a personally relevant collectivity have more effect on criminal behavior than sanctions imposed by a remote legal authority."); Sally S. Simpson, Corporate-Crime Deterrence and Corporate Control-Policies: Views from the Inside, in White-Collar Crime Reconsidered 298 (Kip Schlegel & David Weisburd eds., 1992) (corporate managers regard the risk of informal sanctions as more influential in their decision making than the risk of formal sanctions).[23]  It is doubtful that any person acting as an agent of an American company in a foreign country could look at what has happened to Mr. Naaman and not want to do all they can to avoid his fate.

---

[23]     Similarly, a study of defendants in the U.S. District Court for the Northern District of California found no meaningful difference in recidivism rates between those sentenced to probation and community service and defendants who were eligible for such a sentence under the Sentencing Guidelines but who were instead sentenced to incarceration or incarceration plus probation.  Malcolm M. Feeley et al., Between Two Extremes:  An Examination of the Efficiency and Effectiveness of Community Service Orders and Their Implications for the U.S. Sentencing Guidelines, 66 S. Cal. L. Rev. 155, 191 (1992).

**D.**     **A Lengthy Sentence would Produce a Sentencing Disparity**

      **1.**     **Comparison to Other Similarly-Situated Defendants**

The PSR calculated Mr. Naaman's total offense level for Sentencing Guideline purposes as a 33, which corresponds to a 135-168 month sentence, but it did not account for the downward departure Mr. Naaman is entitled to receive in accordance with Section 5k1.1. The Court should bring Mr. Naaman's sentence down substantially so that it falls into line with other individuals who pled guilty to FCPA offenses and cooperated with the government. Like Mr. Naaman, these defendants accepted responsibility for their misconduct, pled guilty to FCPA violations, and provided the government with genuine assistance in its investigation. Because these defendants were similarly situated to Mr. Naaman, their sentences should inform the Court's analysis of an appropriate sentence for Mr. Naaman. As demonstrated in the chart below, Mr. Naaman has already served more time in prison than most of the other similarly-situated FCPA defendants.

**Sentences of Persons Who Pled Guilty to FCPA Violations *and* Provided Substantial Assistance (5K1.1 Departure)**

| DEFENDANT | CASE | BRIBE | SENTENCE | FINE |
|---|---|---|---|---|
| Misao Hioki | 08-CR-795 (S.D. Tex. 2008) | $1M | 24 months' imprisonment | $80K |
| Kim Nguyen | 08-CR-522 (E.D. Pa. 2008) | ~$400K | 2 years' probation | $20K |
| Joseph Lukas | 08-CR-522 (E.D. Pa. 2008) | $120K - $200K | 2 years' probation | $1K |
| Steven J. Ott | 07-CR-608 (D. N.J. 2007) | $267K | 6 months' home confinement; 5 years probation | $10K |
| Jason Edward Steph | 07-CR-307 (S.D. Tex. 2007) | $1.8M | 15 months' imprisonment | $2K |
| Roger Michael Young | 07-CR-609 (D. N.J. 2007) | $267K | 3 months home confinement; 5 years probation | $7K |
| Yaw Osei Amoako | 06-CR-702 (D. N.J. 2006) | $267K | 18 months imprisonment | $7.5K |

| Jim Bob Brown | 06-CR-316 (S.D. Tex. 2006) | $1.8M | 1 year and 1 day imprisonment | $17.5K |
|---|---|---|---|---|
| Steven Lynwood Head | 06-CR-1380 (S.D. Cal. 2006) | $2M | 6 months imprisonment | $5K |
| Faheem Mousa Salam[24] | 06-CR-157 (D.D.C. 2006) | $60K | 36 months imprisonment | $0 |
| Christian Sapsizian | 06-CR-20797 (S.D. Fla. | $2.5M | 30 months imprisonment | $261.5K |
| Richard John Novak | 05-CR-180 (E.D. Wash. | $30-70K | 3 years probation | $0 |
| Richard G. Pitchford | 02-CR-365 (D.D.C. 2002) | $400K | 1 year and 1 day imprisonment | $400K |
| Guatam Sengupta | 02-CR-040 (D.D.C. 2002) | $50K | 2 months imprisonment; 4 months home confinement | $6K |
| Richard K. Halford | 01-CR-221 (W.D. Mo. 2001) | $1.5M | 5 years probation | $0 |
| Albert Reitz | 01-CR-222 (W.D. Mo. 2001) | $1.5M | 6 months home confinement; 5 years probation | $400 |

As the preceding chart demonstrates, a sentence of time-served in this case would be consistent with sentences imposed in other cases in which a FCPA defendant admitted guilt and cooperated with the government. In the overwhelming majority of such cases, the courts have handed down a sentence of less than two years' imprisonment. And, in the majority of the cases, the court has sentenced the defendant to 366 days or less in prison. Importantly, courts have refused to impose long sentences for FCPA defendants who have cooperated with the government, even where the government was adamant that a long sentence was warranted. For example, in United States v. Kim Nguyen, the DOJ recommended that the court impose a sentence of 70 to 87 months, despite the fact that the DOJ requested a downward departure under

---

[24]     The Court sentenced Salam to 36 months' imprisonment despite the fact that the Department of Justice recommended a guideline imprisonment range of 30 to 37 months and further recommended a sentence of incarceration at the low end of the guidelines.

Section 5K1.1.  In its sentencing memorandum, the DOJ asserted, "Nguyen played a critical role in this conspiracy, as she was the person responsible for handling the finances and maintaining the books and records of Nexus."  Although Nguyen faced a maximum sentence of 35 years' imprisonment, the court declined to adopt and apply the DOJ's recommendation and instead imposed a sentence of 2 years' probation.

Similarly, in the Amoako case, the DOJ recommended a sentence ranging from 37 to 46 months, requesting that the court downward depart from the advisory guidelines based on the defendant's cooperation.  Like the court in Nguyen, the Amoako court declined to follow the DOJ's recommendation and instead imposed a sentence of 18 months' imprisonment.  The preceding cases are but a few examples of cases where the court refused to accept the government's recommended sentence for a FCPA defendant who entered a plea of guilty and cooperated in the government's investigation.  In fact, federal judges across the country have shown a willingness to impose sentences far below the Justice Department's recommendations in FCPA cases.  In at least some cases, judges have seemingly challenged the wisdom of imposing stiff punishment for corruption in countries like Iraq in which the entire regime was corrupt.  More importantly, these cases suggest that federal judges are generally of the view that more lenient sentences are appropriate for FCPA defendants who have accepted responsibility for their actions, shown genuine remorse, entered a plea of guilty and cooperated with the government.

In addition to having each of these attributes, Mr. Naaman exhibits the additional mitigating factors of being a foreign national, suffering from serious health issues, and having made a considerable contribution to society through his charitable deeds and other good works.

77

Based on Mr. Naaman's background and current circumstances, a lenient sentence in this case is just as appropriate, if not more so, as the lenient sentences handed down in the other FCPA cases in which the defendant pled guilty and cooperated with the government.  Notably, Mr. Naaman has already spent more time in prison than over half of the defendants identified in the preceding chart.   While Mr. Naaman undoubtedly has accepted responsibility for his misconduct, and certainly appreciates the seriousness of his offenses, he should not be judged more harshly than other similarly-situated defendants.

Nor should Mr. Naaman be judged more severely than others who have been sentenced for paying or facilitating the payment of bribes or kickbacks under the Iraqi Oil-for-Food Program.   While it is undeniable that thousands of companies, and thousands of individuals working for those companies, paid or facilitated the payment of bribes, kickbacks, and other inducements to the Iraqi government, Mr. Naaman is aware of only two cases in which individuals were sentenced in the United States for their role in facilitating bribes and kickback payments to the Iraqi government to secure favorable contracts under the Oil-for-Food Program. In both cases, the defendants were Americans who were convicted of conspiring to commit wired fraud.  In the first, Oscar Wyatt, Jr. entered a plea of guilty, was sentenced to serve one year and one day in prison, and ordered to pay $11,023,245 in restitution for paying approximately $11,023,245 in bribes and kickbacks to the Iraqi government to secure Oil-For-Food contracts.  In the second, David Chalmers pled guilty and was sentenced to two years' imprisonment and fined $9 million for paying at least $9 million in kickbacks to the Iraqi government to secure contracts under the Oil-for-Food Program.

78

The factual circumstances of both cases stand in stark contrast to Mr. Naaman's case because the defendants were American citizens who directed the payment of kickbacks to the Iraqi government to secure contracts for their American companies. Even ignoring the factual distinctions, the fact remains that Wyatt paid <u>at least</u> $11 million in bribes and kickbacks to the Iraqi government, but was sentenced to only a year and a day in prison. And, Chalmers, who paid <u>at least</u> $9 million in kickbacks to the Iraqi government, was sentenced to only two years in prison. It would not be or seem fair to the world for a Middle Eastern man who had little connection to the United States to receive a more severe punishment for his misconduct in Iraq than two American businessmen who engaged in the same misdeeds.

While it is certainly true that the majority of defendants who were similarly-situated to Mr. Naaman were sentenced to less than two years' imprisonment, there are also a number of similar Oil-for-Food Program cases in which none of the participants involved in the kickback scheme were even prosecuted. Many of these cases bear striking similarities to this case. For example, in July 2010, General Electric ("GE") agreed to pay $23.5 million in fines and disgorged profits to settle charges that four of its subsidiaries paid approximately $3.6 million in kickbacks to the Iraqi government to secure contracts under the Oil-for-Food Program. [25] Similar

---

[25] The complaint against G.E. alleges that four G.E. subsidiaries made illegal kickback payments to the Iraqi government under the Oil-for-Food Program. However, G.E. acquired two of the subsidiaries after their illegal payments under the Oil-for-Food Program. Accordingly, this discussion focuses on the two subsidiaries that were wholly-owned by G.E. at the time of their illegal kickback payments to the Iraqi government.

to the case at hand, the Iraqi agent of two G.E. subsidiaries allegedly made in-kind kickback payments of goods and services to the Iraqi government ministries in the form of after-sales service fees on sales of products to Iraq.  Complaint, <u>SEC v. General Electric Co.</u>, No. 1:10-CV-01258, Dkt. Entry No. 1 (D.D.C. July 27, 2010).  As in the present case, the kickbacks were made or offered with the knowledge and approval of the subsidiaries' officials.  <u>Id.</u>  In fact, to disguise the true nature of the illicit payments, the subsidiaries allegedly increased the Iraqi agent's commission by 10 percent.  <u>Id.</u>  Despite the similarities between the illicit conduct alleged in the G.E. case and the facts of this case, Mr. Naaman is not aware of any criminal prosecution of any of the G.E. sales managers or agents who allegedly approved and facilitated illegal kickback payments to the Iraqi government.  In fact, the DOJ closed its parallel investigation into the matter without filing any criminal charges.  Thus, it appears that G.E.'s settlement of the SEC's civil charges effectively closed the matter.

Similarly, on September 30, 2009, AGCO Corp. a U.S. manufacturer of agricultural machinery and equipment based in Duluth, Ga., agreed to pay more than $18.3 million to settle FCPA charges brought by the SEC, DOJ, and Danish authorities in connection with its business dealings under the Oil-for-Food Program.  AGCO acknowledged responsibility for the improper payments made by officers, employees and agents of its wholly-owned U.K. subsidiary to the former government of Iraq (or by the company for whom he was a mere agent).  The SEC's complaint alleged that AGCO agreed to pay kickbacks to the Government of Iraq to increase its market share.  Complaint, <u>SEC v. AGCO Corp.</u>, No. 1:09-CV-01865, Dkt. Entry No. 1 (D.D.C. Sept. 30, 2009).  According to the complaint, AGCO's U.K. subsidiary, AGCO Ltd., learned

80

from its Jordanian agent that the Iraqi Ministry of Agriculture was demanding a kickback of 10 percent of the contract value as a prerequisite for awarding Oil-for-Food Program contracts to AGCO.  Id.  The business manager and his supervisor agreed to the kickbacks, and the agent agreed to funnel the payments to Iraq on AGCO's behalf.  Id.  Two of AGCO's other subsidiaries then made the kickback payments to the Government of Iraq through the third-party agent based in Jordan.

In February 2008, Flowserve Corporation, a Texas-based company that supplies pumps, valves, and seals to the power, oil and gas, and chemical industries, agreed to pay $10.5 million to settle criminal and civil charges brought by the SEC and DOJ for illegal kickbacks paid to the Government of Iraq under the Oil-for-Food Program.  Similar to this case, Flowserve's French and Dutch subsidiaries allegedly used a Jordanian agent to funnel kickbacks to the Iraqi government in the form of a 10 percent after-sales service fee.  Complaint, SEC v. Flowserve Corp., No. 1:08-CV-00294, Dkt. Entry No. 1 (D.D.C. Feb. 21, 2008).

The preceding cases are but a few examples of cases in which an American corporation paid a fine to resolve criminal and civil charges related to its business dealings under the Iraqi Oil-for-Food Program.  Mr. Naaman is not aware of any of the employees or agents of these companies facing criminal prosecution.  Moreover, he is not aware of any of the foreign agents of these companies being extradited to the United States to face criminal charges for their actions in the Middle East.  Given that the Oil-for-Food kickback scheme implicated thousands of companies and their employees, as well as the agents of those companies, it is likely that most of the individuals who approved and facilitated illegal kickback payments under the program will

81

never face criminal prosecution in any jurisdiction.  For many of these individuals, their employers' settlement payments effectively freed them of exposure to criminal prosecution. While this circumstance does not change the criminality of Mr. Naaman's conduct, which he has freely admitted, it should be taken into consideration when determining an appropriate sentence.

## 2.      Sentencing Disparity in this Case

On the facts of this case, it would also not be fair, or seem fair to the world, to sentence Mr. Naaman to jail when no other actor in this case has been charged with any crime – not in the United States, not in the United Kingdom and not anywhere else.  To be sure, Innospec has pled guilty as a corporation for its conduct in both the United States and the United Kingdom, and it admits that several of its employees and officers were involved in the FCPA violations at issue in this case.  Indeed, it was those individuals at Innospec who asked Mr. Naaman to engage in the very conduct that led to his conviction in this case.  Yet, even though Mr. Naaman was arrested a year-and-a-half ago, has been extradited, charged, convicted and now is awaiting sentencing – not a single one of the Innospec people who gave Mr. Naaman his orders have been charged with any offense.  Not one.  No Innospec employee has been indicted despite the fact that the company was under investigation for almost five years.  It may someday occur that some of these individuals may be charged and sentenced but, if that occurs, these individuals who were the higher-ups in a company that was able to pay a fine to get out of this case would have years of freedom and employment when Mr. Naaman was in jails in Germany, Washington, D.C. and Virginia.  And it is not clear at all that the individuals most involved with Innospec and Alcor

82

will ever be charged (e.g., Dennis Kerrison, a British citizen and the ex-CEO of Innospec, has gone to South Africa where it is unlikely he will return for any proceedings).

It is already noteworthy that only the Middle East intermediary agent for this scheme has been criminally charged and jailed.  It already has been commented about in Lebanon that the U.S. finds its targets among the Middle Easterners while the U.S. and U.K. officials are able to remain free.  And, it is the case that the Innospec company itself was able to simply pay a fine as its punishment.  Any additional incarceration of Mr. Naaman in light of what has and has not happened to the others would reinforce the disparity and likely raise again the issue of bias in the U.S. system.

Here, the United States has stretched its jurisdiction as far as it can go – and farther than most people around the world would anticipate – in holding Mr. Naaman accountable for violating U.S. law for conduct that he engaged in while in Iraq on behalf of a European company that happened to have an American parent company.  None of Mr. Naaman's actions took place on American soil, yet the United States had him seized at an airport in Germany while he was in transit to France seeking medical care for his heart, had him jailed in Germany, extradited to the United States and placed in one of the nastiest prisons in the United States.  With respect to sending the right message, that already has occurred.  What has happened to Mr. Naaman already shows the world that the United States takes violations of the FCPA very seriously.

Taking further action against this one Middle Eastern man is more than what would be considered fair or seen to be fair by many in the world.  The U.S. or U.K. persons or company will receive different treatment – fine, civil settlements, delayed proceedings and sentencings,

and perhaps no charges at all.  While it may change some day, for now the citizens of the United States and the United Kingdom who hired the man from the Middle East to pay their bribes are not charged and continue to walk free, see their families, and enjoy life, while the man from the Middle East who they hired to do their bidding went to jail and faces even more punishment. Such a result is particularly ironic as citizens of the United States and the United Kingdom are expected to follow their own laws, but few people in the Middle East would expect their conduct while in the Middle East to subject them to U.S. law.

The current disparity was certainly not the intent of the government here and may, sometime in the future, be better balanced, but it is the facts of this case as they now exist.  Mr. Naaman understands that joint international prosecutions are complicated and that others may be prosecuted in the future.  But it is not clear to him – and cannot be clear to the Court, the prosecutors or the rest of the world – that such prosecutions actually will take place or what sanctions those who are charged will face.  So his is the only face in the case to be criminally charged.  It simply is and looks unfair.

Our criminal justice system must strive not only to do justice in fact, but – just as importantly – to assure the world that our system of justice is just.  We strive to be that beacon on a hill, but it is hard to imagine how this prosecution or a lengthy jail sentence would help the United States improve its image.  Nor is it likely to help the United States pursue its goal of getting other nations to adopt their own anti-bribery laws, like the FCPA, so that high standards of business conduct are embraced worldwide.  And it is questionable whether foreign governments will continue to cooperate with the United States' FCPA investigations if the

84

perception of foreign governments and their people is that the United States will treat foreign citizens more harshly than the United States treats its own citizens.

## CONCLUSION

There is no question that Mr. Naaman has been severely punished, that he has cooperated extensively with the United States government and foreign governments, and that the punitive goals of sentencing already have been met.  The Court should impose a sentence of time-served and the economic punishments that are consistent with his conduct.

Respectfully submitted,

 /s/ Abbe D. Lowell

Abbe David Lowell, Esq.
Christopher D. Man, Esq.
James M. Commons, Esq.
McDermott Will & Emery LLP
600 Thirteenth Street, N.W.
Washington, D.C.  20005-3096
202-756-8000

85

## CERTIFICATE OF SERVICE

I hereby certify that on January 13, 2011, I caused a true and correct copy of the

foregoing to be served via the Court's ECF filing system to all counsel of record in this matter.

/s/ Abbe D. Lowell

1