## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **CRIMINAL NO. 08-246 (ESH)** |
| **v.** | : | |
| | : | |
| **OUSAMA M. NAAMAN** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

## UNITED STATES' SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD DEPARTURE FROM GUIDELINE SENTENCING RANGE

The United States of America, by and through its undersigned counsel, respectfully submits this Sentencing Memorandum in the above-captioned matter, as well as moves pursuant to U.S.S.G. § 5K1.1 for a downward departure for substantial assistance. As the parties have already stipulated in the plea agreement, 120 months is the sentence under the Sentencing Guidelines and a reasonable sentence for the crimes that defendant Ousama M. Naaman committed. Consequently, the only issue before the Court is to determine the extent of the 5K1.1 reduction, which is based upon the defendant's substantial assistance to the investigation and prosecution of others. For the reasons discussed below, the United States recommends a sentence of incarceration of 90 months, 25% below the advisory guideline range of 120 months.

As part of his guilty plea, Naaman admitted that, as the agent for Innospec, Inc. and its subsidiaries (collectively, "Innospec") in Iraq, over the course of approximately seven years, he played a key role in a scheme to pay approximately $4 million in kickbacks to the Iraqi government and more than $3.5 million in bribes to senior Iraqi government officials to secure

contracts to sell tetraethyl lead ("TEL") to the Iraqi Ministry of Oil ("MoO").  Based on the

defendant's assistance, Innospec earned more than $50 million in profits on those contracts.

Naaman profited handsomely from his indispensable role in these crimes.  Naaman made more

than $2.7 million on the illicit deals - more than any other individual involved in the contracts -

and expected to make an additional $5.3 million on the contract signed in 2008, but which was

never executed because Naaman's promised bribes were discovered by the Department of

Justice.[1]  Above and beyond those staggering amounts, Naaman induced Innospec to pay

$155,000 for bribes to keep a competitor's product out of the market.  But Naaman never paid -

or intended to pay - those bribes; instead he kept them for himself.  Innospec paid Naaman yet

another $600,000 to bribe officials at the Trade Bank of Iraq ("TBI"), but Naaman acknowledges

that he kept all but a few thousand dollars of that amount.  Based on his own admissions,

Naaman's benefit and intended benefit from this criminal conspiracy exceeded $8.8 million

dollars.[2]

 In total, Naaman conspired with Innospec to pay and promise to pay more than $7.4

million in kickbacks and bribes throughout the conspiracy.  Of that amount, nearly $4 million

was siphoned from a fund established expressly for the benefit of the Iraq people, to purchase

humanitarian goods such as medicine and food.  While the bribes were authorized by and paid on

behalf of Innospec and for its benefit, Naaman played a key role in the conspiracy, planning how

---

[1]  Innospec halted all payments to Naaman when the post-Oil for Food payments were discovered.  Naaman has sued Innospec in Switzerland, alleging, among other things, that he is still owed commissions of $336,018 on sales made in 2007.  He also alleges he is owed $1,275,000 for the first purchase Iraq attempted to make on the 2008 contract, but which was never completed because the contract was secured through bribery.  Naaman's total commission on the 2008 contract was 7.5% - 5% for him and 2.5% to pay bribes to Iraqi officials.

[2]  A chart detailing these amounts is attached as Appendix A.

to pay the bribes, negotiating them, convincing Innospec to pay them, and routing the money through numerous bank accounts in Europe, Lebanon, and elsewhere.

To his credit, Naaman has acknowledged his wrongdoing and made the decision to start cooperating with the United States shortly before he was extradited to the United States in April 2010.  Although Naaman's initial attempts at cooperation were not fully truthful or forthcoming, Naaman subsequently met with law enforcement officials from both the United States and the United Kingdom to provide information about the conduct of Innospec and its officers and employees, and provided substantial assistance to the investigation of others.  Thus, the United States has included below a motion, pursuant to Section 5K1.1 of the Sentencing Guidelines, for a downward departure based on Naaman's substantial assistance, resulting in a recommended sentence of 90 months.

## I.   <u>BACKGROUND</u>

On June 25, 2010, the defendant pled guilty to the following counts of the Superseding Information: (a) Count One, conspiracy to commit wire fraud and to violate the Foreign Corrupt Practices Act (the "FCPA"); and (b) Count Two, substantive violations of the FCPA.  During his plea colloquy, the defendant admitted that he participated in a conspiracy to pay kickbacks to the Iraqi government and bribes to senior Iraqi officials in order to secure contracts to sell TEL to the MoO and to secure favorable exchange rates from TBI.

II.     **SENTENCING CALCULATION**

A.     **Statutory Maximum Sentences**

The defendant faces the following maximum possible sentences: (a) Count One (conspiracy), five years' imprisonment, a three-year period of supervised release, a fine of $250,000 or twice the gross pecuniary gain to the defendant or loss to the victim, whichever is greater, and a $100 special assessment; (b) Count Two (FCPA), five years' imprisonment, a three-year period of supervised release, a fine of $100,000 or twice the gross pecuniary gain to the defendant or loss to the victim, whichever is greater, and a $100 special assessment.

The Total Possible Maximum Sentence is: 10 years' imprisonment; a three-year period of supervised release; a fine of $350,000 or twice the gross pecuniary gain to the defendant or loss to the victim, whichever is greater, and a $200 special assessment.  Finally, supervised release may be revoked if its terms and conditions are violated.

B.     **Sentencing Guidelines Calculation**

The Presentence Investigation Report ("PSI") and the defendant's sentencing memorandum contain lengthy discussions of the Sentencing Guidelines and the application of various factors contained therein.  The United States noted its objections and its positions regarding the application of the factors in its objections to the PSI.  The Court, however, need not analyze with specificity the legal issues identified in Naaman's sentencing memorandum at 46-60,[3] because the parties have already agreed upon a reasonable sentence for Naaman's criminal

---

[3] Defendant's Sentencing Memorandum has different page numbers used by ECF on the filed document, and the page numbers placed by the defendant at the bottom of the memorandum.  For ease of reference, the Government uses the page numbers on the bottom of the memorandum.

activity - 120 months.[4]  Because the parties and the PSI[5] all agree that the sentencing guidelines

are above 120 months,[6] the exact calculation of the guidelines absent the 120 month statutory

maximum[7] and how that number is achieved, is not necessary.  Pursuant to U.S.S.G. §§ 5G1.1(a)

and 5G1.2(d),

> Where the statutorily authorized maximum sentence is less than the minimum of
> the applicable guideline range, the statutorily authorized maximum sentence shall
> be the guideline sentence. (5G1.1(a))
>
> If the sentence imposed on the count carrying the highest statutory maximum is
> less than the total punishment, then the sentence imposed on one or more of the
> other counts shall run consecutively.... (5G1.2(d))

Consequently, the guidelines range for the Naaman is 120 months.

---

[4]  The plea agreement states in paragraph 6, "...a guidelines calculation pursuant to the 2009 Sentencing Guidelines *would result in a minimum guidelines sentence in excess of the statutory maximum of 120 months*. Therefore, pursuant to U.S.S.G. §§ 5G1.1 and 5G1.2, the applicable guidelines range is 120 months."  (Emphasis added.)  It continues in paragraph 7, "...the defendant agrees that he will not seek a downward departure from the agreed guidelines range as set forth above or pursuant to 18 U.S.C. § 3553(a) factors.  The defendant further agrees not to seek a downward departure for any reason from the otherwise applicable guideline range established by the Sentencing Guidelines and that a sentence within the applicable guidelines range is reasonable."  Despite his agreement that he would not argue for a downward departure on the basis of anything but cooperation, and the Court's admonishment in that regard, he spends pages 64-66 of his Sentencing Memorandum arguing he is entitled to a downward departure because of his unsubstantiated charitable work.

[5]  *See* paragraph 146 of the PSI.

[6]  The United States notes with concern that despite the stipulation in the plea agreement that the guidelines calculation was above 120 months, Naaman appears to argue that the appropriate guidelines ranges is 63 to 78 months.  Defendant's Sentencing Memorandum at 57.  Such an argument appears to be inconsistent with his obligations under the plea agreement.

[7]  Even using the lowest of the loss/benefit amounts described in the statement of the offense, the sentencing range under the guidelines would at a minimum be 210 months, well in excess of the 120 month statutory maximum. Pursuant to the call with the Court on January 20, 2011, during which the parties agreed the applicable guidelines range is 120 months, the United States does not address its disagreements with the legal theories the defendant advances as to the application of various guidelines.  However, if the Court determines that would like supplemental briefing on the law supporting the application of each enhancement, the United States is prepared to provide such a briefing.

**III.    MOTION FOR DOWNWARD DEPARTURE FROM GUIDELINE SENTENCING RANGE**

As noted in the plea agreement, the appropriate guidelines range is 120 months, and such a range is reasonable, Plea Agreement paragraphs 6 and 7, and, consequently, the only issue for this Court to determine is the appropriate reduction based on the nature and extent of Naaman's cooperation. Consequently, the United States formally moves, pursuant to Section 5K1.1 of the Sentencing Guidelines, in support of a downward departure below the sentencing range of 120 months recommended by the Sentencing Guidelines, based upon the defendant's substantial assistance in the investigation and prosecution of other persons. In support of this motion, the United States notes the following relevant factors that contributed to the United States' determination that a 5K1.1 reduction is warranted and in support of the recommended sentence of 90 months of incarceration.

In determining whether a 5K1.1 departure is warranted and, if so, the extent of that departure, the United States considered the following factors:

1.    <u>Nature of assistance</u>. Section 5K1.1 lists as a relevant factor "the nature and extent of the defendant's assistance." In this case, Naaman met with the United States and with foreign law enforcement officials on approximately four occasions over the course of approximately four months. Although he was not forthcoming or fully truthful in the initial interview, which occurred before he pled guilty, he subsequently was more cooperative and agreed to meet with law enforcement every time he was requested to do so. He explained the conspiracy and his relationship with various persons at Innospec. He reviewed documents and, where he was able, explained the circumstances surrounding the events discussed in the

documents, although at times he was unable to recall key information.[8]  Naaman spent

approximately 20 hours with law enforcement officials in these debriefings and was well-

prepared for all of his debriefings.

      2.    <u>Significance of cooperation</u>.  Section 5K1.1 lists as a relevant factor "the

court's evaluation of the significance and usefulness of the defendant's assistance, taking into

consideration the government's evaluation of the assistance rendered."  In this case, the defendant

was not the first individual to admit to criminal culpability and cooperate with law enforcement

authorities.  The defendant also expressed a willingness to testify before the Grand Jury and at a

trial if that becomes necessary with certain limitations outlined in paragraph 4 below.  The

criminal investigation is ongoing, based in limited part on Naaman's assistance.[9]

      3.    <u>Reliability of information</u>.  Section 5K1.1 lists as a relevant factor "the

truthfulness, completeness, and reliability of any information or testimony provided by the

defendant."  The United States notes with concern that the defendant was not completely truthful

or forthcoming during his initial debriefing in May 2010.  However, since then, including

following Naaman's guilty plea in June 2010, it is the United States' view that the information

provided by Naaman in connection with his cooperative efforts with law enforcement was, in

general, truthful.  The United States has concerns that Naaman failed to recall key events -

including the identities of some of the recipients of the bribes.  Such failures of memory

---

[8]  Naaman notes that he also provided documents to the United States to assist with the investigation.  Most of the documents Naaman provided were already in the possession of law enforcement or not useful, and other useful information and documents requested (most notably financial records) were not provided.  Foreign law enforcement eventually secured some of the financial records through mutual legal assistance.

[9]  The United States provided Naaman with the opportunity to delay his sentencing while the investigation continued until the effect of his cooperation could be fully assessed.  Naaman chose to proceed with sentencing on the current date.

significantly decrease the value of other information he provides because it undermines the overall reliability of his information.

        4.     <u>Danger to defendant</u>.  Section 5K1.1 lists as a relevant factor "any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance."  Naaman claims in his sentencing memorandum that he cooperated, at risk to himself, "with little or no protection offered in return."  This is not true.  Naaman did not furnish the information he said would put him at risk until after receiving assurances that the United States would not share the information and would not require him to testify about it.[10]  The United States has not shared Naaman's that information outside of the immediate U.S. prosecution team, nor has it shared it with foreign law enforcement.  That said, Naaman believes that the sharing of that information still might put him or his family at risk, although he has received no threats since his cooperation became public in June 2010.[11]  Although the United States has no information about the credibility of the defendant's perceived risk of danger to his family or himself, there is always some measure of risk associated with cooperating with the government in a criminal case.[12]  The United States, however, has no evidence to suggest that the

---

    [10]  For more detail regarding the risk Naaman believes he faced and the United States' assurances, please see the United States' sealed response to the defendant's sealed addendum to his sentencing memorandum, to be filed on January 25, 2011.

    [11]  It was also the defendant's fear of "threats" he received while in the D.C. Central Detention Facility that resulted in his placement in solitary confinement, but those "threats" were made before his cooperation with the United States began and before he provided relevant information.  After his cooperation began, Naaman requested transfer to a different wing of the prison where cooperators are normally housed, and the United States supported his request.  However, Bureau of Prisons policy requires that once a complaint that an inmate is being threatened is received, that inmate must remain in solitary confinement, because that is the only place their safety can be guaranteed.  Naaman has reported no threats or concerns about his safety while at Northern Neck or subsequent to his release.

    [12]  The defendant's apparent fear of threats based on his cooperation did not prevent him from explicitly detailing in his public filing the names of others that he considered to be wrongdoers, which in some ways

defendant faces any more risk than other cooperating defendants in other cases of white-collar crime.

5.   Timeliness.  Section 5K1.1 lists as a relevant factor "the timeliness of the defendant's assistance."  In this case, Naaman did not begin providing information to the United States until after his extradition was ordered by German authorities, although he was given ample opportunity to cooperate prior to that date.  Nonetheless, the United States deems it relatively timely.  First, Naaman's cooperation prompted the opening of a new line of investigation. Second, Naaman's cooperation did occur well in advance of trial and sentencing, which allowed the United States time to engage foreign law enforcement and secure his cooperation with the foreign investigation as well.

Taking into account the factors described above, Naaman deserves credit for his substantial assistance to law enforcement authorities.  However, that credit should not go beyond the 25% reduction proposed by the United States.  First, the United States notes with concern that in his Sentencing Memorandum, the defendant repeatedly contradicts not only the evidence in this case, but also the agreed Statement of the Offense, to which he admitted at the time of his plea.[13]  Second, in his Sentencing Memorandum, Naaman challenges whether or not there was

---

undermines the credibility of his claimed fears of retaliation of his cooperation being publicly known by his fellow wrongdoers.

[13]   For example, in the Defendant's Sentencing Memorandum on page 56, he claims that the $2.67 million intended bribe figure is "purely speculative," notwithstanding his admission in paragraph 59 of the Statement of the Offense that, "Based on the terms of the LTPA, had the bribes been paid, *they would have totaled approximately $2,679,600 over the course of three years*." (Emphasis added.)  On page 58, Naaman claims he "did not propose paying bribes to Iraqi officials," and yet, as described below, he proposed travel, pocket money, gifts, and more - including shopping sprees for which he never sought reimbursement from the company, as well as $750,000 in fake bribes that were never paid.  On page 14, he claims that he was no longer involved in the TEL contracts after February 8, 2008, but he admitted during interviews and the evidence clearly demonstrates that Naaman continued to represent to the Iraqi Ministry of Oil that he was Innospec's agent, and continued to communicate with them, until early 2009.  *See* Appendix B, Exhibit 1.  Many other examples are discussed throughout this memorandum.

even a fraud in this case, calling it merely an "injury to the U.N. in its sovereign or regulatory capacity."  Defendant's Sentencing Memorandum at 48-49.  Both of these factors contradict his assertion that he has acknowledged his responsibility for his criminal conduct and demonstrated sincere remorse.  *Id.* at 62.  Lastly, as discussed above, contrary to his assertions that he gave law enforcement "full and complete disclosure of his knowledge," the value of Naaman's assistance was undermined significantly by his initial lack of candor and the fact that he did not provide the United States with financial records that were requested of him.[14]

Consequently, based upon the foregoing and the information contained in the United States' sealed filing of January 21, 2011, and based on the assumption that Naaman continues to cooperate and meet all of his obligations under the plea agreement, the United States believes that the defendant has provided substantial assistance in the investigation of others and has provided information about their activities in a timely manner.  The United States respectfully submits that the appropriate sentence for Naaman, based on the seriousness of his crimes and his cooperation with law enforcement, is 90 months incarceration.  Taking into account Naaman's incarceration in Frankfurt, Germany while he was fighting extradition and in the United States as

---

More importantly, in his first interview with law enforcement in which he claimed he would cooperate, Naaman was untruthful at times, and his answers to questions were often incomplete.  For example, Naaman claimed in that interview that during a meeting that included two other witnesses in the investigation, the CEO of Innospec first introduced the idea of Naaman intervening to force another company's chemical, MMT, to fail a critical test.  Not only do none of the witnesses present in the meeting have any recollection of the CEO making such a suggestion, but they also stated that the intervention of Naaman in the MMT test was Naaman's idea, which is corroborated by correspondence exchanged between Naaman and Innospec employees.  *See* Appendix B, Exhibit 2.  Naaman also claimed in his first interview that no bribes were paid or offered after the Oil for Food Program ended, claiming it was "all a lie" to get money out of Innospec, and at the time, he denied ever paying bribes for Innospec.

[14]  Naaman asserts on page 67 that the documents he provided were "critical."  They were not.

he was negotiating a plea, the resulting recommendation is a sentence of 79 months in addition to the 11 months time served.[15]

The PSI notes that the fine range under the guidelines for an offense level of 33 is $17,500 to $175,000, PSI at 23, but this amount is substantially less than the profits Naaman made from the illicit contracts.  The Guidelines provide that the amount of the fine should always be sufficient to ensure that the fine, taken together with other sanctions imposed, is punitive. U.S.S.G. § 5E1.2(d).  In this case, the Guidelines range is insufficient to be punitive - Naaman earned approximately $2,775,722.25[16] in commissions on the illicit contracts that were actually performed, plus at least an additional $758,816.78 ($155,000 on the MMT test and  $603,816.78 Naaman was paid to bribe TBI officials) from the bribes he never paid, for a total of $3,534,539.03.  The United States submits that the appropriate fine should at least equal the ill-gotten gains Naaman received from his criminal activity.[17]

Naaman has already disgorged $810,076 of his profits to the Securities and Exchange Commission (the "SEC").[18]  Naaman asserts in his Swiss lawsuit against Innospec that $336,018 of his commissions was never paid, leaving approximately $2,388,445.03 ($3,534,539.03 minus $810,076 already disgorged and $336,018 he never received).  The United States respectfully

---

[15]   Naaman was arrested in Frankfurt, Germany on July 30, 2009.  He was extradited to the United States on April 30, 2010.  He was released on bail on June 29, 2010.  Thus, by the United States' calculation, he has spent 335 days in pre-extradition and pre-trial detention.

[16]   Because Naaman was paid in euro, not dollars, the exact amount varies depending on the exchange rate used.

[17]   The United States inadvertently failed to note this issue in its objections to the PSI.

[18]   The SEC also levied a civil penalty of $438,038, but provided the fine to which this Court sentences him is at least that amount, the civil penalty will be deemed satisfied by the criminal fine.

submits that the appropriate fine for Naaman, based on the profits he made from his crimes, is $2,388,445.03.

## IV.    FACTS AND CIRCUMSTANCES OF THE OFFENSE

Pursuant to *United States v. Booker*, 125 S. Ct. 738 (2005), the Sentencing Guidelines are no longer mandatory.  Courts have noted that "*Booker* requires judges to engage in a two-step analysis to determine a reasonable sentence."  *United States v. Doe*, 412 F. Supp.2d. 87, 90 (D.D.C. 2006). This process has been described as follows:

> [A] district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines. Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in [18 U.S.C.] § 3553(a) before imposing the sentence.

*Id.* (quoting *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005)).  The second step of the *Booker* sentencing analysis requires the court in imposing sentence to consider the other factors of Section 3553(a).  *United States v. Price*, 409 F.3d 436, 442 (D.C. Cir. 2005).

Because the parties agree that 120 months is a reasonable sentence for Naaman's criminal activities, the United States submits that the 120 months appropriately reflects the factors enumerated in 18 U.S.C. § 3553(a).  Thus, the only remaining analysis the Court needs to make at this point is the nature and extent of Naaman's cooperation.  As discussed above, while Naaman cooperated in the investigation and provided substantial assistance, he was not the first cooperator and his initial false statements and continued failures of memory undermine his reliability as a cooperating witness.  Some of the factual assertions made in the sentencing memorandum are at odds not only with facts known to the United States, but also at odds with

facts admitted in the Statement of the Offense and acknowledged by the defendant during his interviews with law enforcement.  The contradictions identified in his sentencing memorandum, detailed below, raise doubts as to whether Naaman has truly accepted responsibility for the totality and gravity of his offenses and, in the United States' estimation, further undermined the value of his present and future cooperation.  Nevertheless, the United States recommends Naaman receive a sentence of 90 months, which is a reduction of 25 percent from the agreed reasonable sentence of 120 months.

However, the defendant appears to be arguing that his sentence should be reduced for reasons beyond the impact of Naaman's substantial assistance to law enforcement.  Indeed, much of Naaman's memorandum is spent providing facts and circumstances of the offense that appear to be presented to assist the Court in identifying what is a reasonable sentence.  In a typical case, all of those facts are relevant because the court must determine what is a reasonable sentence for the offense charged.   Such facts are only necessary in those cases in which a court must determine what is a reasonable sentence for the offense charged.  In cases where the Guidelines sentence is agreed to be reasonable, such facts and argument are unnecessary.  In order to avoid exactly the type of voluminous and irrelevant briefing that Naaman has submitted, the United States insisted as a condition of the plea agreement, and the defendant agreed, that 120 months was a reasonable sentence and that the Defendant would not seek a downward departure based on 3553(a) factors.  Plea Agreement paragraph 7.  Naaman's extensive briefing merely obfuscates the issues relevant for sentencing - the scope and value of Naaman's cooperation.  Nevertheless, in order to ensure that the Court has proper information to assess the 3553(a) factors, the United

States is obligated to correct some of the factual inaccuracies presented in Naaman's memorandum.

### A.      Seriousness of the Offense

Naaman not only contradicts the facts that have already been admitted, but appears to dismiss the seriousness of the offenses to which he has pleaded guilty, which he seeks to minimize throughout his Sentencing Memorandum.  Naaman has admitted to conspiring to commit two separate offenses: wire fraud and violating the FCPA.  These are serous offenses that not only caused tremendous monetary losses,[19] but also undermined the proper functioning of government.

While the total monetary loss to the people of Iraq is ultimately impossible to quantify, there is no doubt that the loss was severe.  Certainly the nearly $4 million in kickbacks under the Oil for Food Program - which were to be used to purchase humanitarian goods like food and medicine - was a monetary loss.[20]  Another loss was the nearly $3 million promised and paid in

---

[19]   It may be useful to understand the extent of Naaman's criminal activity in a country as relatively poor as Iraq and why Naaman's conduct was particularly egregious.  Oil is Iraq's most important export, which provides for 90% of the country's foreign exchange earnings.  Per-capita income in Iraq is $2,108 per year, according to the U.S. Department of State.  *See*  "Background Note: Iraq," available at www.state.gov/r/pa/ei/bgn/6804.htm (referencing figures for 2009).  That means that just Naaman's smallest bribe - the honeymoon in Thailand for a refinery official and his wife - was the *annual* income of nearly seven Iraqis.  The bribes promised on the 2008 Long Term Purchase Agreement ("LTPA") would be the *annual* income of 1200 Iraqis.

[20]   The United States feels it necessary to correct some of the factual assertions in the defendant's memorandum.  Regarding the defendant's statement that "when Alcor did not offer the best price, they did not receive the contract," (Defendant's Sentencing Memorandum at 14 and  48) and his "assumption" that Alcor always had the lowest bid, (Defendant's Sentencing Memorandum at 49) and therefore the people of Iraq benefitted from at least the lowest bid being accepted, the defendant knows that this claim is not accurate.  As the defendant has himself discussed extensively with law enforcement, Alcor had been consistently underbid by a Russian company on OFF contracts prior to 2001.  *See* Appendix B, Exhibit 12 (page 3).  As of November 2001, prior to the bidding on the last two contracts, there were no other legitimate bidders on the contracts - Innospec was the world's only remaining manufacturer of TEL.
     Regarding the defendant's argument that the Government of Iraq represents the Iraqi people and "U.S. courts cannot adjudicate claims that a foreign government did not spend its people's money well...," therefore, this was not fraud against the people of Iraq, Defendant's Sentencing Memorandum at 49, that claim has no basis in law,

bribes to senior Iraqi officials[21] after the Oil for Food Program ended because those funds were

siphoned into the pockets of public officials instead of being invested into rebuilding the

devastated Iraqi oil sector.  In addition, some of the monetary losses cannot be quantified because

there is no way to know what the prices on the contracts should have been absent the bribes and

kickbacks.  The bribes and kickbacks undoubtedly secured higher prices on the contracts than

Innospec would otherwise have earned, even with its monopoly on the market.  Indeed, the

company was making nearly 40% profit on its contracts illicitly obtained by Naaman.[22]

Of course, the most invidious harm of public corruption is not monetary.  As Naaman

noted in his own sentencing memorandum, corruption was rife in Iraq during these periods.  As

the Court undoubtedly recognizes, the impact of corruption is not merely on the single contract

that is corrupted, but rather a breakdown in the proper functioning of government and a mistrust

of the entire system of government.  It is impossible to quantify the damage done to an emerging

---

and is in fact directly refuted by case law.  *See United States v. Chalmers et al.,* 2007 WL 528853 at 4-7  (S.D.N.Y. 2007) (discussing applicable law and determining that fraud in the Oil for Food program was fraud against the Iraqi people, because they had a property interest in the humanitarian goods they should have received under the program, independent of their government).  If the defendant believes that there was no fraud here, he should have raised that during plea negotiations, not at sentencing.  He has already admitted to and pleaded guilty to conspiring to commit wire fraud.

[21]  Naaman admits and the evidence shows that bribe recipients and intended recipients included directors general of Iraqi oil refineries, who made contract awards, the heads of departments of the ministry with significant influence over contracting and product approval, a deputy Minister of Oil, and a member of the board of the Trade Bank of Iraq.

[22]  Before Innospec started selling TEL to Iraq, the Ministry of Oil was purchasing it from a Russian company for $6,500 per metric ton.  On the very first contract with Innospec in May 2001, that cost skyrocketed to over $9,000 per metric ton.  By 2008, Naaman had negotiated prices over $18,000 per metric ton.  What the cost would have been absent the bribes is unknowable, because after November 2001, Innospec had no direct competitors as it was the only manufacturer of TEL.  The bribes also induced the purchase of more TEL than Iraq needed.  How much of the Iraqi people's money, and the U.S. taxpayers' assistance dollars after 2003, went into the pockets of Naaman, Innospec, and the Iraqi officials instead of rebuilding is impossible to know.

democracy by Naaman's corruption of senior officials in a ministry critical to Iraq's economy and national security.

The Court, however, should not focus only on the impact on the government and people of Iraq.  Naaman questions the source of the U.S. interest in punishing the crimes of a non-U.S. citizen taking actions overseas.  This is a not-so-subtle attack on the legitimacy of the law itself and should be rejected by the Court.

By way of explanation, the FCPA was enacted by Congress in 1977 (and amended in 1988 and 1998) to combat corruption harmful to foreign economies and governments, to enhance the United States' public image worldwide, and to allow legitimate businesses to compete against corrupt businesses.  The Senate's investigation determined that bribery by American businesses had produced "severe adverse effects":

> Foreign governments friendly to the United States in Japan, Italy, and the
> Netherlands have come under intense pressure from their own people.  The image
> of American democracy abroad has been tarnished. . . .  Corporate bribery is bad
> business.  In our free market system it is basic that the sale of products should take
> place on the basis of price, quality, and service.  Corporate bribery is
> fundamentally destructive of this basic tenet.  Corporate bribery of foreign
> officials takes place primarily to assist corporations in gaining business.  Thus
> foreign corporate bribery affects the very stability of overseas business.  Foreign
> corporate bribes also affect our domestic competitive climate when domestic
> firms engage in such practices as a substitute for healthy competition for foreign
> business....  Secretary of the Treasury Blumenthal, in appearing before the
> committee in support of the criminalization of foreign corporate bribery testified
> that: 'paying bribes – apart from being morally repugnant and illegal in most
> countries – is simply not necessary for the successful conduct of business here or
> overseas.'

S. Rep. No. 95-114 (1977) at 3-4, *reprinted* in 1977 U.S.C.C.A.N. 4098.  Consequently, the impact of Naaman's conduct is not confined merely to the harm caused to Iraq, but the Senate

believed that such conduct had a direct negative impact on the economic system of the United States, and thus they made it a criminal offense.

Since its passage, the FCPA has been at the forefront of a spreading international norm that has now been adopted in most developed countries, and many developing countries, to level the playing field for legitimate businesses. Prohibitions against bribery of foreign officials in international business transactions have been made binding through international conventions sponsored by the United Nations, the Council of Europe, the Organization for Economic Cooperation and Development, and the Organization of American States, and through the policies of other multilateral institutions like the World Bank and the International Chamber of Commerce. *See* Stuart H. Deming, *The Foreign Corrupt Practices Act and the New International Norms* (American Bar Association Section of International Law 2005), at 93-94. As discussed above, the U.S. Sentencing Commission's 2002 change in treatment of the FCPA to the punitive public corruption guideline implemented the mandate of one such international treaty to which the United States is party to provide serious punishment equivalent to sentences in domestic bribery cases.

The point of these anti-bribery laws is that sound government decisions can only be made by honest, unbiased procurement officials. Thus, those who would excuse a business committing bribery of a foreign official as simply adhering to a developing country's "local business custom" challenging the very purpose of these laws. Such a statement not only shows a lack of respect for U.S. and international law, but also expresses a cultural condescension toward foreign nationalities. Most important, the assertion is false – contradicted by the anti-bribery laws on foreign countries' books, by their public institutions specifically organized to combat corruption,

and by the public protests of their citizens against official corruption.  Iraq is no exception, where the Iraqi Anti-Corruption Commission battles corruption every day, and where the U.S. has invested billions to combat corruption.  Combating global corruption is a high priority for the United States, Iraq, and the international community at large.

In this case in particular, however, the U.S. interest is even stronger and more direct than the national interest expressed by Congress in establishing the FCPA.  In 2003, first the U.S. military and later the Coalition Provisional Authority ("CPA") took over administration of the Oil for Food Program and oversaw the rebuilding of Iraq.  During the period from 2003 to 2008, it was U.S. taxpayer's money, in the form of development assistance to Iraq, that was keeping the country afloat.  Trying to get Iraq's critical oil refining capacity back on track and earning money was one of the CPA's highest priorities.  Yet, it was during this time that the defendant was engaged in criminal activity corrupting the procurement process and officials in the Iraqi oil industry.  Moreover, it was not just Iraqi money that the defendant used to perpetrate his crimes.  The funds that the defendant's corruption was siphoning off from the legitimate goals of the Ministry of Oil and putting in his own or corrupt officials' pockets were, ultimately, money the U.S. taxpayers sent to Iraq to stabilize the country and help it to rebuild.[23]

At sentencing, the United States, with the Court's permission,[24] intends to present the testimony of Joshua Volz, the U.S. State Department official overseeing Iraq's fight against

---

[23]  Innospec, while certainly criminally culpable, also suffered from Naaman's criminal conduct.  The investigation and prosecution had a huge impact on the company, which was unable to pay the fines assessed against it.  As a result of the fake bribes Naaman proposed to make MMT fail a necessary test, Innospec is being sued by the company that manufactures MMT.

[24]  Naaman's counsel indicated on a telephone call with the United States and the Court on January 20, 2011 that they had no objections to Mr. Volz's testimony.

corruption.  Mr. Volz is prepared to testify about the harmful impact the kickbacks paid under the

Oil for Food Program had on the people of Iraq.  He will also testify about the long-term impact

of corruption on the Iraqi people, particularly as they struggle to rebuild.  He will discuss the

harm to the security of Iraq and the U.S. posed by corruption, particularly in the all-important oil

industry, as well as the impact on U.S. taxpayer funds invested in rebuilding Iraq and helping the

Iraqi economy to stand on its own.  As Mr. Volz will make clear, corruption such as that

instigated by the defendant has far-reaching and serious consequences.

By any metric, Defendant's offenses were serious - siphoning off resources to be used for

humanitarian relief, causing massive economic loss to a country struggling to rebuild, and further

undermining the public's trust in its government.

### B.    Nature and Circumstances of the Offense

The defendant spends numerous pages describing the nature and circumstances of the

offense, but obfuscates and conveniently ignores the most important issues.  The facts are fairly

simple.  From 2001 to 2008, Naaman and his co-conspirators agreed to pay kickbacks to the

government of Iraq, and bribes to senior officials of the government of Iraq, in exchange for

contracts.  This scheme produced more than $50,000,000 in profits for Innospec, Inc., would

have made more than $8 million for Ousama Naaman, and allowed Iraqi officials to steal more

than $8 million out of the Iraqi public purse, money that should have been used to rebuild a

struggling and war-torn country.

Naaman repeatedly challenges the $2.6 million in anticipated bribes, calling sales of TEL

under the 2008 LTPA "purely speculative."  Defendant's Sentencing Memorandum at 56.

Naaman knows this is not the case.[25]  Notwithstanding the assertion in his Sentencing

Memorandum that he had no engagement in the 2008 LTPA after his suspension on February 8,

2008, Defendant's Sentencing Memorandum at 14, Naaman admitted to investigators that he

continued to represent himself as Innospec's agent to the Ministry of Oil for more than a year

after his suspension, and continued to act as a conduit for correspondence.  The Ministry of Oil

opened a $17 million letter of credit on the 2008 LTPA in January 2009 - and it was Naaman

who sent the letter of credit to Innospec.[26]  *See* Appendix B, Exhibit 1.  On the basis of that letter

of credit, Naaman sued Innospec in Switzerland demanding his commissions of $1,275,000 on

the $17 million.[27]

### 1.     *Benefits to the Co-Conspirators*

The Defendant's Sentencing Memorandum significantly understates the benefits the co-

conspirators received from Naaman's schemes to secure higher prices and greater sales through

bribes.  Innospec made more than $50 million dollars on those extremely lucrative contracts.

Naaman personally benefitted both from taking a percentage from all of the sales procured

through bribes, but also from his fake bribe schemes, that is, getting Innospec to give Naaman

money for bribes that he never intended to pay.  As a result, Naaman made more than $2.7

---

[25]  Naaman's suggestion in his Sentencing Memorandum at page 57 that "the fairer and better course is to assume" bribes under the 2008 LTPA would be the same as the one-off bribe he actually paid under the 2004 LTPA is absurd.  As Naaman has admitted, he negotiated a substantially higher bribe on a percentage basis on the 2008 LTPA than the one-time payment under 2004 LTPA.  He also was well aware that the Ministry of Oil intended to buy at least $17 million worth of TEL, because they sent him the letter of credit they opened to pay for it.  *See* Appendix B, Exhibit 1.

[26]  Due to the bribery on the contract, the shipments requested by the Ministry of Oil were not made until a new contract was negotiated.  However, there have been significant shipments of TEL to Iraq under the untainted contract.

[27]  This includes what would have been the 2.5% bribe amount.  See Appendix B, Exhibit 3.

million in commissions, and would have made an additional $4.8 million off of the 2008 LTPA, had it not been terminated by Innospec as a result of this investigation.  Added to those commissions, Naaman secured $155,000 he told Innospec was for bribes but that he ultimately pocketed.  Of an additional $600,000 that Innospec gave Naaman, believing it would be used to bribe senior officials at the Trade Bank of Iraq ("TBI") to secure favorable exchange rates, Naaman says he paid a small portion to lower-level officials at TBI, but he doesn't remember how much, and kept the rest.  Naaman personally benefitted significantly more from this corrupt scheme than any other single individual involved.

### 2.    *Naaman's Role in the Offense*

The defendant decries the fact that he is the only person that has been charged in this matter to date, when there are others so much more culpable who have yet to be charged.  Of course, the investigation is not yet over, and the United States anticipates that others will be charged.  What Naaman neglects to mention is that he was not incidental to the schemes; he was indispensable to them.  He negotiated, planned, organized, and oversaw[28] the criminal schemes -

---

[28] The defendant argues in his sentencing memorandum that he was not an organizer or leader of the post-Oil for Food bribe scheme because he was just the agent, and he made no decisions, but just "exchanged messages between Alcor and corrupt Iraqi officials."  This is clearly not the case, given that the $155,000 in bribes to fail MMT and the $600,000 to secure favorable exchange rates from TBI were never requested by any corrupt official - there simply were no messages to exchange.  Naaman's statement that he "did not propose paying bribes to Iraqi officials" is clearly contradicted by the facts and Naaman's own admissions.  Naaman created fictional bribe demands in order to increase his personal profits.  For those bribes that did occur or were actually promised, Naaman did far more than exchange messages.  He never even told Innospec about the $167,000 he paid under the 2004 LTPA, and while Innospec was aware that Naaman was promising bribes on the 2008 LTPA, it was Naaman that negotiated the amount and proposed to Innospec that it be hidden in his commission, which rose spectacularly from 3% under the 2004 LTPA to 7.5% under the 2008 LTPA.  No one at Innospec even knew exactly how much the promised bribe was - they just substantially increased his commission to cover it, and Naaman had every incentive to negotiate well given that whatever he did not pay from the 7.5% would be his.

Naaman likewise claims that he was not a manager or supervisor of the scheme to defraud the United Nations, again because he was just the agent and "Innospec was in charge."  Naaman misunderstands the manager/supervisor enhancement.  Exercise of decision making authority is only one factor the Court should consider under this enhancement, according to U.S.S.G. § 3B1.1 Application Note 4.  Others include the recruitment of accomplices, degree of participation in planning or organizing the offense, the nature and scope of the illegal

both to pay bribes and to make more money for himself by pretending to pay bribes.[29]  This was

not some aberrant action by the defedant.  Naaman, over the course of seven years, systematically

encouraged and coached Innospec employees in how to make illegal payments in exchange for

contracts, and made millions for himself in the process.[30]  Naaman's bribes and promises of more

bribes continued long after the investigation into Innospec began, and Naaman was not deterred

from continued illegal activity even knowing that Innospec was under the scrutiny of U.S. law

enforcement.  Indeed, he did not stop his criminal activity until shortly before he was

apprehended by law enforcement.

　　　　Specifically, the defendant, at his own initiative,[31] proposed to Innospec that it pay bribes

- in the form of cash, travel, shopping trips, and the like[32] - in order to secure contracts, keep

---

activity, and the degree of control and authority exercised over others, all factors that weigh in favor of finding
Naaman was a manager or supervisor.

[29]  It should not be forgotten that Innospec went through a four-year investigation that ultimately should
have resulted in hundreds of millions of dollars in fines, but, as this Court knows, the fine was reduced because of
Innospec's inability to pay the full amount.  Certainly the company is culpable - they authorized the payment of
millions in kickbacks and bribes - but it was only at the end that it was discovered that many of those bribes were
never actually paid.

[30]  Naaman claims in his Sentencing Memorandum that his benefit from the Oil for Food contracts should
be lower than what he was actually paid, because he had to share the commissions with another agent.  Defendant's
Sentencing Memorandum at 10-11.  Because Innospec instructed Naaman to share the commissions, Naaman was
asked multiple times to provide law enforcement with bank records showing any money transfers to this other agent.
Yet, no such documents were produced.  Naaman also never states how much money he claims to have transferred to
the other agent.

[31]  Naaman claims on page 82 of his Sentencing Memorandum that Innospec "asked" to engage in the
criminal conduct in this case.  This is contradicted by the evidence.  In every case, Naaman asked Innospec
employees for the money to pay kickbacks and bribes and they agreed to do so and authorized the bribes he
proposed.

[32]  Naaman claims in his Sentencing Memorandum that all of the gifts he gave were authorized by
Innospec.  Defendant's Sentencing Memorandum at 11.  This is inconsistent with Naaman's admissions and the
evidence.  For example, Naaman acknowledged that he simply gave the watch, without discussing it with Innospec,
when it was requested.  An email between an employee of Naaman and Innospec notes that Naaman had spent
thousands on shopping sprees for senior Iraqi officials that he never told Innospec about and for which he never
sought reimbursement.  See Appendix B, Exhibit 4 (top of the second page).

competitors out of the market, and keep profits high.  On some occasions, Naaman approached

Innospec employees several times before he was able to convince them to pay what they believed

were bribes.  These schemes were Naaman's idea; so much so, that one set of bribes was a

complete fiction.  Indeed, according to Naaman's own Sentencing Memorandum, when Naaman

was not able to convince Innospec to pay him for what he considered legitimate business

expenses, he instead lied and proposed a fake bribe scheme to get money out of the company.

Defendant's Sentencing Memorandum at 12.  Naaman told Innospec employees that $100,000 in

bribes was absolutely necessary to keep a competitor out of the market.[33]  According to Naaman,

he never intended to pay a bribe with it - he merely lied to Innospec to get the money, because he

thought he deserved it because of a contractual dispute.  When Innospec employees finally

heeded his dire warnings and agreed to pay the bribe, Naaman kept the money for himself, and

went back for an additional $50,000, sending reminder after reminder until he was paid.  Naaman

even falsified a Ministry of Oil report to make it appear the "bribes" had succeeded.

To rebut the Defendant's contention that he was not a critical component of the criminal

scheme and his argument that it was "Innospec employees who directed his conduct,"

Defendant's Sentencing Memorandum at 54, the United States provides additional examples of

the defendant's instigation of the bribes and inducements to Iraqi officials (documents are

attached as exhibits at Appendix B):

| | |
|---|---|
| Early 2005 | Naaman emailed Innospec employees regarding the travel of Iraqi officials to the United Kingdom he had arranged, including a senior MoO technical engineer.  In arranging the trip with Innospec's supply chain director, an |

---

[33]   In his Sentencing Memorandum, Naaman states that he told Innospec the money was to bribe a single engineer.  Defendant's Sentencing Memorandum at 12.  In fact, after initially requesting $100,000 to pay the needed bribes, Naaman sought an additional $50,000 because he claimed he had to bribe six people.

employee of Naaman stated, "Kindly arrange for 8 envelopes with the name of each delegate.  In each envelope, put GBP 1,000/- except for the envelope for [Senior Iraqi Official], put GBP 2,000/- since he is the delegation head.  [Innospec's supply chain director] can personally give this to each delegate upon arrival in UK.  Please arrange to give the tour guide...enough petty cash to spend with the Iraqi delegates..." (Exhibit 5)

| | |
|---|---|
| October 2005 | Naaman arranged to get the letter of credit on an order for 740 metric tons of TEL from the MoO pursuant to the 2004 Long Term Purchase Agreement, provided that Innospec agrees to pay Iraqi officials "half the currency fluctuation rate (4.5%) which makes it a minimum of 2% to their favor..."  His employee explained, "We are sharing most of our profits with Iraqi officials."  Innospec agreed to make the payment.  (Exhibit 6) |
| February 2006 | Naaman again arranges an order for 2000 metric tons of TEL from the MoO pursuant to the 2004 LTPA, "provided we add up the 2% like last time."  Naaman noted that the Iraqi officials wanted their share paid in advance and stated, "Once, I received [sic] your go signal in writing, even in email, I will proceed with my payment."  (Exhibit 7) |
| March 15, 2006 | An employee of Naaman emailed Innospec regarding reimbursement for a three-day trip of Iraqi Officials to Dubai.  The employee stated, "[T]he pocket money of the delegates has been paid by Mr. Naaman through myself, but what we invoiced you is only the official pocket money...  I can confirm to you that what Mr. Naaman has paid to each delegates [sic] pocket money and shopping expenses which is more than the total amount in the invoice we sent."  (Exhibit 4) |
| August 2006 | Naaman emailed Innospec regarding the travel of a high level official in the Minster of Oil in charge of refineries, stating that he had agreed to travel to Amman, Jordan to discuss possibly testifying on Innospec's behalf in an arbitration, provided that Innospec paid for a trip to Thailand for the MoO official and his wife.  Naaman stated, "...you know this man is high official [sic] employee; he is [a high level official] responsible for all refineries business.  We should accommodate him to his program as he is doing us a favour [sic] by coming... and risking his career.  After you finish the meeting with him by the 13th, he will be travelling [sic] on your account to Thailand for one week with his wife..."  (Exhibit 8) |
| March 2007 | Naaman warns Innospec that he has already promised to pay bribes on the 2008 LTPA under negotiation, stating in a letter, "Following our discussions in Paris, we still have an outstanding invoice of $50K, which |

is your share of the fees that I paid....[34]  As I discussed in our meeting, this fee was not the real cost of rejecting MMT and MTBE.  The real cost should be the increase of our remuneration on TEL for future business, i.e. the remaining 2000 tons of fiscal year 2007 and the new LTPA will be 5%.  This additional money will cover my promise to these people for the <u>loss of their remuneration from MMT</u>, which is a very small price we are paying versus the loss of my money and your money if MMT were admitted in.  I trust that you will approve this, as I have already promised them...”  (Emphasis in original.)  (Exhibit 9)

November 20, 2007   Naaman emailed Innospec, stating “Remuneration - have to be raised up to keep everybody on board, happy and satisfied.  I suggest that if you want to raise the price to the $18,000 level, then to give us a higher remuneration percentage to read seven pct (7%) for a target price of $18,000 plus.  This will leave me a way to negotiate in my next meeting with them, based on your directions set up last July in Nice meeting [sic], i.e. remuneration vs. volume and price.”  On the sidelines of this meeting, Naaman negotiated the 2.5% bribe to be paid to a senior MoO official on the 2008 LTPA.  (Exhibit 10)

Not only was he Naaman determining how to maximize profits and more effectively pay bribes, but, Naaman also sought and suggested ways to stymie the investigation while the conspiracy continued.  Naaman falsified invoices to hide the illegal payments on Innospec’s books and records.  He funneled the kickback and bribe payments through bank accounts in Lebanon, Jordan, Syria, and elsewhere to hide the crimes.[35]  More than that, however, when outside counsel for Innospec interviewed him, Naaman had prepared a proposal intended to mislead U.S. authorities, so that business and the bribery could continue but under a different

---

[34]  This is a reference to the second payment on the fictional $155,000 “bribe” to fail MMT.

[35]  As noted in the Defendant’s Sentencing Memorandum, “Conduct such as hiding assets or transactions, or both, through the use of... offshore financial accounts also ordinarily indicates sophisticated means.”  Defendant’s Sentencing Memorandum at 53 (citing the Sentencing Guidelines).  Naaman admitted during his interviews with law enforcement to routing the payments through multiple countries- false invoices were not the only complex element of this crime, notwithstanding Naaman’s assertions to the contrary in his Sentencing Memorandum.  *Id*. at 52.

name.  In doing so, Naaman devised a plan to ensure that Innospec made its sales, the Iraqi

officals got their bribes, and he got his millions of dollars in commissions under the 2008 LTPA:

> My suggestion:
>
> A new system whereby we buy TEL from you and sell to the Iraqi Ministry of Oil
> (no commission, no invoices) through a new Emirati company to comply with
> new LTPA.... It will be a new trader, new name.  Close all the old files, close old
> stories, start new and fresh one team in front of SEC officials.  Clean new
> business.  Buy and sell to Iraq through new agent in the UAE - no Interact, no
> Tawam, no Naaman anywhere, no commission, no invoices of expenses etc....
> You can convince the Americans that you need such consultant for the above
> scope of work in Iraq as none of ALCOR/OCTEL personnel can visit Iraq today.
> Please advise your opinion.

Appendix B, Exhibit 11.[36]  Nor was that the only time Naaman made suggestions about how to

hide illicit activities.  In 2003, in a detailed agenda for a meeting, Naaman was arguing that he

should be given 1/3 of the 10% in kickbacks on the last two Oil for Food contracts, which

Innospec intended to keep following the fall of the Iraqi government.  He noted that there were

concerns inside Innospec about an audit of the payments.  He proposed:

> Our proposal is to share it (2/3: 1/3) [sic].  2/3 is for you and 1/3 is for us and we
> are ready to give you one-year bank guarantee.  In case there was an audit (God
> forbid), then, you have to give back the money and we shall then pay back our
> share.  But this is a remote possibility having us the access of these letters of
> guarantees, stating officially all were burned.  I believe you ought to share this
> money with everyone, them and us.  All trace will be destroyed and covered.

Appendix B, Exhibit 13.  Unlike the claims made by  Naaman, he is not a mere conduit passing

messages between Innospec and Iraqi officials.  He is the architect of how to make the corrupt

payments and how to cover them up.

---

[36] On the basis of this proposal, as well as Naaman's misdirection in his first interview by law enforcement,
the United States could potentially have sought inclusion of an increase in the PSI guidelines range for obstruction of
justice under U.S.S.G. § 3C1.1, but chose not to due to the fact that the plea agreement had stipulated a reasonable
sentence of 120 months because the guidelines substantially exceeded the 120 month statutory maximum.

C.       **History and Characteristics of the Defendant**

1.       *Naaman's Nationality and National Origin*

In his Sentencing Memorandum, the defendant repeatedly refers to his nationality and

national origin as mitigating factors that should reduce his overall culpability and therefor his

sentence.[37]  Naaman purports to be asking that he not be treated more harshly than U.S. citizens,

Defendant's Sentencing Memorandum at 85, but it is clear that he is in fact asking that he be

treated less harshly based upon his experiences growing up in the Middle East.[38]  Such a request

is entirely improper.  As expressed by the Second Circuit in *United States v. Leung,* 40 F.3d

577m 586 (2d Cir. 1994), "..we reject the view that a defendant's ethnicity or nationality may

legitimately be taken into account in selecting a particular sentence...." (citations omitted).  The

Court went on to say, "Because 'justice must satisfy the appearance of justice,' even the

appearance that the sentence reflects a defendant's race or nationality will ordinarily require a

remand for resentencing."  *Id.* (internal citations omitted).  *See also* 28 U.S.C. § 994(d) ("The

[Sentencing] Commission shall assure that the guidelines and policy statements are entirely

neutral as to the race, sex, national origin, creed, and socioeconomic status of offenders.");

U.S.S.G. § 5H1.10 ("[Race and national origin] are not relevant in the determination of a

sentence."); and *United States v. Jacobson*, 15 F.3d 19, 23 (2d Cir. 1994*)* (reference to national

origin is permissible during sentencing, but only provided it does not become the basis for

---

[37]   There are 21 references to the defendant's Middle Eastern nationality and origins in his Sentencing
Memorandum (and only two to his Canadian nationality).  Aside from this section, there are no references to his
nationality or national origin in the United States' Sentencing Memorandum.

[38]   For example, see page 78-79 of the Defendant's Sentencing Memorandum, noting that his sentence
should be compared with other Oil for Food defendants with his national origin in mind.  He asks for a lower
sentence than either Chalmers or Wyatt received, notwithstanding the fact that he committed more crimes, and more
extensive crimes, than they did.

determining the sentence).[39]   While the Court can consider Naaman's family background and other personal characteristics in crafting an appropriate sentence, case law makes clear that consideration of his cultural background and national origin is prohibited.   Naaman's claim that he should be punished less harshly because he is of Middle Eastern descent would invite precisely the sort of speculation about bias in the U.S. system that the defendant claims should be avoided.

### 2.   *Naaman's Age and Health*

The defendant relies upon his age and health in asking for a sentence of time served. Notwithstanding the discretion this Court enjoys at sentencing, the cases do not support the notion that this Court should refrain from imposing significant imprisonment based on Naaman's age and health.   If these crimes are to be taken seriously by the public, a significant term of imprisonment is appropriate.   Even when a departure or variance from the guidelines sentence is warranted because of extraordinarily ill-health and infirm age, "a prison term is necessary to vindicate the law and provide deterrence... [T]he goal of general deterrence would be ill-served by a public perception that, even for extraordinary reasons, a person can. commit crimes without being imprisoned for a meaningful period." *United States v. Jiminez*, 212 F. Supp. 2d 214, 220

---

[39]   Given how clear it is that Naaman's Middle Eastern descent is an impermissible consideration in the sentencing determination, it appears that what all of these references actually are is a veiled selective prosecution argument.   If Naaman believes that the United States' prosecution is discriminatory application of prosecutorial discretion so severe that his sentence should be reduced to time served, he must demonstrate that he was prosecuted with a discriminatory purpose because he is Middle Eastern, *United States v. Armstrong*, 517 U.S. 456, 465 (1996); *Wayte v. United States*, 470 U.S. 598, 608 n.10 (1985) (holding discriminatory intent is necessary when equal protection claim is not based on overtly discriminatory classification).   Mere speculation, such as that contained in the Defendant's Sentencing Memorandum, does not meet these standards.   *Wayte*, 470 U.S. at 609.   No such bias exists here.   Indeed, the facts belie the suggestion of selective prosecution.   The individuals charged over the past 5 years in FCPA cases come from all over the world and reflect the type of diversity that one would expect in transnational bribery cases: American, Costa Rican, French, Italian, Japanese, Korean, Mexican, Thai, and Vietnamese, among others.

(S.D.N.Y. 2002) (defendant pleaded guilty to illegal re-entry after deportation and then had a

brain aneurism, but was sentenced to imprisonment).

This is not an extraordinary case where a sentence reduction is appropriate because of a

lack of confidence that the Bureau of Prisons can adequately provide for the defendant's medical

needs during an extended prison term.[40]  Naaman has failed to demonstrate "high probability that

lengthy incarceration will shorten" the defendant's life span.  *See United States v. Martin*, 363

F.3d 25, 49-50 and n. 39 (1st Cir. 2004).

### 3.      *Naaman's Career History, Retirement, and Employees*

The defendant also asserts that his business career should be a factor in the Court granting

a minimal sentence.  Yet, as to Naaman's career history and circumstances, the Defendant's

Sentencing Memorandum is a jumble of inconsistencies.  Naaman writes about his 50 employees

and how detrimental his absence has been to them, that they depend on him for their livelihood,

and therefore he should not be incarcerated because they need him.  *Id.* at 43-46.  But Naaman

simultaneously claims that he has transferred most of his business interests to his children

(including his aluminum factory), derives no income from any business, and is planning to retire.

*Id.* at 73; PSI at 18-20.  He simultaneously claims to still run his aluminum company and claims

that he derives no income from it because he has transferred it to his son.

Either he is a business owner and his employees need him, and he should properly

account for those businesses in the PSI in terms of being assessed for a fine based on those assets

and what those businesses earn and will earn when he returns to them, or he is transferring his

---

[40]  Indeed, as a Canadian citizen, Naaman is likely to request prisoner transfer to Canada to serve his period of incarceration.

interest and retiring, and the fact that his employees depend on him is irrelevant, because he will

no longer be their employer in any event.  We have only Naaman's word that any of this is true,

as the Probation Officer noted she was unable to corroborate these claims through independent

research, and the defendant provided no supporting documentation.  PSI at 20.

Naaman emphasizes in his Sentencing Memorandum that he was engaged primarily in

"perfectly legitimate and successful business ventures," Defendant's Sentencing Memorandum at

1, and focuses much of his discussion of his career history on his sales of firefighting equipment.

Defendant's Sentencing Memorandum at 20-25.  What he fails to mention is that, by his own

admission to law enforcement, he paid kickbacks under the Oil for Food Program for the

firefighting equipment companies - on dozens of contracts.  In fact, he told law enforcement he

paid kickbacks on behalf of at least seven other companies in addition to Innospec.  Unlike his

representations in his sentencing memorandum, side deals, fraud, and bribes were an

acknowledged way of doing business for Naaman.  In an email to Innospec employees

advocating for them to pay bribes to TBI officials to get a favorable exchange rate, Naaman says:

> If we do not pay [the Iraqi officials] they will delay the L/C indefinitely.  They
> will keep arguing on the exchange rates, they will need approval from the Minister
> of Oil and from each committee, and the moment they get the approval, the rate
> changes and we go back to square one....  Each one is working for his own
> individual interest, not for the country's interest....
>
> Let me give you an example.  We have one order from the Civil Defense, around
> one year now, for 1.5 million liters of foam fire fighting media.  The L/C was
> never established because of this silly internal fighting on remunerations....

Appendix B, Exhibit 14.  The Court should decline Naaman's invitation to accept as true the

"fact" he asserts about his businesses, business career, and "legitimate" business practices.

Indeed, his past business practices, especially with respect to the firefighting equipment, should weigh in favor of the United States' recommended sentence.

**D.     Deterrence**

The defendant argues extensively that a sentence of incarceration will have no deterrent effect.  To the contrary, an adequate sentence of incarceration is necessary to promote respect for the law and to afford adequate deterrence for criminal conduct.  Well beyond specifically deterring Naaman's own criminal conduct, the general deterrence message by the sentence proposed by the Government would have a profound impact and would be far-reaching.  It is an understatement to say that each case involving bribery in international business transactions is followed closely by companies and business executives alike.  Indeed, it would be particularly detrimental to the effort to combat foreign bribery if a message was inadvertently delivered that suggested bribing foreign officials is not serious offense for which significant penalties attach.

**1.     *Specific Deterrence***

The defendant cites a number of statistics to show that he has a low risk of recidivism. Defendant's Sentencing Memorandum at 70-73.  However, the only non-statistical argument - the only argument which is keyed to the man that Naaman actually is, rather than his statistical position - is that he is easing into retirement and thus poses little risk, and his "forthright acceptance of responsibility in this matter." *Id*. at 73.  Whether Naaman is in fact retiring is unsubstantiated, as discussed above.  He also fails to address the fact that he engaged in schemes to pay kickbacks and bribes on behalf of Innospec and seven other companies over the course of many years, and, consequently, his criminal conduct was not an isolated incident.  Beyond that, the United States submits that his likelihood of recidivism and his general character is

demonstrated by his willingness to create elaborate lies like the MMT test bribes and the TBI

exchange rate splits, just to cheat his principal (Innospec) out of money above and beyond the

millions he was already making in commissions.  His willingness to continue his criminal

activities well into the investigation - and to suggest ways to evade and obstruct the investigation

and hide illicit activities - demonstrate that a strong message needs to be communicated to ensure

that when the opportunity arises, he refrains from violating the law.

As noted throughout this memorandum, Naaman's acceptance of responsibility has been

anything but "forthright."  His suggestions to Innospec on how to evade the investigation and his

initial lack of truthfulness to law enforcement all occurred prior to his guilty plea and should not

be considered under this factor.  However, the numerous factual misstatements in the Sentencing

Memorandum raise concerns about whether Naaman has truly accepted responsibility for these

crimes or is simply seeking another way to fool the relevant decision-maker into providing him

an unjust benefit.

### 2.      *General Deterrence*

Naaman also argues that periods of incarceration are unlikely to have a deterrent effect on the

broader business community.  The United States disagrees with that proposition. This matter is

not an isolated enforcement action that has no ramifications beyond the single defendant Ousama

Naaman.  While Naaman speaks extensively about his individual circumstances and the slim

likelihood that he will commit another crime, those are not the only factors that the Court should

consider in crafting a sentence.  Indeed, 3553(a) explicitly describes that the sentence must be

sufficient "to promote respect for the law" and "afford adequate deterrence to criminal conduct."

That factor is derived from one of the basic principles of criminal law: "general deterrence" - that

individuals can be deterred from violating the law if they believe that they are likely to receive a significant punishment.[41]

The World Bank estimates that corruption accounts for $1 trillion annually - or 3% of the world economy.[42]  While the United States must follow the evidence where it leads, with such illegal activity so rampant, the United States simply cannot investigate and prosecute even a fraction of the trillion dollars of bribes given annually.[43]  Instead, the Department of Justice has identified that reducing this illegal behavior must fall to other actors outside of law enforcement - like companies - who must have a rational basis to make the determination that transnational bribery is bad for their businesses.  The U.S. Departments of State and Commerce have worked closely with the business community to increase awareness of the FCPA and the enforcement efforts of the Department and SEC.  The Department of Justice has noted significant changes in the international business community based upon the increase in FCPA enforcement actions.[44]

A driving factor behind those changes appears to be the concern that individuals who make, approve or are willfully blind to the payment of bribes will be prosecuted, convicted and

---

[41] The classic example is that of parking enforcement.  While cars are often parked illegally in front of expired meters or in no parking zones because they are willing to pay a fine, few people park in front of fire hydrants because there is an expectation that a car parked in front of a fire hydrant will be towed.  The expected punishment is severe enough that the more serious criminal conduct is deterred.

[42] "The Costs of Corruption," April 3, 2004 available at http://go.worldbank.org/VAT2EY5A00.

[43]  The United States has not independently verified the $1 trillion annually paid in bribes.  In addition, that calculation undoubtedly includes bribes that are not violations of the FCPA, including commercial bribery and bribes to foreign public officials that do not have any jurisdictional link to the U.S.

[44]  The Department of Justice has been informed that its recent increased enforcement activity has led companies to enhance their anti-corruption policies and training, and as a result, the increased training has led to a decrease in corrupt business transactions because employees are educated about the risks and choose not to engage in the criminal behavior.  The United States submits that a key factor in the continuing impact of this deterrent effect is the promise of significant sentences for individuals.

incarcerated for a significant period of time.  The United States has secured significant sentences

for some recent violations of the FCPA, and other individuals, in similar situations as Naaman,

are currently pending sentencing.[45]  Unlike many criminal cases where a deterrent effect of a

sentence is merely theoretical, this case has appropriately garnered the attention of many in Iraq,

the United Arab Emirates, the United Kingdom, and the U.S. corporate and legal communities.

The arrest, extradition and conviction of Naaman has been discussed in the press and business

communities through much of the world.  Those same communities are now waiting to see what

the result of this conviction will be.

Consequently, the Court has a great opportunity to "promote respect for the law" and

"afford adequate deterrence of criminal conduct."  By providing a reasonable sentence of

incarceration, which is consistent with the guidelines and with sentences in domestic bribery

cases, the Court can ensure predictability to the business community and help ensure that

businesses around the world recognize that the payment of bribes is too risky for the apparent

immediate economic payoff.  A minimal sentence could  not only possibly be construed as a

violation of U.S. treaty obligations, as discussed below, but could do much to undermine the

efforts by the United States Departments of Commerce and State to educate U.S. businesses

about the harm caused by and risk of engaging in transnational bribery.

---

[45]   The United States notes that there are currently 17 non-U.S. citizens who are facing FCPA charges, and 3 non-U.S. citizens who have pleaded guilty but are still awaiting sentencing.  Of those 20, ten are agents or intermediaries who, like Naaman, were outside the United States.  Three non-U.S. citizens have pled and been sentenced; all three had significantly lower guidelines ranges than Naaman, and two provided extraordinary cooperation far beyond that of Naaman.  None of the three personally benefitted to the degree that Naaman did.

E.        **Sentencing Disparities**

The defendant conducts a survey of existing sentences for cooperating defendants in other

FCPA cases, but such a comparison is entirely misleading and inappropriate in most criminal

cases, and particularly so given the international obligations relevant in the FCPA context.

Pursuant to international treaty, the United States must impose comparable sentences in both

domestic and foreign bribery cases.  Thus, in 2002, the Sentencing Commission amended the

statutory index of offenses located at U.S.S.G. Appendix A to specifically base FCPA's anti-

bribery violations on U.S.S.G. § 2C1.1, the same guideline used for domestic bribery offenses.

The Sentencing Commission stated that such amendment was necessary:

> *to comply with the mandate of a multilateral treaty entered into by the United
> States*, the Convention on Combating Bribery of Foreign Public Officials in
> International business Transactions.  In part *this Convention requires signatory
> countries to impose comparable sentences in both domestic and foreign bribery
> cases*.  Domestic public bribery cases are referenced to § 2C1.1.  To comply with
> the treaty, offenses committed in violation of 15 U.S.C. §§ 78dd-1 through 78dd-3
> are now similarly referenced to § 2C1.1.

Amendments to the Sentencing Guidelines, Policy Statements, and Official Commentary (May 1,

2002), at 3 (emphasis added); *see also* Convention on Combating Bribery of Foreign Public

Officials in International Business Transactions ("OECD Convention"), Art. 3, § 1 ("The bribery

of a foreign public official shall be punishable by effective, proportionate and dissuasive criminal

penalties.  The range of penalties shall be comparable to that applicable to the bribery of the

Party's own public officials."), *reprinted in* 37 I.L.M. 1 (1998).[46]  Thus, comparing Naaman only

---

[46]   This rationale is equally applicable to the Guidelines recommendation of an increase in sentence where
the official who received the bribe is senior.  U.S.S.G. § 2C1.1(b)(3).  Contrary to the defendant's argument at pages
58-60 of his Sentencing Memorandum, treaty law requires the enhancement to apply equally to domestic and foreign
officials.  As noted in footnote 20 above, Naaman bribed numerous high-level officials.

to other FCPA defendants is inappropriate - rather, his sentence should be comparable to other defendants prosecuted for corruption in general, not just corruption of foreign officials.[47]

In addition, comparing sentences requires a much more detailed analysis than that presented by the defendant.  As the Fourth Circuit noted:

> The determination of an appropriate sentence in any particular case requires an *individualized* assessment of the facts and circumstances presented by that particular defendant.  While [defendant] argues that the Court should consider statistical data regarding the median sentence imposed on defendants convicted of similar crimes in reviewing his sentence, such data does not provide the particulars of the defendants who were sentenced and the crimes they committed.  As such, this data does not provide the information necessary to determine whether the defendants who received such sentences are truly comparable to the defendant at hand.  As this Court found in *United States v. Abu Ali*, 528 F.3d 210 (4th Cir. 2008), a defendant should be compared only to other defendants with similar circumstances and histories.  *Id.* at 267.  Because the Court cannot possibly determine the circumstances and histories of each individual defendant whose sentences comprise this statistical information, the assignment of dispositive weight to this type of data would be antithetical to the notion of the individualized assessment required for fashioning an appropriate sentence for a particular defendant.

*United States v. Hawes*, 309 Fed. Appx. 726, 735 (4th Cir. S.C. 2009) (emphasis in original).

Importantly, none of the defendants identified by the defendant are comparable to Naaman and his criminal conduct.  The Sentencing Reform Act seeks not to remove all sentencing disparities, but

---

[47]   Over the period from 2003 to 2009, the Department of Justice charged 8,203 individuals with public corruption offences nationwide and obtained 7,149 convictions.  In addition, over the five-year period from 2001 to 2005, the Department charged 5,749 individuals with public corruption offences nationwide and obtained 4,846 convictions.  Given the number and breadth of public corruption cases, the Guidelines are again the best source to ensure comparability.  However, the Court should consider *United States v. Pool*, 474 F.3d 1127, 1129-30 (8th Cir. 2007).  In *Pool*, the guidelines sentencing range was 33 to 41 months imprisonment, but the district court imposed a sentence of probation with a 1 year of home confinement based on factors it found relevant under 18 U.S.C. § 3553(a), namely, to preserve Pool's business and the jobs of his employees, because of the need for Pool to continue his charitable activities, and because of Pool's medical problems.  *Id.*  The court also received numerous character letters on Pool's behalf, describing his activities in the community and many examples of his generous spirit.  *Id.* at 1128.  The Eighth Circuit reversed the sentence as "unreasonably lenient," reasoning that such considerations, while notable, "do not justify a variance of this magnitude" from the guidelines, and "there was insufficient weight given to the other section 3553(a) factors, for example, the statutory objective of avoiding unwarranted sentence disparities." *Id.* at 1129.

only *unwarranted* sentencing disparities. *United States v. Rhodes*, 145 F.3d 1375, 1381 (D.C. Cir. 1998). Differences in sentences here are not unwarranted. To provide only a few examples, all of the defendants identified by Naaman paid less in kickbacks and bribes than Naaman did. None profited or would have profited personally anywhere close to the same degree that Naaman did. In fact, Naaman personally profited and would have profited more than any single individual in the Innospec investigation, including the two past Chief Executive Officers of Innospec, Inc. and even the officials who received the bribes. The total bribes paid to secure the contracts were higher. The profits earned by the company were higher. Very few of these individuals were managers and organizers of the misconduct at issue. Very few bribed senior foreign government officials. And nearly all of them cooperated earlier and more fulsomely, and did not seek to mislead law enforcement authorities as Naaman did. Thus, the best route to identifying a comparable sentence and to meet the 3553(a)(6) factor of reducing sentencing disparities "among defendants with similar records who have been found guilty of similar conduct" is to turn to the sentencing guidelines.

The same rationale is applicable when comparing sentences among defendants in the same case. The D.C. Circuit Court noted that, in sentencing defendants in the same case, it is appropriate to consider whether co-conspirators had the same criminal history category, the role they played in the conspiracy, and the remuneration received by each conspirator in fashioning a sentence. *United States v. Colwell*, 304 Fed. Appx. 885, 886 (D.C. Cir. 2008) (finding a higher sentence for a particular co-conspirator appropriate under 18 U.S.C. § 3553(a)(6) where she had a higher criminal history category, participated in more fraudulent transactions, did not receive comparable remuneration to the other conspirators, and contributed more to the conspiracy's

success than any other defendant).  No other subject of this investigation, aside from the corporate

entity Innospec itself, made as much money off the corrupt contracts, nor played a more critical

role in the success of the conspiracy.


V.      **SENTENCING RECOMMENDATION**

        Considering the extent of Naaman's cooperation as well as the factors identified in 18

U.S.C. § 3553(a), the government recommends a final sentence of 90 months incarceration.

Such a sentence would be a 25 percent reduction from the guidelines range of 120 months.  It is

appropriate given Naaman's cooperation, while bearing in mind the central role he played in the

crimes, the harm caused by such offenses, and the substantial financial benefit he derived and

intended to derive from his criminal activity.  The ten-year statutory cap has already resulted in a

significant reduction in the sentence Naaman would otherwise face.

        In addition, the Court should impose a criminal fine of $2,388,445.03, which what the

defendant earned through his criminal activity, provided the Probation Office finds he is not

unable to pay that amount.  The Court should ensure that the defendant does not keep his ill-

gotten gains.


VI.     **CONCLUSION**

        Individuals involved in international business must recognize that foreign bribery is a

serious crime with serious consequences.  At the same time, the Government understands the

importance of giving credit to defendants who provide substantial assistance to the government's

investigation and prosecution of others, particularly in the case of FCPA violations which can be

difficult to detect and prove.  The United States thus respectfully submits that a sentence of 90

months of incarceration, 25 percent below the agreed guideline range, properly recognizes

Naaman's cooperation, which had its limitations delineated above, while at the same time

provides adequate deterrence to the business community, punishes Naaman for his criminal

conduct, promotes respect for the law and for U.S. treaty obligations, and adequately considers

all of the 18 U.S.C. § 3553(a) factors.


Respectfully submitted,


DENIS J. McINERNEY
Chief, Fraud Section
Criminal Division, Department of Justice


*/s/ Kathleen M Hamann*
KATHLEEN M HAMANN
Trial Attorney, Fraud Section,
Criminal Division, Department of Justice


*/s/ Nathaniel B. Edmonds*
 NATHANIEL B. EDMONDS
Assistant Chief, Fraud Section
Criminal Division, Department of Justice

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date I caused a true and correct copy of the foregoing United States' Sentencing Memorandum and Motion for Downward Departure from Guideline Sentencing Range to be served by e-mail upon the following:

<u>Defense Counsel</u>

Abbe Lowell
Christopher Man
James Commons
McDermott Will & Emery LLP
600 13th Street, N.W.
Washington, DC 20005

<u>Probation Officer</u>

Kathie J. McGill
Senior United States Probation Officer
United States Probation Office
333 Constitution Avenue, N.W.
Washington, D.C. 20001

                                        */s/ Kathleen M Hamann*
                                        KATHLEEN M HAMANN
                                        Trial Attorney, Fraud Section
                                        Criminal Division, U.S. Department of Justice

Date:   January 22, 2011